No. 23-2248

IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

Kristin Worth, et al.,

Appellees,

vs.

Bob Jacobson, in his individual capacity
and in his official capacity as
Commissioner of the
Minnesota Department of Public Safety,

Appellant.

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

_____

**APPELLANT'S BRIEF**

_____

COOPER & KIRK, PLLC

David H. Thompson
Atty. Reg. No. 17-0143
Peter A. Patterson
Atty. Reg. No. 17-0144
William V. Bergstrom
Atty. Reg. No. 23-0238
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600

OFFICE OF THE ATTORNEY
GENERAL
State of Minnesota

LIZ KRAMER
Solicitor General
Atty. Reg. No. 0325089

AMANDA PRUTZMAN
Assistant Attorney General
Atty. Reg. No. 0389267

*Attorneys for Appellees*
*Kristin Worth, Austin Dye, Axel*
*Anderson, Minnesota Gun Owners*
*Caucus, Second Amendment*
*Foundation, and Firearms Policy*
*Coalition, Inc.*

445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
Telephone: (651) 757-1217

*Attorneys for Appellant Bob Jacobson,*
*Commissioner of the Minnesota*
*Department of Public Safety*

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

Appellees brought this civil rights case against the Commissioner of the Minnesota Department of Public Safety challenging the constitutionality of Minnesota's permit-to-carry statute, Minn. Stat. § 624.714, subds. 1(a) and 2(b)(2), which requires applicants for a permit to carry a gun be at least 21 years old. Appellees alleged the statute violates the Second Amendment of the federal constitution.

Cross-motions for summary judgment were briefed and argued after *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The District court granted Appellees' motion in part, ruling that the requirement that a person be at least 21 years old to receive a permit under Minn. Stat. § 624.714, subd. 2(b)(2) violates the Second Amendment right to keep and bear arms. App. 49-50; R. Doc. 84, at 49-50.

Oral argument is necessary because of the unique and important issues presented. If granted, the Commissioner requests that it be held in St. Paul and be 20 minutes per side.

i

# TABLE OF CONTENTS

Page

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT ....................i

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ....................................................................2

STATEMENT OF THE CASE ................................................................3

SUMMARY OF ARGUMENT ................................................................6

ARGUMENT ........................................................................................8

I.   THE PLAIN TEXT OF THE SECOND AMENDMENT DOES NOT COVER 18-TO-20-YEAR-OLDS FREELY CARRYING GUNS IN PUBLIC FOR SELF-DEFENSE. ...............................................................................8

    A.   18-to-20 Year Olds are Outside of the Scope of "The People" the Framers Intended. ...................................................................9

        1.   In the founding era, 18-to-20-year-olds were not part of the Nation's political community, and were instead considered minors who lacked judgment and required guardians. ...............................................................11

        2.   Militia statutes do not establish that minors had the independent right to freely carry a gun in public for self-defense ...............................................................17

    B.   From the Founding, States have the Power to Regulate Guns in the Hands of Irresponsible or Dangerous Groups like People Aged 18-to-20 ...................................................................22

        1. Legislatures have historically disarmed categories of people determined to pose a risk of danger with guns. ...............................23

Appellate Case: 23-2248     Page: 4     Date Filed: 07/14/2023 Entry ID: 5295912

2. The categorical regulation of people ages 18-to-20 is constitutional because it was enacted to ensure the public safety. .......................................................................27

II. BOTH THE COMMON LAW AND A MULTITUDE OF HISTORICAL REGULATIONS ESTABLISH THAT MINNESOTA'S STATUTE IS CONSISTENT WITH THE NATION'S HISTORICAL TRADITION OF FIREARM REGULATION. ......30

A. The Founding Era's Common Law and Regulations Unambiguously Show a History and Tradition of Limiting "Infants'" Access to Guns. ...................................................33

B. The Significant Number of Analogous Laws from Around the Reconstruction Era are the Proper Focus and Confirm a History and Tradition of Regulating Guns in the Hands of People Under 21. .......................................................................39

1. Technological and market changes created a result the Founders could not have anticipated and require a more nuanced approach to the analysis..............................................40

2. The States responded to mass-market availability of cheap handguns and the ratification of the Fourteenth Amendment by enacting a host of age-restrictions to reduce the risk of danger and ensure public safety..................42

3. No historic cases found age restrictions to be unconstitutional indicating that age restrictions were publicly understood to be in harmony with the Second Amendment. ..................................................................48

4. Age restrictions are more longstanding than firearms restrictions deemed to be presumptively lawful. ......................51

CONCLUSION ................................................................................53

ADDENDUM ...............................................................Add. 1 – App. 57

iii

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Brown v. Ent. Merchs. Ass'n*
  564 U.S. 786 (2011) ...................................................................................... Passim

*Bruen*'s next question of whether Minnesota's age restriction is consistent with the
  Nation's historical tradition of gun regulation. *Bruen*
  124 S.Ct. ..................................................................................................... 31, 32

*District of Columbia v. Heller*
  554 U.S. 570 (2008) ...................................................................................... Passim

*Dobbs v. Jackson Women's Health Org.*
  142 S. Ct. 2228 (2022) ...................................................................... 34, 35, 48, 49

*Ezell v. City of Chicago*
  651 F.3d 684 (7th Cir. 2011) ................................................................................. 48

*Frey v. Nigrelli*, 21-CV-05334-NSR-
  2023 WL 2473375 (S.D.N.Y. Mar. 13, 2023) ............................................... 38, 48

*Heller v. District of Columbia*
  670 F.3d 1244 (D.C. Cir. 2011) ........................................................................... 52

*Jones v. Bonta*
  34 F.4th 704 (9th Cir. 2022) ................................................................................. 51

*Kanter v. Barr*
  919 F.3d 437 (7th Cir. 2019)....................................................... 25, 26, 27, 28

*Mai v. United States*
  974 F.3d 1082 (9th Cir. 2020)......................................................................... 53, 54

*McDonald v. City of Chicago*
  561 U.S. 742 (2010) ............................................................................................... 8

iv

*Nat'l Rifle Ass'n. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*
 700 F.3d 185 (5th Cir. 2012)........................................................................Passim

*Nat'l Rifle Ass'n of Am., Inc. v. Swearingen*
 545 F. Supp. 3d 1247 (N.D. Fla. 2021)................................................ 19, 20, 22

*Nat'l Rifle Ass'n v. Bondi*
 61 F.4th 1317 (11th Cir. 2023) ...................................................................Passim

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
 142 S. Ct. 2111 (2022) .................................................................................Passim

*Parker v. District of Columbia*
 478 F.3d 370 (D.C. Cir. 2007) ............................................................... 23, 24

*Powell v. Tompkins*
 926 F. Supp. 2d 367 (D. Mass. 2013) ............................................................. 20

*Range v. Att'y Gen. United States*
 53 F.4th 262 (3rd Cir. 2022) ........................................................................... 17

*Range v. Att'y Gen. United States*
 69 F.4th 96 (3d Cir. 2023)........................................................................ 48, 52

*Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, __ F.
 2022 WL 17859138 (W.D. La. 2022)........................................................ 29, 30

*Torres v. Madrid*
 141 S. Ct. 989 (2021) ...................................................................................... 35

*Tyler v. Hennepin County*
 143 S. Ct. 1369 (2023) .................................................................................... 35

*U.S. v. Anderson*
 24 F. Cas. 813 (C.C.D. Tenn. 1812) ............................................................... 13

*United States v. Bena*
 664 F.3d 1180 (8th Cir. 2011)...................................................... 23, 25, 26, 33

v

*United States v. Booker*
644 F.3d 12 (1st Cir. 2011) ................................................................. 53

*United States v. Flores*
663 F.3d 1022 (8th Cir. 2011) ............................................................ 16

*United States v. Jackson*
69 F.4th 495 (8th Cir. 2023) ........................................... 25, 26, 27, 29

*United States v. Marzzarella*
614 F.3d 85 (3d Cir. 2010) ................................................................. 53

*United States v. Portillo-Munoz*
643 F.3d 437 (5th Cir. 2011) ........................................................ 16, 17

*United States v. Rene E.*
583 F.3d 8 (1st Cir. 2009) ............................................................ 30, 51

*United States v. Sitladeen*
64 F.4th 978 (8th Cir. 2023) .................................................... Passim

*United States v. Skoien*
614 F.3d 638 (2010) ........................................................................... 53

*United States v. Verdugo–Urquidez*
494 U.S. 259 (1990) ........................................................................... 16

*Washington v. Glucksberg*
521 U.S. 702, 712, 117 S. Ct. 2258 (1997) ...................................... 35

*Weed v. Jenkins*
873 F.3d 1023 (8th Cir. 2017) .............................................................. 9

*Wilson v. Arkansas*
514 U.S. 927 (1995) ........................................................................... 35

**STATE CASES**

69 Tenn. 714 (1878) .................................................................... 49, 50

Appellate Case: 23-2248    Page: 8    Date Filed: 07/14/2023 Entry ID: 5295912

*Andrews v. State*
50 Tenn 165 (1871) ................................................................ 49

*Coleman v. State*
32 Ala. 581 (1858) ................................................................ 50

*Commonwealth v. Callan*
6 Binn 255 (Pa. 1814) ........................................................... 12

*State v. Allen*
94 Ind. 441 (1884) ................................................................ 50

*State v. Hatch*
962 N.W.2d 661 (Minn. 2021) ............................................. 28

*State v. Paige*
256 N.W.2d 298 (Minn. 1977) ............................................. 28

*Tankersly v. Comm.*
9 S.W. 702, 703 (Ky. 1888) ................................................. 50

## FEDERAL STATUTES

28 U.S.C. § 1291 ..................................................................... 1

28 U.S.C. § 1331 ..................................................................... 1

42 U.S.C. § 1983 ..................................................................... 3

U.S. Const. amend. II ......................................................... 2, 18

