## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

————————————

KRISTIN WORTH, et al.

Plaintiffs-Appellees,

v.

BOB JACOBSON, in his individual capacity and in his official capacity as Commissioner of the Minnesota Department of Public Safety,

Defendant-Appellant.

————————————

On Appeal from the United States District Court
for the District of Minnesota

————————————

## BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
## SUPPORTING APPELLANT AND REVERSAL

————————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

ANDREW M. LUGER
  *United States Attorney*

MARK B. STERN
ABBY C. WRIGHT
COURTNEY L. DIXON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7246*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 353-8189*

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST AND SUMMARY .........................................................1

STATEMENT OF THE CASE .................................................................................3

      A.    Statutory Background ................................................................3

      B.    Prior Proceedings ....................................................................5

ARGUMENT .........................................................................................................6

I.     Age-Based Firearms Regulations Are Consistent with the
Second Amendment ............................................................................6

II.    The District Court Properly Cast No Doubt on the
Constitutionality of the Federal Restrictions .......................................21

CONCLUSION ....................................................................................................24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** Page(s)

*Brown v. Entertainment Merchs. Ass'n,*
564 U.S. 786 (2011) ............................................................. 7, 22

*Crawford v. Washington,*
541 U.S. 36 (2004) ..................................................................... 20

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ................................... 2, 3, 6, 8, 11, 13, 14, 16, 19, 20, 22

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ............................................................. 20, 22

*National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
700 F.3d 185 (5th Cir. 2012), *abrogated on other grounds by*
*New York State Rifle & Pistol Ass'n v. Bruen,*
142 S. Ct. 2111 (2022) ....................................... 1, 4, 8, 9, 10, 13, 15, 17, 22

*National Rifle Ass'n v. Bondi,*
61 F.4th 1317 (11th Cir. 2023), *reh'g en banc granted, vacated by*
2023 WL 4542153 (11th Cir. July 14, 2023) .................... 2, 10, 11, 12, 17, 18, 19, 21

*New York State Rifle & Pistol Ass'n v. Bruen,*
142 S. Ct. 2111 (2022) ........................... 2, 6, 7, 13, 14, 18, 19, 20, 21, 22, 24

*Ramos v. Louisiana,*
140 S. Ct. 1390 (2020) ............................................................... 20

*Roth v. United States,*
354 U.S. 476 (1957) ............................................................. 19-20

*State v. Callicutt,*
69 Tenn. 714 (1878) ................................................................... 11

*United States v. Alvarez,*
567 U.S. 709 (2012) ................................................................... 19

*United States v. Jackson,*
69 F.4th 495 (8th Cir. 2023) ................................................... 9-10, 10

*United States v. Portillo-Munoz,*
643 F.3d 437 (5th Cir. 2011) ........................................................ 14

*United States v. Rene E.*,
    583 F.3d 8 (1st Cir. 2009) ............................................. 17

*United States v. Sitladeen*,
    64 F.4th 978 (8th Cir. 2023) .......................................... 14

**Constitution:**

N.C. Const. of 1868, art. XII, § 1 ..................................... 16

**Statutes:**

Act of Mar. 26, 1790, ch. IV, 1 Stat. 104 ...........................7

Act of Jan. 29, 1795, ch. XX, 1 Stat. 415 ...........................7

Act of Mar. 20, 1797, ch. LXXXI, No. 1., § 15, *in The Laws of the State of*
    *Vermont, Digested and Compiled* (1808) ............................23

Militia Act, 1 Stat. 271 (1792):
    § 1, 1 Stat. at 272 ....................................................15
    § 2, 1 Stat. at 272 ....................................................15

Omnibus Crime Control and Safe Streets Act of 1968,
    Pub. L. No. 90-351, tit. IV, § 901(a)(2), 82 Stat. 197, 225 ...........4

18 U.S.C. § 921(a)(21) ...................................................4

18 U.S.C. § 921(a)(21)(C) ...............................................4

18 U.S.C. § 922(a)(1) ....................................................4

18 U.S.C. § 922(b)(1) ............................................. 3, 4, 21

18 U.S.C. § 922(c)(1) ............................................. 3, 4, 21

Minn. Stat. § 624.713, subdiv 1(1) ..................................... 4

Minn. Stat. § 624.714, subdiv. 1a ..................................... 5

Minn. Stat. § 624.714, subdiv. 2(b)(2) ................................ 5

Appellate Case: 23-2248    Page: 4    Date Filed: 07/20/2023 Entry ID: 5297722

Minn. Stat. § 624.714, subdiv. 9 ......................................................... 5

Minn. Stat. § 624.7131, subdiv. 4 ....................................................... 4

**Rule:**

Fed. R. App. P. 29(a) ......................................................................... 1

**Legislative Materials (Federal):**

S. Rep. No. 88-1340 (1964) ............................................................... 3

S. Rep. No. 90-1097 (1968) ............................................................... 4

**Legislative Materials (State):**

Act of Mar. 6, 1810, ch. CVII, § 28, 1810 Mass. Laws 151, 176 ..................................... 23

Act of Dec. 22, 1820, ch. XXXVI, § 46, 1820 N.H. Laws 287, 321 ............................... 23

Act of July 14, 1825, ch. I, § 24, 1825 Mo. Laws 533, 554 ............................... 24

1856 Ala. Acts 17, No. 26, § 1 ............................................................... 10

ch. CLXIV, § 34, 1821 Me. Laws 658, 570-71 ............................................. 24

1875 Ind. Laws 59, ch. XL, § 1 ............................................................. 10

**Other Authorities:**

An Act for raising levies and recruits to serve in the present expedition
against the French, on the Ohio, ch. II, §§ I-III, in 6 Hening (1819) ..................... 15

An Act for the better regulating and training the Militia, ch. II, §§ II-III,
in 6 Hening (1819) ......................................................................... 15

