No. 23-2248

# In the United States Court of Appeals for the Eighth Circuit

No. 23-2248

_____

KRISTIN WORTH, ET AL.,
                              *Plaintiffs-Appellees*,

v.

BOB JACOBSON,
                              *Defendant-Appellant.*
_____

On Appeal form the United States District Court for the District of Minnesota
_____

**BRIEF OF AMICI CURIAE HISTORIAN HOLLY BREWER IN SUPPORT OF APPELLANT AND IN SUPPORT OF REVERSAL**
_____

<div style="margin-left:40%">

Dan Meyers
Lindsay Strong
Naomi Biden
Sam Williams
Veronica Callahan
**Arnold Porter Kaye Scholer LLP**
70 West Madison Street, Suite 4200
Chicago, Illinois 60602-4321
(312) 583-2393
*Counsel for Amici Curiae*

</div>

# TABLE OF CONTENTS

**PAGE**

INTEREST OF AMICI CURIAE ................................................................1

SUMMARY OF THE ARGUMENT ........................................................3

ARGUMENT ............................................................................................5

    I.   Historical context shows the Second Amendment's reference to "the people" did not include 18-to-20-year-olds.................................................6

    II.  The age of majority was 21 during the founding and ratification era demonstrating that our nation has historically confined the rights of minors to bear arms to military or police service. ....................................15

CONCLUSION .......................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*D.C. v. Heller*,
554 U.S. 570 (2008).................................................................6, 8, 21, 24

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022)...................................................................*passim*

*United States v. Collette*,
630 F. Supp. 3d 841 (W.D. Tex. 2022) ...............................................6

*United States v. Sitladeen*,
64 F.4th 978 (8th Cir. 2023) ................................................................5

*Worth v. Harrington*,
No. 21-CV-1348 ...........................................................................20, 21

**Statutes**

Kent, 2 Commentaries On American Law 259 (3d ed., 1836) ...............17

Militia Act of 1792...................................................................7, 9, 10

Minn. Stat. § 624.714, subd. 2(b)(2).............................................*passim*

Minn. Stat. § 624.714, subd. 2(b)(2)'s..................................................3

Minn. Stat. § 624.714, subd. 22 .........................................................20

*Perpetual Laws* ...............................................................................10, 11

*Public Laws* ....................................................................................10, 12

**Other Authorities**

1, 6–7 (1824), https://encyclopediavirginia.org/entries/university-of-
virginia-board-of-visitors-minutes-october-4-5-1824/ .......................22

*A.D. 1798* (1798-1813) ....................................................................10, 12

Appellate Case: 23-2248    Page: 3    Date Filed: 07/25/2023 Entry ID: 5299116

*A.D. 1798* 172-194 (1799) ........................................................................10, 11, 12

Second Amendment .........................................................................................*passim*

*and the Anglo-American Revolution In Authority* at ch. 7 (2005)...........................17

Brewer, *By Birth or Consent*.....................................................................................14

Brian Jackson, *The Lingering Legacy of "In Loco Parentis": An
    Historical Survey and Proposal for Reform*, 44 Vand. L. Rev. 1135
    (1991) ...................................................................................................................21

*By Birth or Consent: Children, Law, and the Anglo-American
    Revolution in Authority, 2005* .......................................................................1, 17

*Constitution of the United States* 415-430 (1797) .................................................10

*Delaware. Laws of the State of Delaware from the Fourteenth Day of
    October, One Thousand Seven Hundred, to the Eighteenth Day of
    August, One Thousand Seven Hundred and Ninety-Seven* 1134
    (1797) ...........................................................................................................10, 11

Griffith, *A Treatise on the Jurisdiction and Proceedings of Justices of
    the Peace in Civil Suits in New Jersey* (3rd ed. 1813).......................................19

Hening's *New Virginia Justice of* 1975 ..................................................................20

Holly Brewer, *By Birth or Consent*.........................................................................17

*Infra* p. __ and note __ ....................................................................................8, 9, 10

*The Laws of the State of New Hampshire, the Constitution of the State
    of New Hampshire, and the Constitution of the United States* 415-
    430 (1797) ....................................................................................................10, 12