## STATE STATUTES

Minn. Stat. § 624.714 .................................................. 2, 6, 7, 54

Minn. Stat. § 624.714, subd. 2(b)(2) ..................................... 1, 3

Minn. Stat. § 624.714, subd. 22 ...................................... 3, 8, 28

Minn. Stat. § 624.714, subds. 1(a) and 2(b)(2) ...................... 1, 3

Appellate Case: 23-2248     Page: 9     Date Filed: 07/14/2023 Entry ID: 5295912

Minn. Stat. § 624.714, subds. 1a ............................................................ 2

**FEDERAL RULES**

Fed. R. App. P. 32(a)(5) ............................................................ 56

Fed. R. App. P. 32(a)(6) ............................................................ 56

Fed. R. App. P. 32(a)(7)(B) ....................................................... 56

Fed. R. App. P. 32(f) ............................................................... 56

FRAP 32 .............................................................................. 56

**OTHER AUTHORITIES**

*Common Law and Legislation*
  21 Harv. L. Rev. 383 (1908) ................................................... 34

Historical Gun Laws Targeting "Dangerous' Groups and Outsiders
  12 *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in
    American Law and Society* (2023). ........................................ 26

  *The Historical Justification for Prohibiting Dangerous Persons from Possessing
    Arms*
  20 Wyo. L. Rev. 249 (2020) ................................................... 24

*The Meaning(s) of "The People" in the Constitution*
  126 Harv. L. Rev. 1078 (2013) ............................................... 17

The "Sensitive Places" Doctrine
  13 Charleston L. Rev. 205 (2018) ........................................... 32

*State Statute and Common Law*
  Pol. Sci. Q. 105-106 (1887) .................................................. 33

Historical state statutes and regulations
  (reproduced pursuant to Fed. R. App. P. 28(f)) ...................... ........Add. 51-57

Appellate Case: 23-2248    Page: 10    Date Filed: 07/14/2023 Entry ID: 5295912

# JURISDICTIONAL STATEMENT

The District court had jurisdiction over Appellees' federal constitutional claims under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291 to review the District court's March 31, 2023 order denying Appellant's motion for summary judgment and granting Appellees' motion for summary judgment in part. App. 49-50; R. Doc. 84, at 49-50. The District court entered judgment on April 25, 2023. R. Doc. 99. Appellant timely filed a Notice of Appeal on May 17, 2023. R. Doc. 100.

Appellate Case: 23-2248    Page: 11    Date Filed: 07/14/2023 Entry ID: 5295912

# STATEMENT OF ISSUES

1. Whether the requirement in Minnesota's permit-to-carry statute, Minn. Stat. § 624.714, that applicants be age 21 or older is constitutional either because the Second Amendment does not grant rights to 18-to-20-year-olds or because the state law is analogous to longstanding firearms restrictions.[1]

- U.S. Const. amend. II
- Minn. Stat. § 624.714, subds. 1a, 2(b)(2)
- *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)
- *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023)
- *United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023)
- *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023)

---

[1] Although not briefed substantively, the Commissioner does not waive the issue of sovereign immunity and maintains the district court erred in determining that the *Ex parte Young* exception applies. App. 44-47; R. Doc. 84, at 44-47.

- 2 -

## STATEMENT OF THE CASE

Age-restrictions like Minnesota's are part of the American tradition of gun regulation going back to both the founding and reconstruction eras. In passing the statute, Minnesota recognized the "fundamental, individual right to keep and bear arms" guaranteed by the Second Amendment. *See* Minn. Stat. § 624.714, subd. 22.

Appellees, three individuals between the ages of 18 and 20 and three gun-advocacy organizations, brought this 42 U.S.C. § 1983 civil rights case against the Commissioner of the Minnesota Department of Public Safety in his official and individual capacities[2] and three sheriffs of their home counties challenging the constitutionality of Minnesota's permit-to-carry statute, Minn. Stat. § 624.714, subds. 1(a) and 2(b)(2) under the Second Amendment and Fourteenth Amendment on June 7, 2021. R. Doc. 1. Minnesota's statute requires applicants for a permit to carry a gun be at least 21 years old. *See* Minn. Stat. § 624.714, subd. 2(b)(2). Appellees allege Minnesota's statute is unconstitutional facially and as applied to them and to 18-to-20-year-old women. R. Doc. 1, at 23-29.

The Commissioner submitted two expert reports: one by a constitutional historian, Saul Cornell, Ph.D., regarding the state of the law in the early American history as it relates to guns and people under 21, and one by a professor in empirical

---

[2] In response to the Commissioner's Motion for Summary Judgment, Plaintiffs agreed to dismiss their claims against the Commissioner in his individual capacity and for nominal monetary damages. R. Doc. 74, at 3, n.1.

- 3 -

legal studies, Professor John J. Donohue, regarding the social science and risk of gun violence from the 18-to-20-year-old age group. App. 53-169; R. Doc. 50-1, at 1, 51. Professor Cornell's report establishes that during the relevant historical period, people under 21 were minors who existed under total legal authority of their parents and includes an analysis of historical regulations restricting guns in the hands of people under 21. *Id*. at 1-50. Professor Donahue's report establishes that neurobiological and behavioral factors cause 18-to-20-year-olds to comprise the most dangerous and homicidal age group in the United States. *Id*. at 51-117. Appellees submitted no expert reports on any issue or rebuttal facts on these issues.

Because the Supreme Court issued its decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), setting forth a new test for reviewing Second Amendment challenges before the parties filed cross-motions for summary judgment on August 4, 2022, the new standard was applied by the parties. R. Docs. 40, 42, 45, 48, 48-1, 48-2, 49, 53, 72, 74, 76, 77, 78, and 79. Oral argument was held on October 5, 2022.

On March 31, 2023, the District court denied the defendants' motions and granted in part plaintiffs' motion. The court concluded Subdivision 2(b)(2)'s "requirement that a person must be at least 21 years of age to receive a permit to publicly carry a handgun in Minnesota violates the rights of individuals 18–20 years

- 4 -

old to keep and bear arms protected by the Second and Fourteenth Amendments."

App. 49-50; R. Doc. 84, at 49-50.

Appellate Case: 23-2248   Page: 15   Date Filed: 07/14/2023 Entry ID: 5295912

## SUMMARY OF ARGUMENT

This Court should reverse the District court and dismiss the Complaint because Section 624.714 is constitutional. Pursuant to *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Court is to consider whether 18-to-20-year-olds freely carrying guns in public for self-defense falls within the plain text of the Second Amendment, and if so, whether Section 624.714 is historically analogous to America's tradition of gun regulation.

On the first question, the textual inquiry, people under 21 are not within "the people" intended by the Framers. It is an undisputed fact that during the founding era, 18-to-20-year-olds were minors without the full spectrum of legal rights that adults had. People under 21 were "infants" in the eyes of the law, lacking in judgment and existing under strict parental authority. Minors did not have the independent right to carry a gun in public for self-defense. Further, states have historically regulated groups believed to be dangerous with guns to ensure the public safety. Because "the people" did not include minors at the time of the founding, Section 624.714 is constitutional. The Court's inquiry need go no further.

But if the Court proceeds to the second question, Section 624.714 remains constitutional because it is consistent with the American tradition of firearm regulation and analogous to regulations in founding and reconstruction eras for two reasons. First, an American tradition of age-restrictions can be found in the common

- 6 -

law of the founding era which prevented minors from independently carrying in public without their parents' consent. Second, around the reconstruction era, the states responded to a change in the dominant type of gun and the ratification of the Fourteenth Amendment with a plethora of laws regulating guns in the hands of minors under 21. Section 624.714 is analogous to these historical regulations because both were enacted to keep guns out of the hands of people under 21 and both were enacted to ensure public safety. For these reasons, Section 624.714 is constitutional and the Court should reverse the District court and dismiss the complaint.

Appellate Case: 23-2248    Page: 17    Date Filed: 07/14/2023 Entry ID: 5295912

# ARGUMENT

## I. THE PLAIN TEXT OF THE SECOND AMENDMENT DOES NOT COVER 18-TO-20-YEAR-OLDS FREELY CARRYING GUNS IN PUBLIC FOR SELF-DEFENSE.

In Minnesota as well as the United States, 18-to-20-year-olds commit homicide at disproportionately higher rates than *any* other age group. App. 115; R. Doc. 50-1, at 63. Neuroscience and social science data shows 18-to-20-year-olds have three unique characteristics which makes them more dangerous with guns: their cognitive systems are under-developed increasing their risk of impulsive behavior, the onset of mental illness during this period is correlated with suicide attempts, and the frequent binge drinking associated with this age group is a stimulant to violence. *Id.* at 56. Scientific research consistently shows that legislative restrictions on groups that pose a risk to public safety with guns effectively reduces violent crime. *Id.* at 62. The District court found that the "Minnesota Legislature made the empirical judgment that individuals under 21 present greater risks when carrying firearms and believed preventing them from carrying the handguns in public is consistent with the Second Amendment." App. 30; R. Doc. 84, at 30 (*citing* Minn. Stat. § 624.714, subd. 22).

Following the landmark Second Amendment cases of *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court explained in *Bruen* that the individual right to bear arms extends outside the home. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

Appellate Case: 23-2248    Page: 18    Date Filed: 07/14/2023 Entry ID: 5295912

*Bruen* dispatched with the means-ends scrutiny adopted by the circuits after *Heller* and *McDonald*. *Id.* at 2126. "The original scope of the right based on its historical meaning" now controls. *Id.* Courts must determine if the plain text of the Second Amendment covers an individual's conduct. If so, the government must show that its regulation is consistent with the Nation's historical tradition. *Id.*

Here, the plain text of the Second Amendment does not cover 18-to-20-year-olds freely carrying guns for self-defense outside the home for two reasons. First, history establishes that the original scope of "the people" in the Second Amendment did not include people under 21 years of age because at common law they were minors lacking judgment and without legal capacity, who were not a part of the political community. Second, from the beginning of our Nation's history, state legislatures have regulated categories of people based on the risk they pose a danger to the public with guns. The decision below should be reversed because the permitting statute does not violate the Second Amendment. Constitutional claims and a grant of summary judgment are reviewed *de novo*. *Weed v. Jenkins*, 873 F.3d 1023, 1028 (8th Cir. 2017).