Appellate Case: 23-2248    Page: 5    Date Filed: 07/20/2023 Entry ID: 5297722

An Act for the settling and better Regulation of the Militia, ch. II, § II, in 4 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislatures, in the Year 1619* (William Walter Hening ed., 1820) ...................................................................................15

An Act to exempt minors from Militia Duty in time of peace (1829), *reprinted in A Compilation of the Public Laws of the State of New-Jersey, Passed Since the Revision in the Year 1820* (Josiah Harrison ed., 1833) ...........................16

An act to oblige the free male inhabitants of this state above a certain age to give assurance of Allegiance to the same, and for other purposes, ch. III (1777), in 9 Hening (1821) ...................................................................17

1 William Blackstone, *Commentaries on the Law of England* (1765) ................................. 8, 22

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) .........................11

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, Yale L. & Pol'y Rev. Inter Alia (Oct. 26, 2021), https://perma.cc/8994-XJH9 ..................................................7

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309 (1991) .............................16

John Faucheraud Grimké, *The South Carolina Justice of Peace* (R. Aitken & Son eds., 1788) .................................................................12-13, 13

*Vivian E. Hamilton, Adulthood in Law and Culture*, 91 Tul. L. Rev. 55 (2016) .................................................................... 8

*James Madison's Notes of the Constitutional Convention, August 7, 1787*, Yale L. Sch. Avalon Project, https://perma.cc/QJ7B-D4J4 .........................................9

Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*, 71 U. Cin. L. Rev. 1345 (2003) ................................................................ 9

2 James Kent, *Commentaries on American Law* (1827) ..............................................8

Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* (2000) ...............................................................8, 9

*Letter from John Adams to James Sullivan, 26 May 1776*, Nat'l Archives, https://perma.cc/CE79-RA8K .................................................................7

*Letter from Thomas Jefferson to Samuel Smith, 3 May 1823*, Nat'l Archives, https://perma.cc/2CJB-N7RS .................................................................9

v

John Locke, *Two Treatises of Government* (Peter Laslett ed., Cambridge 1960) .................. 9

*Militia Act, 25 November 1755*, Nat'l Archives,
https://perma.cc/2DFN-Z2GN ...................................................................................... 23

2 *The Code of North Carolina* ch. 35, § 3168 (William T. Dortch, John Manning,
& John S. Henderson eds., 1883) .............................................................................. 23

*The Code of the State of Georgia*, pt. 1, tit. 11, chs. 1, 2, §§ 981, 1027
(Richard H. Clark et al. eds., 1861) .......................................................................... 16

4 *The Statutes at Large of Pennsylvania from 1682 to 1801* (James T. Mitchell &
Henry Flanders eds., 1897) ........................................................................................ 7

Univ. of Ga. Libraries, *The Minutes of the Senatus Academicus 1799-1842*
(Nov. 4, 1976), https://perma.cc/VVT2-KFDB ....................................................... 12

Univ. of Va. Bd. of Visitors, *University of Virginia Board of Visitors Minutes*,
Encyclopedia Va. (Oct. 5, 1824), https://perma.cc/HNY3-PXDZ .......................... 12

Appellate Case: 23-2248    Page: 7    Date Filed: 07/20/2023 Entry ID: 5297722

## STATEMENT OF INTEREST AND SUMMARY

The district court held that a Minnesota statute restricting the public possession of handguns by 18-to-20-year-olds violates the Second Amendment. The United States has a strong interest in the proper interpretation of the Second Amendment and this nation's historical tradition of firearms regulation, and therefore submits this brief as amicus curiae under Federal Rule of Appellate Procedure 29(a).

At the founding, states set minimum age requirements for an array of important rights, from marriage to voting. By far, the most common age qualification established by Founding Era legislatures was 21, the age of majority at common law. *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* (*NRA*), 700 F.3d 185, 203 (5th Cir. 2012), *abrogated on other grounds by New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). The historical record provides no support for the proposition that the founders precluded legislatures from adopting the same age qualification in regulating firearms. Unsurprisingly, therefore, during the nineteenth century, at least "nineteen States and the District of Columbia … enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms." *Id.* at 202 & n.14. Minnesota's age-based public-carry restriction thus accords with a "tradition of age- and safety-based restrictions on the ability to access arms" that stretches from the founding to the present. *Id.* at 203.

The district court's contrary conclusion is at odds with decisions of the Supreme Court and this Court. The court reasoned that the Second Amendment's

"plain text" does not include an "age limit," App. 13-14; R. Doc. 84, at 13-14, but that reasoning suggests that even young children are included in "the people" constitutionally entitled to carry deadly weapons—an interpretation the district court acknowledged "[n]o court" has embraced, App. 18; R. Doc. 84, at 18. The court found further support from "founding era militia laws." App. 15; R. Doc. 84, at 15. But Founding Era legislatures frequently imposed age limits on militia membership, and in any event, the Supreme Court has held that the right to bear arms is "an individual right unconnected to militia service." *District of Columbia v. Heller*, 554 U.S. 570, 611 (2008).

The court likewise erred in dismissing close historical analogies to Minnesota's prohibition. The court acknowledged that nineteenth-century legislatures enacted age-based firearms restrictions but dismissed such laws as addressing only the "sale[]" of handguns to minors. App. 37; R. Doc. 84, at 37. To the contrary, numerous nineteenth-century legislatures made it "unlawful even to give or lend handguns" to minors. *National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1331 (11th Cir. 2023), *reh'g en banc granted*, *vacated by* 2023 WL 4542153 (11th Cir. July 14, 2023). Moreover, even with respect to historical laws addressing firearm sales, the court erred in demanding a "historical *twin*," rather than a "relevantly similar" "historical *analogue*." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132-33 (2022). The district court further erred in suggesting that nineteenth-century laws are too "far removed in time" to demonstrate a historical tradition. App. 36; R. Doc 84, at 36. The Supreme Court has

2

recognized that nineteenth-century evidence is "a critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605.