*The Laws of Yale-College, in New Haven, in Connecticut, Enacted by
    the President and Fellows, the Sixth Day of October, A.D. 1795*, at
    26 (1800) ..............................................................................................................21

*Martin Iredell, Francois-Xavier. Public Acts of the General Assembly
    of North-Carolina* (1804)....................................................................................10

iii

*The Statutes at Large, Being a Collection of All the Laws of Virginia from the First Session of the Legislature* 340-356 (1823)...................................10

William Waller Hening's *New Virginia Justice* ................................................18, 19

iv

Amicus curiae, Holly Brewer, is a legal historian with over thirty years of experience specializing in early modern political debates and how those debates shaped common and statutory law in early America, early modern England, and in the British Empire. Brewer is currently the Burke Chair of American Cultural and Intellectual History and Associate Professor at the University of Maryland.[2] She has been awarded many prizes for her work in legal history, including the Hurst Prize from the Law & Society Association and the Cromwell Prize from the American Society for Legal History, both in 2006, and the Order of the Coif Book Prize from the Association of American Law Schools in 2008, for her book on the legal status of children in the years surrounding the Revolution (*By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority*, 2005). Her scholarship focuses on the different historical statuses of children and adults and how the boundaries between the two shifted over time within common and statute law in England and America between 1550 and 1820. Brewer's historical understanding of

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored any part of this brief. No party, party's counsel, or any other person other than amicus curiae contributed any money toward the preparation or submission of this brief. All parties consent to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

[2] Affiliations are for identification purposes.

1

the legal privileges, immunities, obligations and incapacities of children and adults during this era provides crucial context for the Court in its analysis of the legal issues presented in this case, since claims about such capacities in the 1790s were central to the initial complaint.

Appellate Case: 23-2248    Page: 7    Date Filed: 07/25/2023 Entry ID: 5299116

# SUMMARY OF THE ARGUMENT

The district court erred in holding Minn. Stat. § 624.714, subd. 2(b)(2) unconstitutional based on the claim that its statutory scheme, by prohibiting 18-to-20-year-olds from possessing weapons, does not comport with United States laws in the 1790s, at the time the Constitution was ratified. In fact, this prohibition does comport with common law and statutory law of the 1790s, and is therefore constitutional. The Court's ruling in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022), does not drive a different conclusion. First, the plain text of the Second Amendment does not afford 18-to-20-year-olds an unqualified right to bear arms in all circumstances, due to their status as minors, which meant, among other limitations, they were unable to purchase such weapons, or to vote. Founding era militia laws demonstrate that young men ages 18 to 20 possessed only a limited right to use arms in a military capacity, under supervision. Accordingly, 18-to-20-year-olds were not included in the Second Amendment's codification of "the people['s]" right to bear arms.

Second, even if this Court concludes 18-to-20-year-olds should be included among "the people" to whom the right to bear arms is extended, Minn. Stat. § 624.714, subd. 2(b)(2)'s burden on 18-to-20-year-olds to possess weapons is consistent with such restrictions imposed on that right around the time of the ratification of the Second Amendment. Such individuals were restricted in their legal

3

capacity to conduct many activities, including the bearing of firearms fit for purposes of personal self-defense, and were so restricted for purposes similar to those which motivated the enactment of the challenged regulation.

Appellate Case: 23-2248    Page: 9    Date Filed: 07/25/2023 Entry ID: 5299116

## ARGUMENT

This Court should reverse the district court's grant of summary judgment favoring Appellees. The district court erroneously concluded that Minn. Stat. § 624.714, subd. 2(b)(2), violates Appellees' Second Amendment rights. The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. The right to bear arms in public, however, is not absolute and can be limited by reasonable, well-defined restrictions. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022).

In *Bruen*, the Supreme Court laid out a two-step analysis for courts to conduct when the constitutionality of such restrictions are challenged. First, "a court must begin by asking whether the firearm regulation at issue governs conduct that falls within the plain text of the Second Amendment." *United States v. Sitladeen*, 64 F.4th 978, 985 (8th Cir. 2023) (citing *Bruen*, 142 S. Ct. at 2126). If the answer is yes, "the court will uphold [the regulation] so long as the government can 'identify an American tradition justifying' the regulation." *Id.* (quoting *Bruen*, 142 S. Ct. at 2138). Thus, the second step of the analysis requires the government to identify a historical analogue demonstrating "a comparable burden on the right of armed self-defense" that was "comparably justified." *Bruen*, 142 S. Ct. at 2132–33.