### A. 18-to-20 Year Olds are Outside of the Scope of "The People" the Framers Intended.

*Bruen* "decide[d] nothing about *who* may lawfully possess a firearm." 142 S. Ct. at 2157 (Alito, J., concurring) (emphasis added). This Court acknowledged as much recently in *United States v. Sitladeen*, 64 F.4th 978, 984 (8th Cir. 2023) (noting

- 9 -

that "*Bruen* does not address the meaning of 'the people'" in the Second Amendment). Instead, *Bruen* directs courts to look to history to determine whether people under 21 during the founding and reconstruction eras were considered part of "the people."[3]

Unlike today, 18-to-20-year-olds were not adults when the Second Amendment was ratified in 1791 or even when the Fourteenth Amendment was ratified in 1868. At common law, people under 21 were minors, also known as "infants," throughout both periods. At both times, the common law age of majority remained 21. *Nat'l Rifle Ass'n. v. Bureau of Alcohol, Tobacco, Firearms and Explosives* ("*BATFE*"), 700 F.3d 185, 201 (5th Cir. 2012) *abrogated on other grounds*, *Bruen*, 142 S. Ct. at 2129-30. The age of majority did not change until the latter half of the twentieth century. "[I]t was not until the 1970s that States enacted legislation to lower the age of majority to 18." *Id.* Although the *Bruen* plaintiffs' age was not at issue, the Court repeatedly emphasized that they were "adult" citizens, confirming that age is important for Second Amendment considerations. *Bruen*, 142 S. Ct. at 2125, 2134, *id.* at 2157 (Alito, J., concurring).

---

[3] The author of the majority opinion in *Bruen*, Justice Thomas, authored a dissent a decade earlier examining the legal status of minors in the founding era in detail to support his conclusion that the Framers' understanding of the First Amendment freedom of speech did not include the right of minors to access speech without parental consent. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 821-39 (2011) (Thomas, J., dissenting). The historical research included in the *Brown* dissent is relevant here and is discussed further *infra.*

- 10 -

History and tradition establish that minors under 21 did not have the right to freely carry guns in public for self-defense. During all relevant times minors under 21 were "infants" in the eyes of the law and were not legally autonomous members of the political community. Further, militia statutes from the founding era do not negate this fact and do not prove that people under 21 had an independent right to freely carry a gun in public for self-defense.

1. **In the founding era, 18-to-20-year-olds were not part of the Nation's political community, and were instead considered minors who lacked judgment and required guardians.**

Minors were seen as "infants" in the eyes of the law and were dependent constitutional actors during the founding era. App. 56; R. Doc. 50-1, at 4. Early legal scholarship explained "[t]he rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights." *Id.* at 12, *citing* John Bouvier, 1 Institutes of American Law 148 (1858). A primary reason for denying minors rights was that they were viewed as lacking in judgment and were categorized along with the mentally ill for this reason. *Id.* at 14. Justice Thomas recognized this fundamental founding era belief: "Children lacked reason and decisionmaking ability. They 'have not Judgment or Will of their own,' John Adams noted." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 826–27 (2011) (Thomas, J., dissenting) (citing Letter from John Adams to James Sullivan (May 26, 1776), in 4 Papers of John

Appellate Case: 23-2248     Page: 21     Date Filed: 07/14/2023 Entry ID: 5295912

Adams 210 (Robert Taylor ed. 1979)). Indeed, it was universally understood by people in the founding era that people under 21 had "*utter* incapacity." *Id.* (emphasis added).

As a result, minors in the founding era could not participate in the Nation's hallmark civic duties in the way today's 18-to-20-year-olds can. "Indeed, the law imposed age limits on all manner of activities that required judgment and reason." *Id.* at 834. "Children could not vote, could not serve on juries…" *Id.* (*citing* Holly Brewer, *By Birth or Consent* 97 (2005)). In fact, "[a]ll states settled on the age of twenty-one as appropriate for voting privileges." Brewer, *supra*, at 43. *See also Brown*, 564 U.S. at 826–27 (*citing* 1 1787: Drafting the United States Constitution, 229 (Wilbourn Benton ed., 1986) (quoting Gouverneur Morris in James Madison's notes from the Constitutional Convention explaining that children do not vote because they "want prudence" and "have no will of their own")).

Minors under 21 also needed their parents' consent to enlist in the military. Minors lacked the legal capacity to enlist both before and after the American Revolution. As of 1813, all minors under 21 required parental consent to enlist in the Army. *Commonwealth v. Callan*, 6 Binn 255, 256 (Pa. 1814) (*per curiam*). Even prior to the 1813 federal law, 18-to-20-year-olds who enlisted without parental consent could be discharged from the military against their will upon their parents' request. *See U.S. v. Anderson*, 24 F. Cas. 813, 814 (C.C.D. Tenn. 1812) (18-year-

- 12 -

old enlistee discharged at the request of his father because "[m]en … enlisted under the age of twenty-one, without the consent of their parents, masters or guardians, are illegally confined….it is obvious that Congress did not intend the minor should have any discretion, either as to enlistment or discharge. The whole matter is entirely a concern of the father.") In addition to the risk of being involuntarily discharged, boys who enlisted without parental consent could discover "that their fathers were entitled to their military wages." *Brown*, 564 U.S. at 833-34 (Thomas, J., dissenting).

Not only was their participation in the voting, jury service, and the military curtailed, but minors under 21 existed wholly under their parent or guardian's authority. App. 62-64; R. Doc. 50-1, at 10-12. "The history clearly shows a founding generation that believed parents to have complete authority over their minor children." *Brown*, 564 U.S. at 834 (Thomas, J. dissenting) (*citing* Blackstone for the proposition that parents had "power over their children," were entitled to the "value of th[e] [children's] labor and services," and that children could not marry "without parental consent" (alterations in original)). For example, sons 16 years or older committed a *capital* offense if they disobeyed "the voice of his Father, or the voice of his Mother." *Id.* at 824. This overarching authority could be delegated to schools, where professors or teachers had similar authority over minors. "The concept of total parental control over children's lives extended into the schools. 'The government both of families and schools should be absolute.'" *Id.* at 830 (quotation omitted).

- 13 -

"Minors attending college did not become autonomous individuals who enjoyed broad freedom but instead traded strict parental authority for an equally restrictive rule of *in loco parentis*." App. 66; R. Doc. 50-1, at 14. Minors existed under the legal authority of their parents or guardians until the age of 21.

The Court in *Heller* made it clear that "the people" "unambiguously refers to all members of the political community, not an unspecified subset." *D.C. v. Heller*, 554 U.S. 570, 580 (2008). Appellees may argue that also means people 18-to-20-years-old. But while those 18 and older are adults today, they were not in the founding era. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad" *or* too narrow. *Id.* at 634-35. The Court should analyze the scope of the right as it existed in history and keep in mind that "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136. As "constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," it is clear that minors 18-to-20-years old were not part of the political community during the founding or reconstruction eras.[4] *Id.* (emphasis in original) (quoting *Heller*, 554 U.S.

---

[4] As in *Bruen*, the public understanding with respect to the rights of minors to freely carry guns for self-defense in public was the same in both eras. 142 S. Ct. at 2138.

Appellate Case: 23-2248     Page: 24     Date Filed: 07/14/2023 Entry ID: 5295912

at 634-35). It is an undisputed fact[5] that 18-to-20-year-olds were minors at all relevant times and did not possess the full spectrum of legal rights that adults of the time had. App. 62-67; R. Doc. 50-1, at 10-15. Appellees have acknowledged, citing sources from both the founding and reconstruction eras, that 18-to-21-year-olds were minors: "To the extent [historical] laws restricting the rights of minors applied to 18-to-20-year-olds, they did so because 18-to-20-year-olds were minors under the legal protection of their parents or guardians. R. Doc. 42, at 23 (citing 1 William Blackstone, *Commentaries* *441; 1 John Bouvier, *Institutes of American Law* 148 (Robert Peterson, ed., 1851) (explaining that upon reaching the age of majority, "every man is in full enjoyment of his civil and political rights.")). Justice Thomas acknowledged, "[a]dmittedly, the original public understanding of a constitutional provision does not always comport with modern sensibilities." *Brown*, 564 U.S. at 836 (Thomas, J., dissenting).

The district court erred when it held that "the people" were members of the "national community," instead of looking at whether 18-to-20-year-olds are part of the "political community." App. 14; R. Doc. 84, at 14; *Sitladeen*, 64 F.4th at 983-84. In examining the meaning of "the people," *Heller* makes clear that the people

---

[5] Appellees submitted no expert report in this matter nor any competing facts rebutting the Commissioner's expert report that 18-to-20-year-olds were not legally minors and therefore failed to create a genuine issue of material fact on this issue. The only facts in this case decided on summary judgment on this issue are those submitted by Appellant through its expert reports.

- 15 -

relevant to Second Amendment analysis is the "political community": "'[T]he people' . . . unambiguously refers to all members of the political community" *Heller*, 554 U.S. at 580. Although it was discussed, the Court did not adopt the term "national community" from the Fourth Amendment case, *United States v. Verdugo–Urquidez,* 494 U.S. 259 (1990). The term "national community" appears nowhere in *Bruen*.