The district court thus erred in invalidating Minnesota's prohibition. But in all events, the court properly cast no doubt on laws restricting the sale of firearms to underage individuals—including longstanding federal restrictions on the commercial sale of arms to minors. App. 27, 37; R. Doc. 84, at 27, 37. Those federal restrictions, which are not challenged here, prevent federal firearms licensees from selling handguns to individuals under the age of 21 but do not curtail the ability of 18-to-20-year-olds to possess handguns or to acquire them from sources other than federal firearms licensees. *See* 18 U.S.C. § 922(b)(1), (c)(1). The federal restrictions thus fall within the class of "commercial sale" regulations that the Supreme Court has taken pains not to call into question, *Heller*, 554 U.S. at 626-27, and they stand on particularly firm historical footing.

## STATEMENT OF THE CASE

### A. Statutory Background

The federal government has imposed reasonable age-based qualifications on the commercial sale of arms since at least 1968. Following a multi-year inquiry that included "field investigation and public hearings," S. Rep. No. 88-1340, at 1 (1964), Congress found "that the ease with which" handguns could be acquired by "juveniles without the knowledge or consent of their parents or guardians[] . . . is a significant factor in the prevalence of lawlessness and violent crime in the United States,"

3

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 901(a)(2), 82 Stat. 197, 225. To address "[t]he clandestine acquisition of firearms by juveniles and minors," S. Rep. No. 90-1097, at 79 (1968), Congress enacted legislation which restricts federal firearms licensees from selling handguns and handgun ammunition to individuals under the age of 21, *see* 18 U.S.C. § 922(b)(1), (c)(1).[1]

These federal restrictions do not regulate private sales by individuals and do not prohibit the possession of handguns or other firearms by 18-to-20-year-olds. Congress recognized that, under the restrictions, "a minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian." S. Rep. No. 90-1097, at 79.

Most states "go[] beyond th[is] federal floor" by imposing additional limits on 18-to-20-year-olds' access to and use of handguns. *NRA*, 700 F.3d at 185, 190 n.4. Minnesota state law generally permits a person over the age of 18 to purchase and possess a handgun. *See* Minn. Stat. § 624.7131, subdiv. 4; *id.* § 624.713, subdiv. 1(1). Minnesota requires a permit, however, to carry a handgun in public, and an applicant must be "at least 21 years old" to obtain such a permit, in addition to other

---

[1] A federal firearms license is required to "engage in the business of importing, manufacturing, or dealing in firearms[ or ammunition]." 18 U.S.C. § 922(a)(1). A person is "engaged in the business" of dealing firearms, *id.* § 921(a)(21), if that person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms," *id.* § 921(a)(21)(C).

4

requirements. *Id.* § 624.714, subdiv. 1a, subdiv. 2(b)(2). A permit is not required to carry a handgun about one's place of business or dwelling; between one's home and place of business; in the woods, fields, or open waters of Minnesota for hunting or target shooting; or to transport a handgun in a motor vehicle if it is unloaded and contained in a closed package. *See id.* § 624.714, subdiv. 9.

## B. Prior Proceedings

Plaintiffs are three 18-to-20-year-olds and three advocacy organizations with 18-to-20-year-old members. R. Doc. 1, at 6-9, ¶¶ 19-24. Plaintiffs challenge Minnesota's age-based public-carry restriction as inconsistent with the Second Amendment.

The district court granted summary judgment for plaintiffs. The court first held that "the people" referenced in the Second Amendment is "better read to include" 18-to-20-year-olds, reasoning that the "plain text" of the Second Amendment does not "include an age limit," App. 13-14; R. Doc. 84, at 13-14; and that 18-to-20-year-olds were required to serve in a "majority" of "founding era" militias, App. 15-16; R. Doc. 84, at 15-16. The court next proceeded to consider whether Minnesota's public-carry restriction was "consistent with the nation's history and tradition of firearms regulation," and held that it was not. App. 20; R. Doc. 84, at 20. The court recognized that, during the Reconstruction Era, over 19 jurisdictions prohibited "selling or otherwise furnishing" handguns to minors. App. 36; R. Doc. 84, at 36. The court reasoned, however, that those laws were not sufficiently

5

analogous to Minnesota's public-carry restriction because, in the court's view, "[s]everal" of those laws addressed only the "sale[] of firearms to minors, but did not place restrictions on minors receiving them from parents." App. 37; R. Doc. 84, at 37. The court further suggested that nineteenth-century laws are too "far removed in time from the ratification of the Second Amendment to demonstrate the 'historical tradition of firearm regulation'" required by the Supreme Court. App. 36-37; R. Doc. 84, at 36-37 (quoting *Bruen*, 142 S. Ct. at 2135-36).

## ARGUMENT

### I. Age-Based Firearms Regulations Are Consistent with the Second Amendment

The Constitution protects an individual right to keep and bear arms, but, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. The Supreme Court has consistently described the right as belonging only to "law-abiding, responsible citizens," *id.* at 635, and has provided a non-exhaustive list of regulations—including "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "conditions and qualifications on the commercial sale of arms"—that comport with the right to bear arms, *id.* at 626-27; *see Bruen*, 142 S. Ct. at 2156 (reaffirming that the right is "subject to certain reasonable, well-defined restrictions"). In identifying additional categories of lawful regulations, courts consult "the Second Amendment's plain text" and "the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30. Here, text and history

6

both confirm that reasonable age-based firearms regulations such as Minnesota's pass constitutional muster.

**A.** The Second Amendment does not protect underage individuals. The Supreme Court has recognized that the Amendment protects only "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134.