5

Having an accurate account of history is undoubtedly necessary for addressing both steps of the *Bruen* analysis. It is essential that courts interpret the Constitution with accurate history because "'[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Id.* (quoting *D.C. v. Heller*, 554 U.S. 570, 634–35 (2008)). As the Court itself cautioned in *Bruen*, "not all history is created equal." *Id.* at 2119. Inaccurate history begets flawed interpretation which begets rulings at odds with the demands of the American people.

## I. Historical context shows the Second Amendment's reference to "the people" did not include 18-to-20-year-olds.

The district court erroneously concluded history supports 18-to-20-year-olds being included in the Second Amendment. As *Heller* makes clear, constitutional references to "the people" are references "to all members of the *political community*." *D.C. v. Heller*, 554 U.S. 570, 580 (2008) (emphasis added). Political community is not meant to include all individuals. Rather, it includes individuals *possessing political rights*. *United States v. Collette*, 630 F. Supp. 3d 841, 847 (W.D. Tex. 2022).

Historical context shows that 18-20-year-olds were not part of the political community possessing political rights. Certainly at that time they could not vote, a right that was restricted in the 1790s to only those over twenty one, and primarily to property holders. Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-*

6

*American Revolution In Authority* at ch. 7 (2005); Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* at 7 (2009). The Federal Militia Act of 1792 and subsequent state laws demonstrate that "young men" between the ages of 18 and 20 were expected to train with and to serve in the militias, but were not expected to own their own weapons. The district court noted the existence of these laws but incorrectly interpreted them. The Militia Act of 1792, and consequently all state laws that were passed in accord with it over the next several years, required young men of 18 years and above to show up for militia service, and, as the introductions to these laws specified, bring a gun, accoutrements, and ammunition. The states bore the burden of implementing these general requirements, and in every state, they made exceptions for young men (minors) under twenty one, who were to be provided with such weapons for the purposes of militia musters and trainings. *See Infra* p. 10, n. 3.

Thus, each state adopted the Militia Act of 1792 with supplemental language to accord those general federal requirements with their current laws and common law norms. The district court was misled by Appellees' briefing, which failed to take account of either the complete text of the laws in question or to assess those laws within their historical context, which necessitates comprehending that the legal status of young men as minors or "infants" at the time meant that they were incomplete members of the political community. The misreading of the history of

7

the state militia laws led the court to misapply the *Bruen* test. The state militia laws demonstrate that 18-to-20-year-olds were not thought to hold political rights such as the right to bear arms afforded to "the people." Instead, the presence of these laws and the language therein demonstrates that the underlying assumption was that 18-to-20-year-olds did not possess weapons and were under the supervision and authority of others—thus the need for laws explicitly granting 18-20-year-olds the right to bear arms *in the militia*.

Before diving deeper into examples of such state laws, it is important for this Court to take a step back and appreciate the context of the body of law we are about to review. We are reviewing state *militia* laws. These laws outline possession of weapons for 18-to-20-year-olds in the context of *serving in the militia*. They do not address 18-to-20-year-olds possessing weapons as a personal right outside the context of the militia—nor do any such positive laws from this period exist, as reviews of contemporary legal guides and statute law illustrate. All references to weapons are in the context of militia service, and are similar to those discussed below. *See Infra* p. 10, n. 3. In this respect, militia laws were less akin to current interpretation of the Second Amendment (since *Heller*) or a comparable rights-conferring state constitutional provision and more akin to modern federal laws establishing the Selective Service System and governing service in the U.S. military. Militia members were expected to bear these firearms not for individual self-defense,

Appellate Case: 23-2248     Page: 13     Date Filed: 07/25/2023 Entry ID: 5299116

but in accordance with rules and ordinances specified in a uniform military code. All of the state militia laws from the 1790s, which are referenced in full below, make some reference to such codes, to rules of military discipline, to processes of military punishment, and to obedience to commissioned officers.