The Court's recent decision in *Sitladeen* makes clear that for purposes of the Second Amendment, "the people" are all members of the "political community" rather than the "national community" referenced by the district court. 64 F.4th at 983-84. *Sitladeen* held the Eighth Circuit is bound by a four-sentence opinion holding that illegal aliens are not part of "the people" to whom the Second Amendment applies. *Id.* (discussing *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011)). The Court explained, "Although *Flores* offered little analysis of its own, we cited favorably the Fifth Circuit's decision in *United States v. Portillo-Munoz*." *Id. United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011), rejected the plaintiff's argument that "the people" includes all members of the "national community": stating "We do not find that the use of 'the people' in both the Second and the Fourth Amendment mandates a holding that the two amendments cover exactly the same groups of people." 643 F.3d 437, 440-41. Instead, "we find it reasonable that an affirmative right [to bear arms] would be extended to fewer groups than would a

- 16 -

protective right [to be free from unlawful searches and seizures]." *Id.* at 441. Taken together, *Flores*, *Portillo-Munoz*, and *Sitladeen* confirm that the Eighth Circuit has rejected the use of "national community" in defining "the people" for purposes of the Second Amendment. Instead "the people" protected by the Second Amendment are members of "the political community."[6]

The political community at the time of the founding was eligible voters, namely white, male, yeomen farmers. *See* Note, *The Meaning(s) of "The People" in the Constitution*, 126 Harv. L. Rev. 1078, 1085 (2013). The political community "as it then existed" was "free, Christian, white men." *Range v. Att'y Gen. United States*, 53 F.4th 262, 276 (3rd Cir. 2022) *vacated*, *reh'g en banc granted* 56 F.4th 992 (3rd Cir. 2023), *rev'g*, 69 F.4th 96 (3rd Cir. 2023). And in this case, the unrebutted material facts establish that people 18-to-20 were minors without the right to vote and lacking in almost every other right given to those who had reached the age of majority. App. 62-67; R. Doc. 50-1, at 10-15. Because minors 18-to-20-years-old were not legally-autonomous members of the political community, they are not part of "the people" in the plain text of the Second Amendment.

---

[6] The District court did not have the benefit of *Sitladeen* when it issued its opinion, as its opinion preceded *Sitladeen's* release.

Appellate Case: 23-2248    Page: 27    Date Filed: 07/14/2023 Entry ID: 5295912

### 2. Militia statutes do not establish that minors had the independent right to freely carry a gun in public for self-defense.

Militia statutes are not evidence that minors under 21 had the right to freely carry a gun for their self-defense without the authority or supervision of a parent or a militia superior. Appellees argued below that various state militia statutes and the federal Militia Act of 1792 were evidence that 18-to-20-year-olds were part of "the people," but this argument fails to overcome the significant, unrebutted evidence above of their lack of legal capacity for at least three reasons. First, *Heller* held that the Second Amendment right is not connected to militia service. Second, when needed, minors were required to serve in militia under military discipline and order, entirely consistent with their common law status. Third, if the militia statutes are evidence of a Second Amendment right, then states would not have been given so much autonomy to define their militia membership.

On the first point, the Second Amendment right is independent of the militia. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Appellees have argued below that because 18-to-20-year-olds were part of the militia referenced in the Second Amendment's prefatory clause, then the right to keep and bear arms explained in the operative clause must also apply to them. R. Doc. 77, at 7-8. But the Second Amendment protects "an individual right to use arms for self-defense" that is "*unconnected* with

- 18 -

militia service." *Heller*, 554 U.S. at 605 (emphasis added); *Nat'l Rifle Ass'n of Am., Inc. v. Swearingen*, 545 F. Supp. 3d 1247, 1258 (N.D. Fla. 2021) (citing *Heller* 554 U.S. at 599) ("*Heller* held that the Second Amendment encompassed a right to possess arms for self-defense that stands outside the militia context."), *aff'd sub nom. Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023). Appellees have explained that it is precisely because the right is disconnected from militia service that people who fall outside of the categories compelled to muster for militia (*i.e.* women) also have Second Amendment rights. R. Doc. 77 at 8. But Appellees cannot have it both ways. Because the right is unconnected to militia service, it does not necessarily follow that because certain people were *compelled* to be in militia that they also had a *right* to freely carry a gun for individual self-defense.

A duty to defend one's state and country does not create a right to arms for defense of self. "[T]he conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Heller*, 554 U.S. at 627. Males under 21 were capable of military service, but lacked legal capacity to independently purchase and freely carry firearms. Because males under 21 lacked legal capacity, many states required parents, guardians, and "masters" to *obtain* arms for their minor charges. *See* Add. 51-53. There would be no need for such laws if males under 21 could purchase or keep their own guns.

- 19 -

Instead, these laws ensured that a group who did not otherwise have the means or ability to procure arms had them in order to assist with the collective (but not self) defense.

Second, the minimum ages in militia statutes were set as a result of the needs of the militia and do not correspond with who had a right to carry guns in the founding era. Militia statutes sometimes set the minimum age at 18, sometimes 21, sometimes 16. This fluctuation is explained through the need for more soldiers and a larger militia in times of war than in times of peace. "In times of war, the age for service in the militia crept down towards sixteen; in times of peace, it crept up towards twenty-one." *Swearingen*, 545 F. Supp. 3d at 1258; *see also Powell v. Tompkins*, 926 F. Supp. 2d 367, 387 (D. Mass. 2013) ("The minimum age for militia service varied wildly across the colonies and early states, ranging from as low as sixteen to as high as twenty-one."). When they were called to serve, minors under 21 served subject to militia order and discipline. App. 64-65; R. Doc. 50-1, at 12-13. Additionally, minors likely served alongside their fathers, uncles, or grandfathers. Even when participating in the "hue and cry," minors were participating under the supervision of legal adults and were not free to do as they pleased. *Id.* at 14.[7] Tellingly, Appellees have pointed to nothing in the historical record showing that

---

[7] This fact was uncontroverted in summary judgment. Appellees introduced no expert report.

Appellate Case: 23-2248    Page: 30    Date Filed: 07/14/2023 Entry ID: 5295912

minors under 21 had the unimpeded right to freely carry guns for their own self-defense.

The historical evidence shows that when minors were required to muster at 18, it was because of the physical strength associated with that age, not because of their responsible judgment or legal agency. The legislative history of the Militia Act of 1792, cited by Appellees below, confirms that the "period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen…. the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field." R. Doc. 42, at 11-12, (alteration in original) (quoting 2 *Annals of Cong.* 2146, 2153 (1834)). It was noted that "from eighteen to twenty-one was found to be *the best* age[8] to make soldiers of." *Id.* at 12 (emphasis in original) (quoting 2 *Annals of Cong.* 1860 (1834)). The purpose of militia laws was to ensure strong militias to defend state or country, not for exercising any individual right to self-defense. Consequently, the militia statutes are of limited value in defining the right of minors 18-to-20-years-old to freely carry a gun outside their home for self-defense.

---

[8] Modern social science explains why 18-to-21 years of age was thought to be the ideal age for a soldier. Besides their physicality, 18-to-20-year-olds do not have fully developed neurobiological systems. Because their pre-frontal cortexes are not mature, their rational thinking is overridden by more "impulsive, emotional, or irrational behavior." App. 110; R. Doc. 50-1, at 58. They are more highly susceptible to social pressures and are "more likely to act on negative emotions like stress or rage." *Id.* at 57.

- 21 -

Third, militia statutes cannot logically serve as evidence of who possessed the federal right to bear arms, because states were authorized to enact militia statutes and they varied greatly. "[T]he states had enormous authority over the militia—including the power to either provide arms or require militia members to provide their own." *Swearingen*, 545 F. Supp. 3d at 1258 (internal citation and quotation omitted). The Militia Act of 1792 set the minimum age (at 18) but allowed states to set the ages differently if they chose to. And they did. *See e.g.*, An Act to exempt minors from Militia Duty in time of peace (1829), reprinted in *A Compilation of the Public Laws of the State of New-Jersey, Passed Since the Revision in the Year 1820*, at 266 (Josiah Harrison ed., 1833); An Act to regulate the Militia, 1843 Ohio Acts 53, § 2 (setting minimum age at 21). If militia statutes are evidence of a federal right, it does not follow that the federal government would permit states the authority to alter the boundaries of that right.

### B. From the Founding, States have had the Power to Regulate Guns in the Hands of Irresponsible or Dangerous Groups like People Aged 18-to-20.

State legislatures historically had the power to restrict groups believed to be irresponsible or dangerous with firearms to ensure public safety.[9] Although our determination of what groups are dangerous has changed over time, what has remained constant is a state's ability to restrict groups believed to be dangerous with

---

[9] *See* R. Doc. 49, at 28, 31; R. Doc. 72, at 5-6, 16.

Appellate Case: 23-2248     Page: 32     Date Filed: 07/14/2023 Entry ID: 5295912

guns. In enacting Section 624.714, Minnesota determined people ages 18-to-20 carrying guns in public posed a public danger, as have many states across the country, and courts have upheld such regulations post-*Bruen*.

### 1. Legislatures have historically disarmed categories of people determined to pose a risk of danger with guns.

The ability to carry a gun has always been subject to certain restrictions, including those related to public safety. The Second Amendment text was "meant to codify a *pre-existing* right." *Bruen*, 142 S. Ct. at 2130 (emphasis in original); *accord United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011). This pre-existing right "was subject to restrictions at common law" and was not unlimited. *Bena*, 664 F.3d at 1183 (*citing Parker v. District of Columbia,* 478 F.3d 370, 399 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008)). Accordingly, the common law in effect in the founding era is critical for determining the public understanding of the Second Amendment. "The language of the Constitution cannot be interpreted safely except by reference to the common law … *when the instrument was framed and adopted*." *Bruen*, 142 S. Ct. at 2139 (emphasis in original) (citation omitted).