Today and at the time of the Second Amendment's ratification, legislatures exercised significant latitude in establishing age requirements for various rights. At the founding, legislatures set age qualifications for an array of important activities, such as getting married, becoming a naturalized citizen, forming an enforceable contract, petitioning the government, and serving on juries.[2] Then, as now, age qualifications reflected the view that, as John Adams warned, minors lack "[j]udgment" and are not "fit to be trusted by the [p]ublic." *See Letter from John Adams to James Sullivan, 26 May 1776*, Nat'l Archives.[3]

---

[2] *See, e.g.*, 4 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 153 (James T. Mitchell & Henry Flanders eds., 1897) (age qualification for marriage); Act of Mar. 26, 1790, ch. IV, 1 Stat. 104; Act of Jan. 29, 1795, ch. XX, 1 Stat. 415 (age qualification for becoming a naturalized citizen), Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, Yale L. & Pol'y Rev. Inter Alia (Oct. 26, 2021), https://perma.cc/8994-XJH9 (noting that the right to petition "was foreclosed [to] minors" and that even the "venerable" right to contract "could be overridden when the contracting party was a minor"); *see also Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 832-34 (2011) (Thomas, J., dissenting) (explaining that minors at the time of the founding could not "serve on juries," among other restrictions).

[3] https://perma.cc/CE79-RA8K.

7

For the Second Amendment's ratifiers, the most natural point at which to draw the line between untrustworthy minors and responsible adults was age 21. "The age of majority at common law was 21," and individuals under that age were classified as "minor[s]" or "infant[s]." *NRA*, 700 F.3d at 201; *see* 1 William Blackstone, *Commentaries on the Law of England* 463 (1765) ("So that full age in male or female, is twenty one years . . . who till that time is an infant, and so styled in law."). Following the common law approach, the "American colonies, then the United States, adopted age twenty-one as the near universal age of majority." Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016); *see* 2 James Kent, *Commentaries on American Law* 101 (1827) (confirming that "the inability of infants to take care of themselves . . . continues, in contemplation of law, until the infant has attained the age of twenty-one years").

Of particular relevance here, Founding Era legislatures set a minimum age of 21 for a right they closely associated with the right to bear arms: the right to vote. The Supreme Court has described the class entitled to bear arms as limited to those who belonged to "the political community," *Heller*, 554 U.S. at 580, and at the time of the founding, legislatures allowed individuals to vote only after they turned 21, *see* Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 277 (2000) (explaining that, "[s]ince the nation's founding, a voting age of twenty-one . . . had been a remarkable constant in state laws governing the franchise," and emphasizing the "prevailing consensus that twenty-one was the age of political

8

maturity"). That tradition remained prevalent until the passage of the Twenty-Sixth Amendment in 1971. *See id.*; *see also* Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*, 71 U. Cin. L. Rev. 1345, 1345, 1358-59 (2003).

These historical age restrictions reflect the founders' view that reason and judgment are not fully developed before the age of 21. Gouverneur Morris, a signer of the Constitution and drafter of the Preamble, warned that under-21-year-olds "want prudence" and "have no will of their own." *James Madison's Notes of the Constitutional Convention, August 7, 1787*, Yale L. Sch. Avalon Project.[4] Thomas Jefferson similarly placed "infant[s]"—a term that encompassed all "persons under the age of 21," *NRA*, 700 F.3d at 201—in the same category as "maniacs," "drunkards," and others who "cannot take care of themselves," *Letter from Thomas Jefferson to Samuel Smith, 3 May 1823*, Nat'l Archives;[5] *see also, e.g.*, John Locke, *Two Treatises of Government* 324-28 (Peter Laslett ed., Cambridge 1960) (observing that the rights of "lunatics," "idiots," and "children" could be restricted because those groups had not achieved a "state of reason").

Age-based qualifications thus reflect the broader historical understanding that legislatures could disarm members of groups "based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) (describing colonial-era prohibitions). Although

---

[4] https://perma.cc/QJ7B-D4J4.
[5] https://perma.cc/2CJB-N7RS.

many of these laws would "of course" be "impermissible today under other constitutional provisions," they illustrate the traditional recognition that legislatures may disarm groups that are seen as presenting "an unacceptable risk of dangerousness." *Id.* at 503, 505.

**B.** Historical analogues confirm that age-based firearms regulations comport with the Second Amendment.

**1.** Before the end of the nineteenth century, at least "nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms." *NRA*, 700 F.3d at 202 & n.14.

As early as 1856, Alabama forbade providing "to any male minor" any "air gun or pistol," 1856 Ala. Acts 17, No. 26, § 1, and "[a]t that time, the age of majority in Alabama was twenty-one years," *Bondi*, 61 F.4th at 1325. A "flurry" of similar laws followed in the decades surrounding the passage of the Fourteenth Amendment. *See id.* at 1327. An 1875 Indiana law, for example, made it a crime "for any person to sell, barter, or give to any other person, under the age of twenty-one-years, any pistol" or similar deadly weapon. 1875 Ind. Laws 59, ch. XL, § 1. Similar age-based restrictions were enacted in numerous other jurisdictions across the country, including Tennessee (1856), Kentucky (1859), Delaware (1881), the District of Columbia (1892), Illinois (1881), Iowa (1884), Kansas (1883), Louisiana (1890), Maryland (1882), Mississippi (1878), Missouri (1879), North Carolina (1893), Texas (1897), West Virginia (1882), Wisconsin (1883), and Wyoming (1890). Age-based restrictions thus spanned every

10

region of the country and covered much of the population.  The addendum to this brief provides source and citation information for each law.