The following paragraphs highlight state militia laws passed between 1792 and 1796, all adopted in response to the requirements of the Federal Militia Act of 1792. These laws demonstrate young men (minors) were not presumed fully responsible enough to possess weapons. Instead, the laws presume the minors were under the control or owed obedience to others (fathers, masters, or guardians). The exemplary laws from Connecticut, Delaware, and Massachusetts are highlighted because of their comprehensive nature. As discussed after these examples, all states enacted similar state militia laws containing that show 18-to-20-year-olds did not possess a right to carry weapons outside of their military duty.

Connecticut passed its state militia statute in October, 1792, in conformity with the federal militia law passed in May, 1792, and the statute distinguished between men over the age of 21 and those under that age. *Acts and Laws of the State of Connecticut, in America* 298–314 (1796). In particular, Connecticut supplemented the Militia Act of 1792 with its own requirements about who was required to show up and with what weapon and outlined different punishments for failure to comply depending on the individual's age. If a man either does not show

9

up for service or does not show up with weapons, then he is "delinquent" and a fine

can be levied against him if he is "upwards of twenty-one years of age." *Id.* at 308.

If the man is under that age, however, it is the responsibility of the "parent, master

or guardian" to supply the weapons and to bear the costs of any fines for his failure

to appear or to perform his duty. *Id.* at 308.[3]

---

[3] The Connecticut militia statute is representative of nearly every similar state militia statute of the era in providing that the parents, guardians, or masters (for apprentices) of minors subject to militia duties were responsible for furnishing arms and equipment or for paying the financial penalties associated with failure to furnish the same. *See Delaware. Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven* 1134 (1797); *The Perpetual Laws, of the Commonwealth of Massachusetts, from the Establishment of its Constitution to the Second Session of the General Court, A.D. 1798* 172-194 (1799); *The Laws of the State of New Hampshire, the Constitution of the State of New Hampshire, and the Constitution of the United States* 415-430 (1797); *Laws of the State of New Jersey Revised and Published Under the Authority of the Legislature of William Paterson* 436-48 (1799); *Laws of the State of New-York* (1802); *James; Martin Iredell, Francois-Xavier. Public Acts of the General Assembly of North-Carolina* (1804); *Public Laws of the State of Rhode-Island and Providence Plantations Passed since the Session of the General Assembly in January, A.D. 1798* (1798-1813). The few states without a similar policy include Georgia and South Carolina, which had similar policies for apprentices and their masters but did not address parents and minors; Pennsylvania, which exempted men under 21 years of age and servants from militia duties except in cases of emergency; and Virginia, which placed men between the ages of 18 and 25 in separate "light compan[ies]" subject to different training requirements. A Digest of the Laws of the State of Georgia 458-467 (1800); *A Digest of the Laws of the State of Georgia* 458-467 (1800); *Acts and Resolutions of the General Assembly of the General Assembly of the State of South-Carolina* 50-51 (Dec. 1792); *The Statutes at Large of Pennsylvania from 1682 to 1801* 454-481 (1909); *The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature* 340-356 (1823).

Appellate Case: 23-2248    Page: 15    Date Filed: 07/25/2023 Entry ID: 5299116

Delaware's militia law of 1792 likewise begins by quoting language from the Militia Act of 1792. *Delaware. Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven* 1134 (1797). Delaware's law then proceeds to explicitly exempt young men under age 21 from having to supply their own weapons. They did so, as will be explored at more length below, because they understood that as minors, such young men had no capacity to purchase or own such weapons of themselves: "but all young men under the age of twenty-one years . . . shall be exempted from furnishing the necessary arms, ammunition and accoutrements as are required by the fourth section thereof, and shall be exempted from militia duties and fines during such minority or servitude."[4] The law then adds that in "cases of rebellion" they might be called up but clarifies that the responsibilities for provision of weaponry and fines are different for "young men." *Id.*

Massachusetts' 1785 and 1792 militia law should be read together, as their 1792 law was merely a supplement. *The Perpetual Laws, of the Commonwealth of Massachusetts, from the Establishment of its Constitution to the Second Session of the General Court, A.D. 1798* 172-194 (1799). They provide an exemption for young

---

[4] Pennsylvania's law contains similar language exempting "all men under the age of twenty-one years" from "furnishing the necessary arms" and from "militia duties." *The Statutes at Large of Pennsylvania from 1682 to 1801* 456 (1909).