The common law at the time the Second Amendment was ratified permitted legislatures to consider public safety. The "government's interest in public safety [is] consistent with our common law tradition." *Parker*, 478 F.3d at 399. There is no dispute on this point. Even the Director of Constitutional Studies for Appellee

- 23 -

Firearms Policy Coalition wrote, "[p]reserving public safety was the underlying rationale for the restrictions" throughout the colonial, founding, and nineteenth century periods. Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 273 (2020) (analyzing felon-in-possession laws). There is "one controlling principle that applied to each period: violent or otherwise dangerous persons could be disarmed" even if the broader categorical restrictions covered some who posed no risk. *Id.* at 272. Greenlee argued, "[t]hat some people are too dangerous to permit to have firearms is" not only "a good public policy reason" but is also "historically accurate." *Id.* at 281 (internal quotation omitted).

States have historically had the power to regulate a group based upon a determination that they pose a risk to public safety, are irresponsible, or are dangerous. "History shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people." *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023). Indeed, "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Id.* at 504. In fact, "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting) *abrogated by Bruen*, 142 S. Ct. at 2127. Public

- 24 -

safety has always been a concern. "[T]hreatened violence and the risk of public injury" is the "same concern that animated English and early American restrictions on arms possession." *Id*. at 456. (Barrett, J., dissenting)

Further evidence that the public understood that dangerousness was a sufficient reason to disarm a group can be found in a constitutional amendment proposed by Pennsylvania delegates in 1787: "no law shall be passed for disarming the people or any of them, unless for crimes committed, *or real danger of public injury from individuals*." *Bena*, 664 F.3d at 1184; *citing* The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents, *reprinted in* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971) (emphasis added). Therefore, history "does support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous." *Kanter*, 919 F.3d. at 464 (Barrett, J., dissenting). This Court has already held that legislatures have the power to categorically restrict groups deemed dangerous. *Jackson*, 69 F.4th at 505.

Sound judgment and responsibility with firearms are key. The Supreme Court has repeatedly described the class of individuals to which the right extends as "law-abiding, responsible citizens." *See e.g.*, *Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2156. The right to arms was tied to the idea of a "virtuous" citizen, which allows laws disarming "those who, like *children* or the mentally unbalanced, are deemed

- 25 -

incapable of virtue." *Bena*, 664 F.3d at 1183-84 (emphasis added) (upholding federal statute that was "focused on a threat presented by a specific category of presumptively dangerous individuals."). There is a "common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens." *Bena*, 664 F.3d at 1184.

Status-based restrictions varied over time, and included, for example, Catholics, Native Americans, slaves, people who would not swear a loyalty oath to the government. *Jackson*, 69 F.4th at 502–03; *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). While our sensibilities regarding regulating certain groups have evolved, one thing has not changed: legislatures have the power to regulate groups based on dangerousness. It is the historical understanding that legislatures had the power to disarm categories of people considered dangerous, irresponsible, or a threat to public safety that controls, not their determination of *who* may be disarmed in 1791. "One can accept that the Framers denied firearms to groups they thought to be particularly dangerous (or unvirtuous, or irresponsible) without sharing their conclusion about which groups qualify as such." Blocher & Catie Carberry, Historical Gun Laws Targeting "Dangerous' Groups and Outsiders 12, *in New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (Joseph Blocher, Jacob Charles, & Darrell Miller, eds., 2023). "While some of these categorical prohibitions [i.e. race-based] of course would be

Appellate Case: 23-2248     Page: 36     Date Filed: 07/14/2023 Entry ID: 5295912

impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th at 503; *see also Kanter v. Barr*, 919 F.3d at 458 (Barrett, J., dissenting).

This "historical approach," which focuses on the reasoning behind historical categorical restrictions, "resolves the gap through analogical reasoning: by suggesting that our modern prohibition is based on a principle that the Framers endorsed." Blocher & Carberry, *supra*, at 12. "That *some* categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details." *Kanter*, 919 F. 3d at 464 (Barrett, J., dissenting) (emphasis in original) (internal citation omitted). Legislatures may fill in the details "based on present-day judgments about categories of people whose possession of guns would endanger the public safety." *Id.* In fact, restrictions grounded in concern for dangerousness are "lineal descendants" of historical laws banning people thought to be dangerous from possessing guns. *Id.* at 464-65.

### 2. The categorical regulation of people ages 18-to-20 is constitutional because it was enacted to ensure the public safety.

Minnesota's age restriction is a modern example of a state's historical power to exclude certain groups' access to guns based on a risk of dangerousness. Courts around the country have upheld similar age restrictions using the *Bruen* analysis.

- 27 -

Minnesota enacted its age-restriction "to prevent the possession of firearms in places where they are most likely to cause harm in the wrong hands, i.e., in public places where their discharge may injure or kill intended or unintended victims." *State v. Hatch*, 962 N.W.2d 661, 664 (Minn. 2021) (quoting *State v. Paige*, 256 N.W.2d 298, 303 (Minn. 1977)).

Minnesota made a determination that this age group posed a risk to public safety and believed its age restriction comported with the Second Amendment. "Minnesota enacted the age requirement in 2003 for reasons that align with these very concerns, with the Legislature balancing safety interests against its understanding of the right to keep and bear arms." *Id.* at 38 (citing Minn. Stat. § 624.714, subd. 22). This decision is well-supported by social science, which shows this age group is more dangerous with firearms than any other age group. App. 113-118; R. Doc. 50-1, at 61-66. There is nothing in the record contradicting the historical or social science research referenced above.

Indeed, the District court said it had no basis in the record to question the conclusions reached by the Commissioner's expert regarding the dangerousness of this age-group, the effectiveness of Minnesota's age restriction, and the social science that the "still-developing nature of 18–20-year-olds' brains [is linked] to increased impulsivity and a prediction that greater access to firearms among young adults leads to disproportionate rates of violent crimes involving firearms and

- 28 -

suicides." App. 38-39; R. Doc. 84, at 38-39. The District court was wrong, however, to conclude that Minnesota does not have the power to categorically restrict people under 21 from publicly carrying guns. The power to restrict groups that pose a risk of danger with guns has belonged to legislatures since the founding era, as *Jackson* has already decided. 2023 WL 3769242 at *5.

Additionally, courts around the country have upheld age restrictions post-*Bruen*. *See Bondi*, 61 F.4th at1326-27 (finding Florida's law prohibiting people under 21 from purchasing guns consistent with nation's historical tradition of firearm regulation on this age group to "enhance public safety."); *Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, __ F. Supp. 3d. ___, 2022 WL 17859138, at *10 (W.D. La. 2022) (upholding federal law prohibiting sale of guns or ammunition to people under 21 based on "historical evidence that safety-based restrictions were not thought to violate the Second Amendment.")

Pre-*Bruen* cases also found age restrictions comport with historical tradition. Cases decided before *Bruen* that engaged in a historical review are "broadly consistent with *Heller*," *Bruen*, 142 S. Ct. at 2126–27 and, accordingly, their analyses have been relied upon after *Bruen*. *See Reese*, 2022 WL 17859138 at *8-10 (following extensive historical analysis in *BATFE*). Based on a similar historical review, the First Circuit concluded, "[t]here is some evidence that the founding generation would have shared the view that public-safety-based limitations of

- 29 -

juvenile possession of firearms were consistent with the right to keep and bear arms." *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009). Historical cases show "[f]rom at least the Civil War period, that regulating juvenile access to handguns was permissible on public safety grounds and did not offend constitutional guarantees of the right to keep and bear arms." *Id.*[10] Minnesota's age restriction is consistent with a longstanding tradition of excluding select groups' access to guns for the sake of public safety.

18-to-20-year-olds were not part of "the people" intended by the Framers because they were minors at common law, dependent constitutional actors who were not part of the political community, and lacked the right to freely carry guns in public for self-defense. Militia statutes are not evidence that such an independent right existed during the founding era. Further, states have historically regulated groups believed to be dangerous with guns to ensure the public safety. As the plain text of the Second Amendment does not cover 18-to-20-year-olds carrying guns in public, the inquiry under *Bruen* should end here.

---

[10] Although the First Circuit was reviewing a federal ban on those under 18 in *Rene E*, "because the line between childhood and adulthood was historically 21, not 18, the First Circuit's conclusion that there is a 'longstanding tradition' of preventing persons under 18 from 'receiving' handguns applies with just as much force to persons under 21." *BATFE*, 700 F.3d at 204.

Appellate Case: 23-2248     Page: 40     Date Filed: 07/14/2023 Entry ID: 5295912

## II. BOTH THE COMMON LAW AND A MULTITUDE OF HISTORICAL REGULATIONS ESTABLISH THAT MINNESOTA'S STATUTE IS CONSISTENT WITH THE NATION'S HISTORICAL TRADITION OF FIREARM REGULATION.

Because the plain text of the Second Amendment does not cover 18-to-20-year-olds carrying guns in public, it is not necessary to proceed to *Bruen*'s next question of whether Minnesota's age restriction is consistent with the Nation's historical tradition of gun regulation. *Bruen*, 124 S.Ct. at 2129-30. If the inquiry proceeds, however, the Court should use analogical reasoning to determine if the modern regulation is "relevantly similar" to the historical regulation. *Id.* at 2132. And the Court is to do so by considering "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.

But the government is only required to "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original); *see also Sitladeen*, 64 F.4th at 985. The Supreme Court cautioned in *Bruen* that "relatively few" regulations in the historical record is not a bar to a finding of historical tradition. *Id.* at 2133 (analyzing D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018)).[11] Here, the

---

[11] This article cited, tellingly, only *one* regulation from the founding era but several from the reconstruction era which the Court indicated was sufficient to find a historical tradition. D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 235-36) (2018) (citing only Delaware's 1776 constitution). Two other statutes from 1647 and 1650, which predate the 1791 ratification of the Second Amendment by more than 140 years are too far removed to be used in (Footnote Continued on Next Page.)

- 31 -

District court required too similar of an analogue in all respects, indicating that only a "dead ringer" law from the founding era that was identical in exactly how and exactly why it burdened the right would suffice to find Minnesota's age restriction constitutional. *Bruen*, 142 S. Ct. at 2133.