Nineteenth-century courts and commentors noted with approval restrictions on the ability of minors to access arms.  "[T]he judge and professor Thomas Cooley, who wrote a massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, included among the permissible exercises of state police power "[t]hat the State may prohibit the sale of arms to minors," Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883); *see Heller*, 554 U.S. at 616-17 (treating Cooley's interpretation of the Second Amendment as persuasive authority).  Likewise, in what appears to be the sole nineteenth century judicial decision addressing these prohibitions, the Tennessee Supreme Court upheld a state law outlawing the sale of pistols to individuals under the age of 21.  *See State v. Callicutt*, 69 Tenn. 714, 716-17 (1878).  The court explained that the challenged law "do[es] not in fact abridge[] the constitutional right of the 'citizens of the State to keep and bear arms for their common defense,'" and that "acts to prevent the sale" of "a pistol or other like dangerous weapon to a minor" were "not only constitutional as tending to prevent crime[,] but wise and salutary in all [their] provisions."  *Id.*  "[T]he fact that there was apparently only a single challenge to these [restrictions'] constitutionality until well into the twentieth century" further illustrates that the public "considered the statutory prohibitions constitutionally permissible."  *Bondi*, 61 F.4th at 1330.

11

**2.** These nineteenth-century restrictions accord with Founding Era

attitudes. *See supra* pp. 7-9. The founders accordingly approved various measures

governing 18-to-20-year-olds' access to firearms. *See Bondi*, 61 F.4th at 1327. For

example, an 1824 University of Virginia resolution supported by Thomas Jefferson

and James Madison forbade students from keeping "weapons or arms of any kind, or

gunpowder" on school grounds. Univ. of Va. Bd. of Visitors, *University of Virginia

Board of Visitors Minutes*, Encyclopedia Va. 6-7 (Oct. 5, 1824).[6] And as an 1810

University of Georgia resolution attests, public universities retained authority to bar

students from possessing firearms not just while they stayed on school grounds but

also when they left campus. *See* Univ. of Ga. Libraries, *The Minutes of the Senatus

Academicus 1799-1842*, ¶ 86 (Nov. 4, 1976);[7] *see also Bondi*, 61 F.4th at 1327. The

founders thus accepted prohibitions on firearm possession by university students, a

group which included some of the most privileged 18-to-20-year-olds in the early

republic.

Individuals under the age of 21 were also excluded from roles such as peace

officer that entailed the unsupervised use of firearms. A leading treatise published in

1788 explained that when summoned by local authorities, citizens generally had a duty

to serve as peace officers. *See* John Faucheraud Grimké, *The South Carolina Justice of*

---

[6] https://perma.cc/HNY3-PXDZ.

[7] https://perma.cc/VVT2-KFDB (prohibiting students from possessing "any gun" or "other offensive weapon in College" or "out of the college in any case whatsoever").

Appellate Case: 23-2248     Page: 19     Date Filed: 07/20/2023 Entry ID: 5297722

*Peace* 118 (R. Aitken & Son eds., 1788). Citizens ineligible for service included "idiots," "madmen," and "infants"—that is, individuals under the age of 21. *Id.* at 117-18. As discussed above, similar comparisons pervade the historical materials, confirming that the ratifiers harbored substantial doubts about the judgment of individuals under the age of 21. *See supra* pp. 7-9 (citing similar analogies drawn by John Locke and Thomas Jefferson).

It is a testament to the strength of the historical tradition that laws restricting 18-to-20-year-olds' access to arms remain prevalent today. In recent times, "all fifty States (and the District of Columbia) have imposed minimum-age qualifications on the use or purchase of particular firearms." *NRA*, 700 F.3d at 190 n.4. The Minnesota prohibition challenged here thus stands in stark contrast to the "outlier[]" laws the Supreme Court invalidated in *Bruen* and *Heller*. *See Bruen*, 142 S. Ct. at 2156; *Heller*, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"). Far from those exceptional laws, Minnesota's prohibition reflects a historical tradition that stretches from the founding to the present, and it therefore satisfies the Second Amendment.

**C.** The district court's contrary conclusion rests on an erroneous understanding of the Second Amendment's text and history.

**1.** In concluding that 18-to-20-year-olds are part of "the people" whom the Second Amendment protects, the district court reasoned that the "plain text" of the Amendment "does not include an age restriction" and that the First and Fourth

13

Amendments also refer to "the people" and are not limited based upon age. App. 13-14; R. Doc. 84, at 13-14 (quotation marks omitted). That reasoning proves far too much. Under that interpretation, even young children might be included among "the people" constitutionally entitled to carry deadly weapons—an interpretation the district court acknowledged "[n]o court" has embraced. App. 18; R. Doc. 84, at 18.

Contrary to the district court's reasoning, the Supreme Court has described the Second Amendment right, unlike the First and Fourth Amendment rights, as belonging to "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134. The Fifth Circuit has similarly admonished—in a decision this Court has embraced in reasoning and result, *see United States v. Sitladeen*, 64 F.4th 978, 983-84, 985 (8th Cir. 2023)—that the "use of 'the people' in both the Second and the Fourth Amendment" does not mean that "the two amendments cover exactly the same groups of people," *United States v. Portillo-Munoz*, 643 F.3d 437, 440-41 (5th Cir. 2011).

The Supreme Court has described "the people" in the Second Amendment as limited to "members of the political community." *Heller*, 554 U.S. at 580; *see* App. 13; R. Doc. 84, at 13. And for the reasons explained above, "this Nation's historical tradition," *Bruen*, 142 S. Ct. at 2126, demonstrates that the Founders would not have understood 18-to-20-year-olds to be included within the political community entitled to keep and bear arms. *See supra* pp. 7-9.

**2.** The district court's textual analysis gains no support from "founding era militia laws." App. 15; R. Doc. 84, at 15. The court reasoned that because such laws

"requir[ed] service in the militia by 18-20-year-olds," those individuals must be within the scope of the individual right to bear arms protected by the Second Amendment. App. 16-17; R. Doc. 84, at 16-17. That is wrong in both premise and conclusion.