Appellate Case: 23-2248    Page: 16    Date Filed: 07/25/2023 Entry ID: 5299116

men from supplying their own "arms and equipments." *Id.* at 181. The statute explicitly states that parents, masters, or guardians should provide such weapons if their families happen to possess such weapons if they can afford it, and for the town to supply them if not. *Id.* Because militia service was required only of men between 18 and 45, it was entirely possible that young men might bring their father's weapon for such service. It also explicitly states that if the young man must be equipped at the expense of the town, that the weaponry "shall remain the property of the town at the expense of which they shall be provided." *Id.* Furthermore it provides penalties for failure to return the weapons to the town magazine once such service is concluded.[5]

Three common themes persist in all state militia laws showing 18-to-20-year-olds lacked the right to possess firearms. First, all of these statutes lay out the means by which an 18-to-20-year-old would obtain weaponry. In other words, none of these statutes assume 18-to-20-year-olds possessed weapons themselves. Instead, 18-to-20-year-olds were *to be supplied* weaponry by their parents, guardians, masters or, in some cases, the government, for a for military duty, which includes sometimes

---

[5] State militia laws enacted by New Hampshire and Rhode Island also provide that those unable to arm themselves will be equipped by the town. *The Laws of the State of New Hampshire, the Constitution of the State of New Hampshire, and the Constitution of the United States* 422 (1797); *Public Laws of the State of Rhode-Island and Providence Plantations Passed since the Session of the General Assembly in January, A.D. 1798* (1798-1813).

Appellate Case: 23-2248     Page: 17     Date Filed: 07/25/2023 Entry ID: 5299116

the role that we could now call policing, and for which they were paid. It should be understood that in peacetime, there were then (in the 1790s) neither police nor a permanent military in any of the states or at the federal level. Though of course they had local sheriffs and federal marshals, they were few in number. The militia thus played a prominent role in keeping the peace and providing defense, one similar to today's national guard, police, and selective service.

Second, financial penalties for failure to furnish appropriate arms and equipment—the punitive components and practical enforcement mechanisms of these laws—ultimately affected the parents, guardians, or masters of those legal "infants" who were members of the militia, not the infants themselves. The 18-to-20-year-olds were spared most legal repercussions for failure to comply with the law. Their responsibility to do so depending instead on the disciplinary efforts of their guardian or master. This runs against our nation's tradition of holding its citizens—or those part of the "political community"—to the rule of law, and reflects the inferior legal status of these infants as dependents within households, despite their required participation in the militia. Once in service, they could be directly disciplined (with bodily punishments) for failure to follow orders. However, these statutes make clear that 18-to-20-year-olds were not considered full members of the political community who were expected to abide by law. They had no unqualified right to bear arms.

Appellate Case: 23-2248    Page: 18    Date Filed: 07/25/2023 Entry ID: 5299116

Third, the punitive components of the laws further demonstrate that these laws were imposing an obligation—not creating or codifying a preexisting right—for 18-to-20-year-olds to bear arms, and especially to train to bear arms, in anticipation of their fuller participation as legal adults. These militia statutes did not purport to recognize a preexisting right to armed self-defense but instead imposed an obligation on certain citizens to perform specified tasks involving the use of specialized tools, including firearms.

In sum, these state militia laws clearly demonstrate that 18-to-20-year-olds[6] were not considered a part of the "political community" to which the Second Amendment's "the people" clause is interpreted to refer post Heller, especially if we are meant to interpret it, post *Bruen*, in light of these laws. The statutory language from state militia laws such as providing a method for supplying 18-to-20-year-olds with weapons, holding parents or guardians liable for failure to furnish minors for militia duty, and punitive consequences for failing to do so, all support the understanding that minors were not expected—let alone possessed a right—to bear

---

[6] Although only Connecticut and Delaware's laws explicitly reference men below the age of 21, the remaining state laws also reference this age group, with different language that everyone then understood. For example, Maryland, Massachusetts and New Hampshire's laws all reference the parents of those exempted from the law, from which it can be inferred that the law exempted minors. At the time the laws were passed, the age of adulthood for most purposes was 21. *See* Brewer, *By Birth or Consent* at ch. 7, focusing on the legal inability of those under age 21 to form contracts, and the authority of masters, parents, and guardians. Such norms were commonly understood in virtually all legal guides and statutes of the 1790s.