The District court also improperly rejected all evidence of reconstruction era regulation. But the Supreme Court specifically declined to determine which time period – founding era or reconstruction era – applies when analyzing historically analogous regulations. *Bruen*, 142 S. Ct. at 2138; *Bondi*, 61 F.4th at 1323. This Court has said "regulations in effect at or near the time of the Second Amendment's ratification carry *more weight* in the analysis than those that existed long before or after that period." *Sitladeen*, 64 F.4th at 985 (emphasis added) (citing *Bruen*, 142 S. Ct. at 2136). But if founding era regulations carry "more weight," then reconstruction era regulations carry at least *some* weight rather than no weight at all.

Minnesota's age restriction is consistent with our Nation's historical tradition of gun regulation and is constitutional for two reasons. First, analogous historical precedent exists in the common law and confirming historical regulations from the founding era. *See also supra* I.B. (arguing that dangerous groups have been excluded from the definition of "the people" throughout history). Second, a plethora of

---

analogous reasoning under *Bruen*, especially when Appellees argue that reconstruction era laws post-dating 1791 by approximately 50 years are too far removed to be used. R. Doc. 77, at 10-12.

- 32 -

analogous statutes from around the reconstruction era codified the common law understanding that free public carriage of guns by those under 21 was not permissible. A more nuanced approach to the analogical reasoning required by *Bruen* considers the plethora of analogous statutes from around the reconstruction era which limited guns in the hands of minors under 21.

## A. The Founding Era's Common Law and Regulations Unambiguously Show a History and Tradition of Limiting "Infants'" Access to Guns.

The Second Amendment codified a pre-existing common law right. *Heller,* 554 U.S. at 592; *Bena*, 664 F.3d at 1183. The common law, while not written in the same manner as statutes, governed founding era society and was the basis of American legal development. Munroe Smith, *State Statute and Common Law*, 2 Pol. Sci. Q. 105-06 (1887). In this case, the undisputed facts prove that pursuant to common law in effect around 1791, people under 21 were not adults but were "infants under the law" or minors with limited legal capacity and rights. *See* I.A *supra*.

*Bruen* does not limit the government to identifying an analogous statute from the founding era. Rather, "the court will uphold [the challenged regulation] so long as the government can 'identify an *American tradition* justifying' the regulation.'" *Sitladeen*, 64 F.4th at 985 (*citing Bruen*, 142 S. Ct. at 2138) (emphasis added). The common law should not be dismissed simply because of its form. Judge-made law

- 33 -

ordered society during the founding era, was binding law, and exemplified the public understanding of the right to carry at that time.

> Roughly speaking, the first century of American judicature was taken up with determining the applicability of the several doctrines of the common law to this country and working out the potential applications of common law principles to American conditions. Hence it was marked by fresh and living juristic thought and vigorous judicial law-making.

Roscoe Pound, *Common Law and Legislation*, 21 Harv. L. Rev. 383, 403 (1908). The common law "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

The Supreme Court has relied on the common law as evidence of the public understanding of rights at the time of the founding in other constitutional cases, and the Second Amendment should be no different. The Supreme Court has reviewed and given weight to "eminent common-law authorities (Blackstone, Coke, Hale, and the like)" in other constitutional cases. *E.g., Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2249 (2022); *see also Heller*, 554 U.S. at 603 (referring to English common law as consistent with its interpretation of the Second Amendment); *Tyler v. Hennepin County*, 143 S. Ct. 1369, 1376-77 (2023) (analyzing common law from pre-colonial era through reconstruction era in context of the Fifth Amendment); *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (confirming Supreme Court "precedents have interpreted the term 'seizure' by consulting the common law of arrest"); *Washington v. Glucksberg*, 521 U.S. 702, 712, 117 S. Ct. 2258, 2263-64

- 34 -

(1997) (incorporating common law into constitutional analysis and noting the importance of Blackstone at the time: "Sir William Blackstone, whose Commentaries on the Laws of England not only provided a definitive summary of the common law but was also a primary legal authority for 18th and 19th-century American lawyers"); *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995) (explicitly incorporating common law into Fourth Amendment jurisprudence: "In evaluating the scope of this right, we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing.")

With respect to minors' rights to freely carry arms in public, and similar to the history of the codification of abortion discussed in *Dobbs*, "American law followed the common law until a wave of statutory restrictions in the 1800s" codified the common law and limited minors' rights to guns. *Dobbs*, 142 S. Ct. at 2248. Indeed, "during the Reconstruction Era—when the people adopted the Fourteenth Amendment, thereby making the Second Amendment applicable to the States—many States responded to gun violence by 18-to-20-year-olds by prohibiting that age group from even possessing deadly weapons like pistols." *Bondi*, 61 F.4th at 1320; *see also infra* II.B.2; Add. at 54-57. The common law in effect during the founding era is the American tradition which is historically analogous to Minnesota's age restriction.

Appellate Case: 23-2248    Page: 45    Date Filed: 07/14/2023 Entry ID: 5295912

Appellees have argued "[a]t the time the Second Amendment was ratified, not only were there *no laws in any state* that purported to limit the rights of 18-to-20-year-olds to carry firearms for self-defense, there were several laws enacted, including the Militia Act of 1792, that *required* 18-year-olds to buy and maintain firearms." R. Doc. 42, at 18 (emphasis in original). It is not surprising there is a dearth of statutes from the founding era because the common law controlled. *See* Pound, *supra*, at 403. It is similarly unsurprising, then, that the Militia Act of 1792 and state militia laws exist as they were *contrary* to the common law by *requiring* minors to acquire guns for militia purposes, something not generally permitted under the common law. State militia statutes, which make parents responsible for their minors' firearms in some way, are further proof that at common law minors had no independent ability to obtain and freely carry firearms in public for self-defense without their parent, guardian, or master's authorization. *See* Add. 51-53.

Founding era collegiate regulations confirm the common law and the public understanding that people under 21 lacked the right to freely carry firearms in public. Minors who left their parental home and went to college traded parental authority for the guardianship authority of their college *in loco parentis*. App. 66; R. Doc. 50-1, at 14. In turn, many colleges exercised authority over students by prohibiting their access to firearms. For example, in 1800 Yale College prohibited students' possession of any guns or gun powder. *Id.*; Add. 53. In 1811, the University of

- 36 -

Georgia issued a regulation that "no student shall be allowed to keep any gun, pistol, … in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever." *Id*. at 15. And in 1838, the University of North Carolina issued an ordinance stating, "No Student shall keep … firearms, or gunpowder." *Id*.

These founding era collegiate regulations confirm that minors had no legal agency independent of parents or guardians. The District court erred in not affording them proper weight. The fact that multiple colleges used their *in loco parentis* authority to keep guns out of the hands of their students[12] at a time when there were few colleges is evidence of a tradition of regulation. The District court found these laws were not relevant analogues because they were not "the product of a legislative body elected by founding-era voters." App. 30; R. Doc. 84, at 30. But that analysis misses the point. *Bruen* places no size or scope limitations on the reach of historical analogues nor does it require analogues be passed by an elected public body rather than another entity. *See also Frey v. Nigrelli*, 21-CV-05334-NSR-, 2023 WL 2473375 at *19 (S.D.N.Y. Mar. 13, 2023) (finding historical private rail regulations adequate analogy for modern laws prohibiting carrying on public transportation).

---

[12] The District court assumed there would be college students older than 21 in the founding era to which these regulations could apply. *See* App. 30; R. Doc. 84, at 30. In fact, the oldest student in the 1757 class of Harvard, which was "typical of that period," was 19. Iran Mohsenin, *Note on Age Structure of College Students*, 23 Hist. of Educ. Q. 491, 492 (1983).

- 37 -

These regulations and Minnesota's statute are relevantly similar in both the "why" and "how." As to the "why," both demonstrate an understanding that 18-to-20-year-olds are not competent to make responsible decisions with guns and pose a risk of dangerousness to themselves and to others as a result. As to the "how," both attempt to keep guns out the hands of 18-to-20-year-olds by prohibiting the keeping, and some even the carrying, of guns. Notably, Minnesota's statute is narrower, prohibiting only the public carrying of guns.

Municipal ordinances also reflect an American tradition of regulating guns in the hands of minors to improve public safety. App. 67; R. Doc. 50-1, at 15; *see also* Add. at 54. For example, New York made guardians responsible for minors' firearms violations in 1803. *Id.* In 1817, Columbia, South Carolina enacted an ordinance allowing seizure of weapons held by minors in the city. *Id.* Finally, in 1857, Louisville, Kentucky did not allow the sale of gunpowder to minors without the consent of a parent or guardian. *Id*. at 15-17. These historical municipal regulations are similar in the reasons and the methods by which they regulate the rights of minors to Minnesota's statute. The District court incorrectly found that the first two ordinances burdened the right for different reasons and in different ways. App. 32-33; R. Doc. 84, at 32-33. But like Minnesota's statute, these ordinances were passed to reduce the risk of danger this age group posed to the public; by preventing the firing of guns where they pose the greatest risk of danger to others. Both operate by

Appellate Case: 23-2248    Page: 48    Date Filed: 07/14/2023 Entry ID: 5295912

restricting minors' access to guns. *Bruen* does not require a historical "dead ringer," it is enough that the laws are "relevantly similar." Municipal regulations are evidence of the founding era public understanding of that age restrictions comported with the Second Amendment.