First, Founding Era legislatures had discretion to exclude 18-to-20-year-olds from militia service. The district court cited the National Militia Act of 1792 (Militia Act), which provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as herein after excepted) shall severally and respectively be enrolled in the militia." Militia Act, § 1, 1 Stat. 271, 272 (1792). But the very next section of the Act "gave States discretion to impose age qualifications on service." *NRA*, 700 F.3d at 204 n.17 (discussing Militia Act § 2, 1 Stat. at 272).

Thus, "in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21, depending on legislative need." *NRA*, 700 F.3d at 204 n.17. Virginia set a minimum age of 21, which it lowered in times of exceptional need—for example, in 1755 prior to the Seven Years War.[8] Other

---

[8] *See* An Act for the settling and better Regulation of the Militia, ch. II, § II, in 4 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislatures, in the Year 1619*, at 118 (William Walter Hening ed., 1820) (originally promulgated in 1723); An Act for raising levies and recruits to serve in the present expedition against the French, on the Ohio, ch. II, §§ I-III, in 6 Hening, *supra*, at 438, 438-39 (1819) (originally promulgated in 1754); An Act for the better regulating and training the Militia, ch. II, §§ II-III, in 6 Hening, *supra*, at 530, 530-31 (1819) (originally promulgated in 1755).

Appellate Case: 23-2248    Page: 22    Date Filed: 07/20/2023 Entry ID: 5297722

states—including Georgia, New Jersey, and North Carolina—enrolled only individuals over 21 in their respective militias at various points between the late eighteenth century and the mid-nineteenth century.[9]  Thus, to the extent militia laws are relevant, they are fully consistent with legislatures' authority to restrict 18-to-20-year-olds' access to firearms.

In any event, as the Supreme Court has explained, the founders understood the right to bear arms as "an individual right unconnected to militia service."  *Heller*, 554 U.S. at 611.  The district court was therefore incorrect in assuming that everyone enrolled in Founding Era militias retained an individual right to bear arms outside the supervised context of militia service.  For example, Black people served in many state militias and fought in the Revolutionary War yet were barred from possessing arms outside the context of militia service in other states and at other times.  *See* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309, 331-32 (1991).  And Virginia disarmed individuals

---

[9] *See, e.g.*, *The Code of the State of Georgia*, pt. 1, tit. 11, chs. 1, 2, §§ 981, 1027, at 189, 199 (Richard H. Clark et al. eds., 1861); An Act to exempt minors from Militia Duty in time of peace (1829), *reprinted in A Compilation of the Public Laws of the State of New-Jersey, Passed Since the Revision in the Year 1820*, at 266 (Josiah Harrison ed., 1833); N.C. Const. of 1868, art. XII, § 1.

Appellate Case: 23-2248     Page: 23     Date Filed: 07/20/2023 Entry ID: 5297722

who refused to swear a loyalty oath but required them to enroll in the militia and even participate in musters, albeit without weapons.[10]

"[M]erely being part of the militia" thus did not establish an entitlement to Second Amendment rights. *Bondi*, 61 F.4th at 1331. Were it otherwise, the presence of 16-year-olds in some Founding Era militias could be viewed as dictating that today's high school sophomores have full rights to keep and bear arms. *See NRA*, 700 F.3d at 204 n.17 (collecting examples of militia laws enrolling sixteen-year-olds); *see also United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) (upholding, based on an analysis of Founding and Reconstruction Era sources, the federal prohibition on handgun possession by individuals under the age of 18).

**3.**  The district court also erred in dismissing close historical analogues to Minnesota's prohibition. The court acknowledged that in the decades surrounding the ratification of the Fourteenth Amendment, over 19 jurisdictions enacted age-based firearms restrictions. App. 36; R. Doc. 84, at 36. But the court found "none" of those laws to be "relevantly similar" to Minnesota's restriction, reasoning that "[s]everal" historical laws restricted only the "sale[]" of firearms to minors or allowed minors to obtain firearms with their parents' permission. App. 37; R. Doc. 84, at 37.

---

[10] An act to oblige the free male inhabitants of this state above a certain age to give assurance of Allegiance to the same, and for other purposes, ch. III (1777), in 9 Hening, *supra*, at 281, 281-82 (1821).

Appellate Case: 23-2248    Page: 24    Date Filed: 07/20/2023 Entry ID: 5297722

Contrary to the district court's reasoning, several nineteenth-century legislatures enacted laws that made it unlawful "even to give or lend handguns and other deadly weapons to minors" under the age of 21, *Bondi*, 61 F.4th at 1330-31, and those laws do not on their face appear to be limited to only commercial sales or to allow an exception for arms provided by parents. This includes, for example, the laws enacted by Alabama (1856), Tennessee (1856), Indiana (1875), Maryland (1882), Iowa (1884), Louisiana (1890), Wyoming (1890), the District of Columbia (1892), and North Carolina (1893). Moreover, at least two legislatures—Kansas (1883) and Wisconsin (1883)—enacted laws that prohibited minors from possessing handguns generally. The district court offered no reason to explain why these historic prohibitions did not impose at least a "comparable burden," *Bruen*, 142 S. Ct. at 2133, on 18-to-20-year-olds' ability to keep and bear arms as the Minnesota restriction at issue here, which does not prevent 18-to-20-year-olds from obtaining or possessing handguns but limits where that age group may carry a handgun in public.

In any event, even with respect to historical laws that addressed only handgun sales or that allowed an exception for handguns provided by parents,[11] the district court took far too blinkered a view of the historical record. *Bruen* warned that history does not impose "a regulatory straightjacket." 142 S. Ct. at 2126, 2132-33. The question is not whether a modern law mirrors a "historical *twin*" but rather whether it

_____

[11] *E.g.*, Kentucky (1859), Mississippi (1878), Missouri (1879), Delaware (1881) Illinois (1881), and Texas (1897).