14

arms at this time. For this reason, the district court erred in finding that the founding era militia laws support the inclusion of 18-to-20-year-olds in the Second Amendment's "the people." Instead, these laws show that, during the founding and ratification era, 18-to-20-year-olds were not a part of the "political community," and the Second Amendment's reference to "the people" did not include 18-to-20-year-olds, nor did it not afford them the right to bear arms.

## II. The age of majority was 21 during the founding and ratification era demonstrating that our nation has historically confined the rights of minors to bear arms to military or police service.

If this Court concludes that the Second Amendment's plain text presumptively guarantees Appellees' right to publicly carry a handgun for self-defense, *Bruen* requires that the Commissioner demonstrate that the age requirement in Minn. Stat. § 624.714, subd. 2(b)(2) is consistent with the nation's history and tradition of firearms regulation. This Court must consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 1233.

But much has changed since the eighteenth century. While then, certain norms were incorporated in commonly used legal treatises, some of those norms have been challenged or changed in different ways, and the world has changed dramatically as a result of technological innovation. Because this case implicates "unprecedented societal concerns" and "dramatic technological changes," it accordingly requires a

15

"more nuanced approach" under *Bruen*. It is entirely appropriate that states have designed more nuanced legislation to deal with issues surrounding legal minority and powerful weapons. Courts employing a more nuanced approach to determine whether the challenged statute is consistent with the nation's history and tradition of firearms regulation must consider the broader historical context to account for unprecedented concerns and dramatic changes when assessing "how and why" historical regulation and the challenged regulation "burden a law-abiding citizen's right to armed self-defense." *Id.* Courts employing a nuanced approach should also exercise increased caution in upsetting the considered judgments of state legislatures by declaring contrary to the Constitution regulations enacted in response to conditions "unimaginable at the founding." *Id.* at 2132.

This amicus brief hereby adds the larger context that shows that such regulation was assumed by the plain text of common law treatises of the period, especially in their focus on the legal incapacity of minors. It thus helps to provide evidence to properly apply *Bruen*'s strictures.

The common law age of majority then, 21, as specified in legal guides for justices and lawyers published in all states in the 1790s and in the decades that followed, provides a "relevantly similar" historical analogue to Minn. Stat. § 624.714, subd. 2(b)(2). The age of majority for most purposes then was 21.

16

There are multiple reasons "why" this infant status and consequent limited capacity to contract—which severely limited the ability of those so designated to acquire a firearm—was imposed. Regulations establishing 21 years as the age of majority during this period were premised on the understanding that those below that age are mentally immature and not yet capable of responsible self-governance. As stated by early nineteenth century legal author and jurist James Kent in 1836 in his influential Commentaries on American law: "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years." James Kent, 2 Commentaries On American Law 259 (3d ed., 1836). Minors were accordingly subject to greater state supervision than nearly any other legal entity involved in the marketplace during the early years of the republic. *See* Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution In Authority* at ch. 7 (2005).

To give practical examples of how legal restrictions on minors worked in practice in terms of the ability of minors to purchase weapons, consider, for example, two widely used legal guides published in two states in the 1790s. During this era, few lawyers or judges had formal training, but instead served apprenticeships and learned the law from practical guides such as these.

17

William Waller Hening's *New Virginia Justice*, published in Richmond in 1795, was a typical guide for justices of the peace. It defines "infants" as all those under the age of 21. "By an infant, or minor, is meant any one who is under the age of 21 years." William Waller Hening, New Virginia Justice 258 (Richmond, 1795) (citing Sir Edward Coke, *Institutes of the Laws of England* (vol. 1, 1628)). It clarifies that no minor can sell or alienate lands, goods, or chattels "At 21, and not before, persons may bind themselves by any deed, and alien lands, goods and chattels." *Id.* (citing Coke's *Institutes*, vol. 1 at 171). They cannot, therefore, enter a bond for good behavior (or as we would say in modern parlance, for bail for release from jail) except via their "sureties" or others over 21. More importantly, in terms of the issues under discussion, such minors or infants cannot purchase anything upon credit except necessaries: "an infant may bind himself to pay for his necessary meat, drink, apparel, physic, and such like, and also for his good teaching or instruction, whereby he may profit himself afterwards; but if he binds himself in an obligation or other writing, with a penalty for the payment of any of these, that obligation shall not bind him." *Id.* Furthermore, citing an English case, which clearly Hening thought to be binding (as was so much common law precedent still in the new American states in the 1790s), he elaborated that any merchant would be a fool to lend a minor money except for strict necessities, as minors under the age of 21 are NOT bound by their obligations. "And in Earl's case, it is said, that an infant may buy necessaries, but