**B.** **The Significant Number of Analogous Laws from Around the Reconstruction Era are the Proper Focus and Confirm a History and Tradition of Regulating Guns in the Hands of People Under 21.**

Laws from the 1800s are relevant to the analogical reasoning required by *Bruen* because they confirm the common law and are evidence that the public at the time understood age restrictions to be constitutional. "Legal commentators viewed the reconstruction era statutes as constitutional." *Bondi*, 61 F.4th at 1330. Thomas Cooley, a "'judge and professor' 'who wrote a massively popular 1868 Treatise on Constitutional Limitations' agreed that 'the State may prohibit the sale of arms to minors' pursuant to the State's police power.'" *BATFE*, 700 F.3d at 203 (quoting *Heller*, 554 U.S. at 616-17 (relying on Cooley's interpretations as persuasive)). Cooley "recognized the validity of imposing age qualifications on arm sales" while acknowledging that the "federal and State constitutions provide that the right of the people to bear arms shall not be infringed." *Id.* Cooley was cited favorably in *Heller* for his understanding of the Second Amendment right, yet he understood that it was constitutionally permissible to regulate minors under 21 to ensure public safety. 554 U.S. at 616-17.

- 39 -

A plethora of historically analogous laws from before and around the time the Fourteenth Amendment was ratified in 1868 establish that Minnesota's statute is within the nation's history and tradition of regulating guns in the hands of 18-to-20-year-olds. The combined weight of reconstruction era laws is substantial and should not be dismissed for four reasons. First, technological changes led to a result the Founders could not have anticipated and require a more nuanced approach. Second, the states responded to these technological changes and the ratification of the Fourteenth Amendment by enacting a host of age restrictions to ensure public safety. Third, no historic decisions found age restrictions to be unconstitutional. Finally, age restrictions are more longstanding than presumptively lawful firearms restrictions.

1. **Technological and market changes created a result the Founders could not have anticipated and require a more nuanced approach to the analysis.**

There are several reasons why there are more historically analogous statutes from this era. First, prior to 1800, there were sixteen states. By the time the Fourteenth Amendment was ratified, there were thirty-eight states. More states had the opportunity to pass more laws on this issue. Second, the states responded to the application of the Second Amendment to them by passing laws regulating guns in the hands of minors under 21 to enhance public safety and reduce the risk of danger posed by this age group. As the laboratories for democracy, the states unsurprisingly

- 40 -

did not address the "why" in identical ways, but the ultimate effect of all laws was to reduce guns in the hands of minors under 21.

Finally, the marketplace had a significant impact:

The market revolution of the Jacksonian period transformed American life, making a host of consumer goods—from wooden clocks to firearms—widely available for the first time. The impact of this interconnected set of changes in production, marketing, consumption, and technology transformed gun culture by making a variety of weapons, including pistols, more common.

App. 69; R. Doc. 50-1, at 17. At the time of the Second Amendment, "90% of the guns owned by Americans were long guns" but the "market revolution of the early nineteenth century made cheaper handguns widely available *for the first time in American history*." *Id*. (emphasis added). Suddenly, at approximately the same time the Second Amendment was applicable to the states, handguns multiplied within the populace. States responded by passing laws to address the increased risk of danger and effect public safety, many of which were age restrictions. *Bondi*, 61 F.4th at 1320.

Here, the marked increase in availability of handguns brought about by the market revolution requires a more nuanced approach than the District court applied when reviewing historical analogues. "[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132. "[T]he Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id*. The Founders could not

- 41 -

have anticipated such a rapid growth in the change of the dominant type of gun and the availability of cheap handguns. A nuanced approach would involve consideration of these facts coupled with consideration of the combined weight of the multiple historic laws enacted after the market revolution in the mid-to-late 1800's. These laws provide more than enough relevantly similar regulations to Minnesota's statute to find that it is within the Nation's history and tradition of gun regulation.

> **2. The States responded to mass-market availability of cheap handguns and the ratification of the Fourteenth Amendment by enacting a host of age-restrictions to reduce the risk of danger and ensure public safety.**

"[B]y the end of the 19th century, nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of 'minors' to purchase or use particular firearms while the state age of majority was set at age 21." *BAFTE*, 700 F.3d at 202; *citing* 1856 Ala. Acts 17; 16 Del. Laws 716 (1881); 27 Stat. 116–17 (1892) (District of Columbia); 1876 Ga. Laws 112; 1881 Ill. Laws 73; 1875 Ind. Acts 86; 1884 Iowa Acts 86; 1883 Kan. Sess. Laws 159; 1873 Ky. Acts 359; 1890 La. Acts 39; 1882 Md. Laws 656; 1878 Miss. Laws 175–76; Mo. Rev. Stat. § 1274 (1879); 1885 Nev. Stat. 51; 1893 N.C. Sess. Laws 468–69; 1856 Tenn. Pub. Acts 92; 1897 Tex. Gen. Laws 221–22; 1882 W. Va. Acts 421–22; 1883 Wis. Sess. Laws 290; 1890 Wyo. Sess. Laws 1253. *See also* Add. 54-57.

Appellate Case: 23-2248     Page: 52     Date Filed: 07/14/2023 Entry ID: 5295912

These laws show that at least 20 states attempted to limit the possibility of guns actually making their way into the hands of minors under 21. Laws that restrict the sale or giving of guns to minors necessarily restrict the carriage of guns; if people under 21 did not have a gun to carry, they could not carry. All of these restrict minors' access to guns address the heightened risk of danger posed by this age group with guns and to protect public safety. For example, the earliest provides it is unlawful to "sell or give or lend, to any male minor, a[n]… air gun or pistol." 1856 Ala. Acts 17; Add. 54.

Some had exceptions for parents or guardians, which confirms that these laws codified the founding era common law. *See*, *e.g.*, 1859 Ky. Acts 245 § 23 (making it unlawful for anyone "other than the parent or guardian," to "sell, give, or loan any pistol … cane-gun, or other deadly weapon … to any minor"); Mo. Rev. Stat. § 1274 (1879) (making it unlawful to "sell or deliver, loan or barter to any minor" any "deadly or dangerous weapon … without the consent of the parent or guardian of such minor"); 1881 Ill. Laws 73 (making it unlawful for anyone other than a minor's father, guardian, or employer to "sell, give, loan, hire or barter," or to "offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer … or other deadly weapon of like character"); 1897 Tex. Gen. Laws 221–22 (making it unlawful to "knowingly sell, give or barter, or cause to be sold, given or bartered

- 43 -

to any minor, any pistol … without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof"); *see also* Add. 57.

Further confirming the public understanding of the relationship between legal capacity and the right to bear arms from the founding era common law, some states placed minors on par with intoxicated or mentally ill people. *See* 1883 Kan. Sess. Laws 159 ("Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver …or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor."); 1878 Miss. Laws 175-76 (making it unlawful "for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any … pistol"); *see also* Add. 55-57.

Rather than restrict ownership, some laws specifically identified the narrower limitation of carriage of guns. *See* Nev. Rev. Stat. § 4864 (1885) (making it unlawful for anyone "under the age of twenty-one (21) years" to "wear or carry any pistol, sword in case, slung shot, or other dangerous or deadly weapon"); 1890 La. Acts 39 (making it unlawful "for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years"); 1890 Wyo. Terr. Sess. Laws 140 (making it "unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol… or other deadly

- 44 -

weapon that can be worn or carried concealed upon or about the person") Notably, Wisconsin not only prohibited the sale or giving of guns to minors, it also prohibited carriage and authorized the seizure of guns. *See* 1883 Wis. Sess. Laws 290 ("It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriff's, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession.")*; see also* Add. 56-57.

The District court disposed of these historical analogues in one paragraph, finding that not a single one of the 22 laws from the 1800's was sufficiently similar to Minnesota's age-restriction to evidence a history and tradition per *Bruen*. App. 37; R. Doc. 84, at 37. In doing so, the District court read *Bruen* too narrowly, and required an "ideological twin" and "dead ringer" rather than a relevantly similar historical analogue. 142 S. Ct. at 2133. These reconstruction era laws all burden the right similarly to Minnesota's statute in the "how" and the "why." While different methods may be employed, the intended effect is the same: to reduce the number of guns in the hands of people under 21. Both the historical and modern laws prevent those under 21 from carrying a gun in public. Section 624.714 allows those under 21 to carry a gun at home, on their premises and land, and in the fields and waters of the state for hunting or target practice, so it poses even less of a burden than historical laws. Second, the justification for the historical law and the modern laws

- 45 -

are near identical. 18-to-20-year-olds pose a greater danger to themselves and others with guns than any other age group. Then, as now, states determined it was an important use of their police powers to limit guns in the hands of minors in order to enhance public safety. *Bondi*, 61 F.4th at 1331. Because these laws are historically analogous to Minnesota's age restriction, they are probative of its constitutionality.

Reconstruction era analogues should be given some weight, especially given the technological changes the Founders could not have anticipated. A more nuanced approach would weigh the combined weight of these reconstruction era statutes. In *Bruen*, the Court "acknowledge[d] that there is an ongoing scholarly debate on whether courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." 142 S. Ct. at 2138 (emphasis added). The debate is whether *primary* reliance should be on the founding era or reconstruction era, not whether either era should receive *no* consideration. In *Heller*, the Court "reiterated that evidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represented a 'critical tool of constitutional interpretation.'" *Bruen*, 142 S. Ct. at 2136 (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 605). The Court did not indicate which was more persuasive, but did indicate that laws that long predate *either* amendment are not instructive, which again indicates that the reconstruction era should not be ignored.

- 46 -

> Constitutional rights are enshrined with the scope they were understood to have when the people adopted them. The Second Amendment was adopted in 1791; *the Fourteenth in 1868*. Historical evidence that long predates *either date* may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.

*Id* at 2136 (emphasis added) (internal citation omitted). The Court did not take a stand on either time period. Rather, it indicated that both should be considered. The District court erred when it failed to consider the combined weight of the multitude of relevantly similar laws from the 1800s in favor of a finding that only regulations from the founding era are relevant. R. Doc. 84, at 36-7. *Bruen* indicates that both time periods are relevant to the analysis. *Heller* found reconstruction era views about the scope of the Second Amendment particularly "instructive" as to the "*origins* and continuing significance" of the Second Amendment. 554 U.S. at 614 (emphasis added). "The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 *or the Reconstruction generation in 1868*." *Bruen*, 142 S. Ct. at 2132 (emphasis added).