18

is "relevantly similar" to a "historical *analogue*." *Id.* That numerous legislatures across the country enacted laws in the nineteenth century to restrict 18-to-20-year-olds' access to firearms in the interest of "public safety" confirms that the public at the time did not perceive an inconsistency between the right to bear arms and reasonable aged-based restrictions. *See Bondi*, 61 F.4th at 1326. Minnesota's public-carry law fits comfortably within that historical tradition.

To the extent the district court discounted nineteenth-century sources altogether as too "far removed in time from the ratification of the Second Amendment," App. 36-37; R. Doc. 84, at 36-37, that too was error. The Supreme Court has explained that although nineteenth-century materials may "not provide as much insight into [the Second Amendment's] original meaning" as Founding Era sources, those materials nonetheless constitute a "critical tool of constitutional interpretation." *Bruen*, 142 S. Ct. at 2136-37 (quoting *Heller*, 554 U.S. at 605, 614). The Court's extensive review of nineteenth-century evidence in both *Heller* and *Bruen* confirms that such evidence plays an important role in Second Amendment analysis. *See Heller*, 554 U.S. at 605-19; *Bruen*, 142 S. Ct. at 2145-56.

The Supreme Court has similarly looked to practices from the nineteenth-century onward in interpreting the historical scope of other rights. In analyzing the First Amendment, for example, the Court has reviewed nineteenth-century sources in discussing "historic and traditional" exceptions to the free speech right. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (quotation marks omitted); *see, e.g., Roth v. United*

19

*States*, 354 U.S. 476, 483-85, 483 n.13, 485 n.17 (1957) (citing nineteenth-century laws in determining whether obscenity is protected by First Amendment). In Sixth Amendment cases, the Court has likewise consulted nineteenth-century evidence. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (citing evidence from "throughout the 19th century" in addressing right to jury trial); *Crawford v. Washington*, 541 U.S. 36, 49-50 (2004) (citing mid-nineteenth-century materials in defining confrontation clause's scope).

There is no basis for adopting a more circumscribed view of the relevant historical evidence in Second Amendment cases. To the contrary, the Supreme Court in *Bruen* compared the historical analysis under the Second Amendment to the analysis that applies under the First and Sixth Amendments. *See Bruen*, 142 S. Ct. at 2130. And several features of Second Amendment doctrine confirm that nineteenth-century materials warrant substantial weight.

First, the Supreme Court has explained that the Second Amendment codified a "pre-existing right" regarded as "venerable" when the Amendment was ratified in 1791, *Heller*, 554 U.S. at 570, 603, 605, and that "was still recognized to be fundamental" in the mid-to-late nineteenth century, *McDonald v. City of Chicago*, 561 U.S. 742, 773 (2010). Sources from both before and after 1791 thus provide insight into what the right to bear arms entails.

Second, nineteenth-century history assumes particular importance because the Supreme Court has determined that the Second Amendment and the Fourteenth

Amendment "have the same scope." *Bruen*, 142 S. Ct. at 2137. The Eleventh Circuit has concluded that to the extent historical practices in those periods diverge, the understanding that prevailed at the time of "the later-enacted [Amendment] controls." *Bondi*, 61 F.4th at 1323-24 (quotation marks omitted). At a minimum, tracing the meaning of a right codified in 1791 and renewed in 1868 requires a review of sources from both periods.

Third, the Supreme Court has also recognized that "a regular course of practice" that arises after ratification "can liquidate [and] settle the meaning of disputed or indeterminate terms" in the Constitution. *Bruen*, 142 S. Ct. at 2136 (quotation marks omitted). Examining a regular nineteenth-century course of practice is particularly appropriate where, as here, that practice is fully consistent with Founding Era attitudes. *See id.*

## II.  The District Court Properly Cast No Doubt on the Constitutionality of the Federal Restrictions

For the reasons discussed above, age-based firearms regulations such as Minnesota's public-carry law accord with the Second Amendment. In all events, the federal restrictions on the commercial sale of handguns rest on especially firm doctrinal and historical foundations.

The federal commercial-sales restrictions bar 18-to-20-year-olds from purchasing handguns from federal firearms licensees. *See* 18 U.S.C. § 922(b)(1), (c)(1). They do not prevent 18-to-20-year-olds from "possess[ing] and us[ing] handguns,"

21

and they leave undisturbed 18-to-20-year-olds' ability to obtain handguns "from parents or guardians" or "through unlicensed, private sales." *NRA*, 700 F.3d at 189. Because of their narrow focus, the federal age-based commercial-sales restrictions fit neatly within the category of commercial-sale restrictions the Supreme Court has approved. In *Heller*, the Court identified "laws imposing conditions and qualifications on the commercial sale of arms" as "presumptively lawful." 554 U.S. at 626-27, 627 n.26. And in *McDonald*, the Court "repeat[ed]" its "assurances" that *Heller* did not "cast doubt on such longstanding regulatory measures" as "laws imposing conditions and qualifications on the commercial sale of arms." 561 U.S. at 786; *see Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that nothing in *Bruen* "should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms").

The federal restrictions also hew especially closely to historical tradition. Justice Thomas has observed that the founders contemplated substantial "parental control" over minors. *Brown*, 564 U.S. at 829-30 (Thomas, J., dissenting). Indeed, William Blackstone explained that a father's "legal power" over "the person of his children" did not "cease [until] the age of 21." Blackstone, *supra*, at 440-41. Under these circumstances, it is inconceivable that the Second Amendment's ratifiers regarded individuals under the age of 21 as retaining a right to acquire firearms over their parents' objections.

22

That practice persisted well into the nineteenth century. As discussed above, several laws at that time restricted the sale of firearms to minors or made it a crime to provide firearms to minors without their parents' consent. *Supra* p. 18. The federal restriction thus stands on particularly firm historical footing. Indeed, the district court itself suggested that it would have viewed a law regulating "the *sale* of handguns to 18-to-21-year-olds" differently. App. 27, 37; R. Doc. 84, at 27, 37 & n.30.