18

cannot borrow money to buy: for he may misapply the money, and therefore the law will not trust him, *but at the peril of the lender*, who must lay it out for him, or see it laid out." *Id.* (emphasis added) (referencing English reporter, Salkeld). Hening elaborates that while technically the "infant" has the ability to purchase because "it is intended for his benefit." He can repudiate any debts "at his full age" of 21, when "he may either agree thereunto, and perfect it, or without any cause to be alleged, waive or disagree to the purchase." *Id.* at 262. The clarification merely underlines the risk that any merchant would be taking in lending a young man under the age of 21 the money to purchase an expensive firearm.

Turning to New Jersey, the main guide for justices was one written by William Griffith. *See* Griffith, *A Treatise on the Jurisdiction and Proceedings of Justices of the Peace in Civil Suits in New Jersey* (3rd ed. 1813). Griffith helpfully supplied the following guidelines about how to proceed (or not) in an action for debt against a minor. Such actions can only be maintained against a minor if they were for necessaries, or if he had done a trespass (a civil crime) or if he is an executor of a will. Even then it has be done not against the minor himself, but against a guardian appointed to act in his behalf by the court. Likewise any minor has to act through a guardian to collect a debt. "All proceedings against the defendant by his guardian." *Id.* at 175. *See also* Brewer, *supra*, at ch. 7.

Appellate Case: 23-2248    Page: 24    Date Filed: 07/25/2023 Entry ID: 5299116

By the late eighteenth century, it was an established rule that young people under the age of 21 could not make contracts except for necessaries. While the exact scope of those "necessaries" was slightly flexible and debatable, Amicus has never encountered a situation where a firearm was considered a necessary. Thus, at the time of the founding, people under the age of 21 could only enter into contracts for food, clothes, lodging, and occasionally education, as specified in Hening's *New Virginia Justice* of 1795, and discussed above.

These legal exclusions of minors from contracts rested on larger understandings of minors' lack of sufficient understanding to be fully competent and responsible for their own decisions, an understanding that comports with Minnesota's current laws. The district court acknowledged the Minnesota Supreme Court's determination that Minn. Stat. § 624.714, subd. 22 was enacted "'to prevent the possession of firearms in places where they are most likely to cause harm in the wrong hands, *i.e.*, in public places where their discharge may injure or kill intended or unintended victims.'" *Worth v. Harrington*, No. 21-CV-1348 at *13 n.22 (citing *State v. Hatch*, 962 N.W.2d 661, 664 (Minn. 2021)). The court further acknowledged the link between the "still-developing nature of 18-20-year-olds' brains to increased impulsivity and a prediction that greater access to firearms among young adults leads to disproportionate rates of violent crimes involving firearms and suicides." Id. at *17. This rationale both comports with the historical rationale for instituting the age

of majority and respects the scope of the Second Amendment right to bear arms, which extends to "law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2156; *Heller*, 554 U.S. at 635.

Beyond the common law age of majority, the ability of infants to keep and bear arms was more explicitly restricted by collegiate and municipal regulations during the ratification era and ensuing few decades. Students attending college in this era were explicitly excluded from having to participate in the militia by most state militia statutes. They also, as one scholar has noted, still lived under the restrictive authority of colleges operating in loco parentis, which then had many harsh and restrictive regulations. Brian Jackson, *The Lingering Legacy of "In Loco Parentis": An Historical Survey and Proposal for Reform*, 44 Vand. L. Rev. 1135 (1991). Keeping and carrying of firearms were forbidden on campus at Yale College[7], the University of Georgia[8], the University of North Carolina[9], and the University of Virginia[10], reflecting the degree of authority a state institution could wield over legal infants under its care. These policies were implemented for the

---

[7] *The Laws of Yale-College, in New-Haven, in Connecticut, Enacted by the President and Fellows, the Sixth Day of October, A.D. 1795*, at 26 (1800).