Post-*Bruen*, courts have recognized that "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States." *Bondi*, 61 F.4th at 1323; *see also Range v. Att'y Gen. United States*, 69 F.4th 96, 112 (3d Cir. 2023) (*en banc*) (Ambro, J., concurring) ("the relevant period may extend beyond the Founding era."); *Frey*, 2023 WL 2473375, at *13 ("[T]he Supreme Court's

- 47 -

language demonstrates that there is an open question regarding how much importance to attribute to historical evidence from the Fourteenth Amendment's ratification period, and not whether that evidence deserves any weight.").

Before *Bruen*, the Seventh Circuit found that the reconstruction time period controls. *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.")

The 1868 time period is the most appropriate focus when considering state regulations, especially when a significant number of states passed nearly identical laws. In *Dobbs*, the Supreme Court noted the importance of "grounding in the constitutional text, history, or precedent," and disapprovingly noted, "*Roe*'s failure even to note the overwhelming consensus of state laws in effect in 1868 is striking, and what it said about the common law was simply wrong." *Dobbs*, 142 S. Ct. at 2237, 2267. Similarly, here the consensus of state laws around 1868 should not be ignored. Their combined weight should inform the analysis in a nuanced approach under *Bruen.*

- 48 -

**3. No historic cases found age restrictions to be unconstitutional indicating that age restrictions were publicly understood to be in harmony with the Second Amendment.**

Courts of the time did not find age restrictions to be offensive to the Second Amendment. Indeed, there is a marked absence of cases from the 1700s or 1800s which find age restrictions to be unconstitutional, and only one challenge. In *State v. Callicutt*, the Tennessee Supreme Court[13] case cited by Cooley's treatise, considered a constitutional challenge to a state law that criminalized the selling, giving, or loaning of pistols to minors. 69 Tenn. 714, 714-15 (1878). In upholding the law, the court found the act "not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *Id.* at 717. The challenged age restriction was aimed at "the pernicious and dangerous practice of carrying arms," and was not "intended to affect, and [did] not in fact abridge," the right to keep and bear arms. *Id.* at 715–17. *Callicutt* found the age restriction served an important public safety purpose and was constitutional.

---

[13] *Heller* repeatedly endorsed the Tennessee Supreme Court's understanding of the Second Amendment right favorably. *See* 554 U.S. at 603, 608, 613-14, 629. Three years after *Callicutt*, the Tennessee Supreme Court found a different law constitutionally infringed on the right. *Andrews v. State*, 50 Tenn 165 (1871).

- 49 -

A few other cases reviewed convictions under historical age restrictions, though there were no other constitutionality challenges.[14] *See Coleman v. State,* 32 Ala. 581, 582–83 (1858) (upholding conviction under 1856 state law making it a misdemeanor to "sell, give, or lend, to any male minor, a pistol" when the age of majority was 21.); *State v. Allen,* 94 Ind. 441 (1884) (remanding charge for "unlawfully barter[ing] and trad[ing] to … a minor under the age of twenty-one years, a certain deadly and dangerous weapon, to wit: a pistol, commonly called a revolver, which could be worn or carried concealed about the person" for reasons unrelated to constitutionality of the statute.); *Tankersly v. Comm.*, 9 S.W. 702, 703 (Ky. 1888) (dismissing appeal from jury verdict finding defendant guilty of selling deadly weapon to minor). These cases, as well as the laws they examine, are evidence of a public understanding of the right which is not in conflict with age-restrictions.

Tellingly, from the nation's founding to the twentieth century, there are no cases other than *Callicutt* which examine a constitutional challenge to an age-restriction.[15] No historical cases have found an age restriction to be unconstitutional.

---

[14] While some may attempt to dismiss the importance of these pre-reconstruction decisions by claiming the challenged laws were passed with improper motives, the cases are good law and represent the public understanding of the scope of the right at the time.

[15] After it was decided, *Callicutt* wasn't cited again for 151 more years until, in 2009, it was cited in *Rene E. See* 583 F.3d at 14. Then, as of the date of this brief, (Footnote Continued on Next Page.)

- 50 -

Pursuant to *Bruen*, determinations that a historical law was unconstitutional are relevant. "And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 142 S. Ct. at 2131. But the converse must also be true: the absence of constitutional challenges *and* the absence of findings of unconstitutionality as to age restrictions is probative evidence of constitutionality. "For the most part, cases from this time did not address the constitutionality of laws that regulated firearm ownership by young adults." *Jones*, 34 F.4th at 720, *op. vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022). "Indeed, the fact that there was apparently only a single challenge to these twenty statutes' constitutionality until well into the twentieth century suggests that the public understanding at the time of the ratification considered the statutory prohibitions constitutionally permissible." *Bondi*, 61 F.4th at 1330.

### 4. Age restrictions are more longstanding than firearms restrictions deemed to be presumptively lawful.

Age restrictions are more longstanding than the "presumptively lawful" "longstanding prohibitions" mentioned in *Heller* such as restrictions on felons and

---

it was cited seven more times between 2012 and 2023. *Callicutt's* conclusion was not cited negatively for 164 years, until in 2022 it was cited in in *Jones v. Bonta*, 34 F.4th 704, 720 (9th Cir. 2022), vacated on reh'g, 47 F.4th 1124 (9th Cir. 2022).

- 51 -

the mentally ill. 554 U.S. at 626-27, n.6. The Supreme Court has recognized that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Bruen*, 142 S. Ct. at 2137 (internal quotation omitted); *see also Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (A "regulation that is 'longstanding,' which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right.") No matter what side they have come down on, since *Bruen*, the circuits have similarly held that longstanding prohibitions enjoy a presumption of constitutionality. *See*, *e.g., Bondi*, 61 F.4th at 1330 ("We can see no reason why, when we are construing a constitutional provision incorporated against the States by the Fourteenth Amendment the rule should be any different where a governmental practice has been open, widespread, and unchallenged since the early days of the Reconstruction era ratification."); *Range*, 69 F.4th at 112 (*en banc*) (Ambro, J. concurring) ("[T]he more longstanding a prohibition, the more likely it is to be constitutional.")

Age restrictions, while similar to other prohibitions enacted for the public safety that are presumptively constitutional, are significantly more "longstanding." *Heller*'s list of "presumptively lawful" and "longstanding measures" – prohibitions on possession by felons, the mentally ill, carry restrictions in sensitive places, for example – are not as longstanding as age restrictions. *See* 554 U.S. at 626-27, n.6.

Appellate Case: 23-2248    Page: 62    Date Filed: 07/14/2023 Entry ID: 5295912

As *Heller*'s list was a non-exhaustive list, others are possible. *United States v. Marzzarella*, 614 F.3d 85, 92-93 (3d Cir. 2010). The earliest of these "presumptively lawful" "longstanding measures" can be traced to 1938 at the most. "Heller considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of those bans are of mid-20th century vintage." *BATFE*, 700 F.3d at 196 (citing *United States v. Booker*, 644 F.3d 12, 23-24 (1st Cir. 2011) (the federal felon-in-possession-ban was not enacted until 1938); *see also United States v. Skoien*, 614 F.3d 638, 641 (2010). Likewise, the the earliest restriction on the possession of firearms by the mentally ill appears to be the 1930 Uniform Firearms Act, which "prohibited the delivery of a pistol to any person of 'unsound' mind." *Mai v. United States*, 974 F.3d 1082, 1089 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing *en banc*). The federal statute "which forbids possession by a person 'who has been adjudicated as a mental defective or who has been committed to a mental institution,' was not enacted until 1968…" *Skoien*, 614 F.3d at 641.

But age restrictions like Minnesota's are even older. The earliest historically analogous state statute was before the reconstruction era in 1856, seventy-four years earlier than the earliest presumptively lawful measure identified by *Heller*. *Compare* App. 70; Add.54-57; R. Doc. 50-1, at 18 (citing 1856 Alabama statute); *with Mai*, 974 F.3d at 1089 (regarding 1930 federal statute). Historical age restrictions are not only much more longstanding than the "presumptively lawful" measures mentioned

- 53 -

in *Heller*, they are also historically analogous to Minnesota's age restriction, and therefore proof of its constitutionality.

## CONCLUSION

For the aforementioned reasons, Appellant requests the Court reverse the District court and grant summary judgment to Appellant based on a conclusion that Minnesota's age restriction in Minn. Stat. § 624.714 comports with the Nation's historical tradition of gun regulation.

Dated: July 11, 2023

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ Amanda Prutzman
AMANDA PRUTZMAN
Assistant Attorney General
Atty. Reg. No. 0389267

LIZ KRAMER
Solicitor General
Atty. Reg. No. 0325089

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1217 (Voice)
(651) 282-5832 (Fax)
Amanda.Prutzman@ag.state.mn.us
Liz.Kramer@ag.state.mn.us

ATTORNEYS FOR APPELLEE BOB
JACOBSON, COMMISSIONER FOR
THE MINNESOTA DEPARTMENT OF
PUBLIC SAFETY

- 55 -

## CERTIFICATE OF COMPLIANCE
## WITH FRAP 32

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,953 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 pt Times New Roman font.

s/ Amanda Prutzman
AMANDA PRUTZMAN
Assistant Attorney General

- 56 -

## CERTIFICATE OF COMPLIANCE
## WITH 8th Cir. R. 28A(h)(2)

The undersigned, on behalf of the party filing and serving this brief and

certifies that the brief has been scanned for viruses and

that they are virus-free.


<span style="margin-left:3em">s/ Rea Bastian</span>
<span style="margin-left:3em">Rea Bastian</span>

|#5537833-v1

Appellate Case: 23-2248     Page: 67     Date Filed: 07/14/2023 Entry ID: 5295912