The tradition of parental control over minors' access to arms is illustrated by even the Founding Era militia laws upon which the district court relied. Pennsylvania's 1755 militia act, drafted by Benjamin Franklin, permitted persons under 21 to enroll in the militia but provided "[t]hat no Youth, under the Age of Twenty-one Years, . . . shall be admitted to enroll himself, or be capable of being enrolled, in the said Companies or Regiments without the Consent of his or their Parents or Guardians."[12] By the same token, many states required parents to furnish the firearms for their minor children's militia duty, including Massachusetts (1789), New Hampshire (1786), Vermont (1797), North Carolina (1806), Maine (1821), and Missouri (1826).[13]

---

[12] *Militia Act, 25 November 1755*, Nat'l Archives, https://perma.cc/2DFN-Z2GN.

[13] *See* Act of Mar. 6, 1810, ch. CVII, § 28, 1810 Mass. Laws 151, 176; Act of Dec. 22, 1820, ch. XXXVI, § 46, 1820 N.H. Laws 287, 321; Act of Mar. 20, 1797, ch. LXXXI, No. 1., § 15, *in The Laws of the State of Vermont, Digested and Compiled* 122, 131-32 (1808); 2 *The Code of North Carolina* ch. 35, § 3168, at 346, 346-47 (William T.

*Continued on next page.*

23

In short, because the federal commercial-sales restrictions comport with the Second Amendment's text and reflect "this Nation's historical tradition of firearms regulation," *Bruen*, 142 S. Ct. at 2126, they easily pass constitutional muster.

---

Dortch, John Manning, & John S. Henderson eds., 1883); ch. CLXIV, § 34, 1821 Me. Laws 658, 570-71; Act of July 14, 1825, ch. I, § 24, 1825 Mo. Laws 533, 554.

Appellate Case: 23-2248     Page: 31     Date Filed: 07/20/2023 Entry ID: 5297722

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

ANDREW M. LUGER
*United States Attorney*

MARK B. STERN
ABBY C. WRIGHT

*s/ Courtney L. Dixon*
COURTNEY L. DIXON
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7246*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 353-8189*
 *courtney.l.dixon@usdoj.gov*

July 2023

25

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedures 29 and 32(a)(7)(B) because it contains 5,991 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*s/ Courtney L. Dixon*
Courtney L. Dixon

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.


*s/ Courtney L. Dixon*
Courtney L. Dixon

**ADDENDUM**

**Table of Historical Laws Restricting the Sale of Handguns to Eighteen-to-Twenty Year Olds**

| Jurisdiction | Year | Source | Available at |
|---|---|---|---|
| Alabama | 1856 | 1856 Ala. Acts 17, No. 26, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssal0178&i=17 |
| Delaware | 1881 | 16 Del. Laws 716 (1881) | https://heinonline.org/HOL/Page?handle=hein.ssl/ssde0173&id=430&collection=ssl |
| District of Columbia | 1892 | *The Miscellaneous Documents of the Senate of the United States for the First Session of the Fifty-Second Congress 1891-92*, at 288, § 5 (1892) | https://hdl.handle.net/2027/hvd.hj1gjl?urlappend=%3Bseq=294%3Bownerid=27021597767057788-314 |
| Illinois | 1881 | 1881 Ill. Laws 73, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssil0240&i=81 |
| Indiana | 1875 | 1875 Ind. Laws 59, ch. XL, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssin0221&i=59 |
| Iowa | 1884 | 1884 Iowa Acts and resolutions 86, ch. 78, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssia0095&i=114 |
| Kansas | 1883 | 1883 Kan. Sess. Laws 159, ch. CV, 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/ssks0111&i=169 |

A1

Appellate Case: 23-2248    Page: 36    Date Filed: 07/20/2023 Entry ID: 5297722

| | | | |
|---|---|---|---|
| Kentucky | 1859 | Edward Bullock and William Johnson, *The General Statutes of the Commonwealth of Kentucky* 359, Art. XXIX, § 1 (1873) | https://heinonline.org/HOL/P?h=hein.sstatutes/gcucky0001&i=371 |
| Louisiana | 1890 | 1890 La. Acts 39, No. 46, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssla0223&i=39 |
| Maryland | 1882 | 1882 Md. Laws 656, ch. 424, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssmd0444&i=656 |
| Mississippi | 1878 | 1878 Miss. Laws 175, ch. 666, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssms0207&i=207 |
| Missouri | 1879 | *Revised Statutes of the State of Missouri* 224, § 1274 (1879) | https://heinonline.org/HOL/P?h=hein.sstatutes/ristesm0001&i=320 |
| Nevada | 1885 | 1885 Nev. Stat. 51, ch. 51, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssnv0097&i=61 |
| North Carolina | 1893 | 1893 N.C. Pub. L. & Res. 468, ch. 514, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssnc0078&i=498 |
| Tennessee | 1856 | 1856 Tenn. Acts 92, ch. 81, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/sstn0249&i=108 |

A2

| | | | |
|---|---|---|---|
| Texas | 1897 | 1897 Tex. Gen. Laws 221-22, ch. 155, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/sstx0251&i=245 |
| West Virginia | 1882 | 1882 W. Va. Acts 421-22, ch. CXXXV, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/sswv0101&i=421 |
| Wisconsin | 1883 | 1883 Wis. Sess. Laws 290, ch. 329, §§ 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/sswi0136&i=290 |
| Wyoming | 1890 | 1890 Wyo. Sess. Laws 140, § 97 | https://heinonline.org/HOL/P?h=hein.ssl/sswy0076&i=138 |

A3