[8] *The Minutes of the Senatus Academicus* 1799–1842, p.73 University of Georgia Libraries (1976).

[9] Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina 15 (1838).

[10] University of Virginia Board of Visitors Minutes (October 4–5, 1824) 1, 6–7 (1824), https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/..

Appellate Case: 23-2248    Page: 26    Date Filed: 07/25/2023 Entry ID: 5299116

maintenance of public safety in recognition of the relative immaturity of young men who were then defined as legal infants.

Municipal ordinances of the ratification era also reflect that the ability of infants to carry arms for self-defense was not afforded the respect due to the supposed exercise of a constitutional right. An 1803 New York ordinance and an 1817 South Carolina law each prohibited the firing of firearms in the city on penalty of a $5 fine. *Ordinance of the City of New York, to Prevent the Firing of Guns in the City of New York § 1, Laws and Ordinances, Ordained and Established by the Mayor, Alderman and Commonalty of the City of New-York, in Common-Council Convened, for the Good Rule and Government of the Inhabitants and Residents of Said City* 83–84 (1803); *An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia* (1817); *Ordinances of the Town of Columbia, (S.C.) Passed Since the Incorporation of Said Town: To Which are Prefixed the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto* 61 (1823). When infants were found to have violated the statute, either the penalty would fall on their guardian (in New York) or the city would seize and sell the firearm used by the infant in order to pay the fine. These laws thus likewise reflect the reduced capacity of infants to bear firearms for the purposes of self-defense.

The court should accordingly recognize that the legal status of individuals under age 21 as infants, the relative inefficacy of firearms of the era for the purpose

22

of individual self-defense, and the relative unavailability of those firearms best suited to such purpose, especially to minors, limited the right of young men as individuals to bear firearms for the purpose of armed self-defense. The court should further recognize that, to the extent that these burdens were by design, they were motivated by the same types of concerns that motivated the passage of Minn. Stat. § 624.714, subd. 2(b)(2).

## CONCLUSION

Respectfully, the district court applied the *Bruen* guidelines erroneously and in a manner that did not account for the problem of legal minority as it was understood at the time of the founding and ratification of the Second Amendment. The Minnesota Statute, when properly analyzed under the *Bruen* guidelines, is in fact constitutional. In particular, the historical laws such as founding era militia laws cited in support of the district court's grant of summary judgment, when read in full and with the benefit of historical context, actually drive a contrary result. These laws, especially when read with a comprehensive understanding of the existing, written common law of that era, far from proving that all 18-20 year-olds had an unhindered right to bear arms in all circumstances, show the abbreviated nature of such capacity. The Minnesota Statute, according to a conscientious and contextual reading of the state militia statutes of the 1790s, as required by *Bruen*, is constitutional.

Appellate Case: 23-2248   Page: 28   Date Filed: 07/25/2023 Entry ID: 5299116

DATED:

/s/ Daniel Meyers
Dan Meyers
Lindsay Strong
Naomi Bident
Sam Williams
Veronica Callahan
**ARNOLD PORTER KAYE SCHOLER LLP**
70 West Madison Street, Suite 4200
Chicago, Illinois 60602-4321
Daniel.Meyers@arnoldporter.com
(312) 583-2393

*Counsel for Amici Curiae*

24

## CERTIFICATE OF COMPLIANCE
## WITH FRAP 32

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,566 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 pt Times New Roman font.

s/ *Daniel M. Meyers*
Daniel M. Meyers

Appellate Case: 23-2248     Page: 30     Date Filed: 07/25/2023 Entry ID: 5299116

**CERTIFICATE OF COMPLIANCE**
**WITH 8ᵗʰ Cir. R. 28(h)(2)**

The undersigned, on behalf of the party filing and serving this brief and certifies that the brief was scanned for viruses and that it is virus-free.

s/ *Daniel M. Meyers*
Daniel M. Meyers

Appellate Case: 23-2248    Page: 31    Date Filed: 07/25/2023 Entry ID: 5299116