IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

---

Kristin Worth, et al.,

Appellees,

vs.

Bob Jacobson, in his individual capacity
and in his official capacity as
Commissioner of the
Minnesota Department of Public Safety,

Appellant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---

**APPELLEES' BRIEF**

---

Blair W. Nelson
BLAIR W. NELSON LTD
205 Seventh Street NW, Ste. 3
Bemidji, MN 56601
Tel: 218-444-4531
bwnelson@paulbunyan.net

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

*Attorneys for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and 8th Cir. R. 26.1A, Appellee Second Amendment Foundation states that it is a nonprofit organization incorporated under the laws of Washington, that it has no parent corporation, and that no publicly held corporation owns 10% or more of its stock.

Appellee Firearms Policy Coalition Inc. states that it is a nonprofit organization incorporated under the laws of Delaware, that it has no parent corporation, and that no publicly held corporation owns 10% or more of its stock.

Appellee Minnesota Gun Owners Caucus states that it is a nonprofit organization incorporated under the laws of Minnesota, that it has no parent corporation, and that no publicly held corporation owns 10% or more of its stock.

Dated: August 15, 2023

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson

*Attorney for Appellees*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES.................................................................... iii

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF THE CASE...................................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................4

ARGUMENT ...................................................................................8

   I.   The District Court Correctly Held that the Second Amendment's Plain Text Covers 18-to-20-Year-Olds' Right to Carry Firearms in Public for Self-Defense. ...................................................................9

      A. 18-to-20-Year-Olds Are Part of "the People."............................................9

      B. The State's Putatively Textual Arguments Are Unavailing.......................16

   II.   The State Has Failed to Demonstrate that the Carry Ban Is Consistent With Historical Restrictions on the Second Amendment Right. ..................24

      A. The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-Olds to Exercise Their Second Amendment Rights on Equal Footing with Older Americans. ......................................26

      B. The State's Reconstruction Era Analogues Are Too Little, Too Late to Justify the Carry Ban........................................................40

      C. The Carry Ban Is Not A "Presumptively Lawful" "Longstanding Prohibition." .................................................................49

   III.   The State Has Waived Its Arguments Regarding Sovereign Immunity and *Ex parte Young*. ........................................................50

CONCLUSION ................................................................................50

Appellate Case: 23-2248   Page: 3   Date Filed: 08/16/2023 Entry ID: 5306404

# TABLE OF AUTHORITIES

**Cases**                                                            **Page**

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015).......................................................................10

*Aymette v. State*,
21 Tenn. 154 (Tenn. 1840) ...........................................................47

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011)........................................................................37

*Coleman v. State*,
32 Ala. 581 (1858) .........................................................................47

*Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*,
492 U.S. 573 (1989)........................................................................20

*District of Columbia v. Heller*,
554 U.S. 570 (2008)............................... 1, 5, 8, 10, 12, 13, 15, 16, 19, 20, 21,
22, 23, 24, 29, 32, 47, 49

*Dobbs v. Jackson Whole Women's Health Organization*,
142 S. Ct. 2228 (2022)....................................................................34

*Dred Scott v. Sandford*,
60 U.S. (19 How.) 393 (1857) ..................................................19, 29

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)........................................................................13

*Espinoza v. Mont. Dep't of Revenue*,
140 S. Ct. 2246 (2020)....................................................................30

*Fraser v. BATFE*,
No. 3:22-cv-410, 2023 WL 3355339 (E.D. Va. May 10, 2023) ...................40

*Glasgow v. Nebraska*,
819 F.3d 436 (8th Cir. 2016).........................................................50

*Hirschfeld v. BATFE*,
5 F.4th 407 (4th Cir. 2021)....................................1, 10, 11, 15, 16, 27, 35, 41

*Hirschfeld v. BATFE*,
14 F.4th 322, 328 (4th Cir. 2021)............................................1, 10

*Jones v. Bonta*,
34 F.4th 704 (9th Cir. 2022).................................. 1, 12, 14, 26, 27, 35, 41, 47

iii

*Jones v. Bonta*,
  47 F.4th 1124 (9th Cir. 2022)....................................................1, 12

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)..........................................................8, 41

*Moore v. Madigan*,
  702 F.3d 933 (7th Cir. 2012)..........................................................45

*Nat'l Rifle Ass'n v. BATFE*,
  714 F.3d 334 (5th Cir. 2013).......................... 16, 26, 27, 33, 34, 35

*Nat'l Rifle Ass'n v. BATFE*,
  700 F.3d 185 (5th Cir. 2012)..........................................................40, 48

*Nat'l Rifle Ass'n v. Bondi*,
  72 F.4th 1346 (11th Cir. 2023)..........................................................26

*New Jersey v. T.L.O.*,
  469 U.S. 325 (1985)..........................................................11

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022)................ 1, 4, 8, 9, 17, 18, 19, 24, 25, 28, 29, 30, 31,
  32, 33, 35, 41, 42, 44, 45, 46, 49

*Nunn v. State*,
  1 Ga. 243 (1846)..........................................................10

*Page v. State*,
  50 Tenn. 198 (1871)..........................................................47

*Parker v. District of Columbia*,
  478 F.3d 370 (D.C. Cir. 2007)..........................................................13

*State v. Allen*,
  94 Ind. 441 (1884)..........................................................47

*State v. Callicutt*,
  69 Tenn. 714 (1878)..........................................................47

*Tankersly v. Commonwealth*,
  9 S.W. 702 (Ky. 1888)..........................................................46, 47

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969)..........................................................11

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014)..........................................................20

iv

Appellate Case: 23-2248     Page: 5     Date Filed: 08/16/2023 Entry ID: 5306404

*United States v. Carpio-Leon*,
    701 F.3d 974 (4th Cir. 2012) ........................................................19

*United States v. Cruikshank*,
    92 U.S. 542 (1875) ................................................................20, 21

*United States v. Miller*,
    307 U.S. 174 (1939) ......................................................................26

*United States v. Portillo-Munoz*,
    643 F.3d 437 (5th Cir. 2011) ...................................................21, 22

*United States v. Sitladeen*,
    64 F.4th 978 (8th Cir. 2023) ..............................................17, 21, 25

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ......................................................................11

## Constitutions, Statutes, and Rules

U.S. CONST.
    art. I, § 2, cl. 2 ...........................................................................10
    art. I, § 8, cl. 16 .........................................................................12
    amend. II .....................................................................1, 8, 11, 12

Minn. Stat. Ann.
    § 642.714 subd. 1a ........................................................................2
    § 624.714 subd. 2(b) ......................................................................2
    § 624.714, subd. 9 .......................................................................45

The Militia Act of 1792, ch. 33, 1 Stat. 271, § 1 .................................12

27 Stat. 116–17 (1892) .......................................................................46

16 Del. Laws 716 (1881) .....................................................................43

1856 Ala. Laws 17 ........................................................................40, 41

1856 Tenn. Pub. Acts 92 ...............................................................40, 41

1859 Ky. Acts 245 § 23 ...........................................................40, 41, 43

1873 Ky. Acts 359 ..............................................................................43

1875 Ind. Acts 59 ...............................................................................46

1876 Ga. Laws 112 .............................................................................46

1878 Miss. Laws 175–76 ...............................................................43, 44

MO. REV. STAT § 1274 (1879) ............................................................43

Appellate Case: 23-2248    Page: 6    Date Filed: 08/16/2023 Entry ID: 5306404

1881 Ill. Laws 73 ....................................................................................43

1882 Md. Laws 656 ...............................................................................45

1882 W. Va. Acts 421–22 ......................................................................45

1883 Kan. Sess. Laws 159 .....................................................................45

1883 Wis. Sess. Laws 290 .....................................................................45

1884 Iowa Acts 86 ................................................................................45

1890 La. Acts 39 ...................................................................................45

1890 Wyo. Sess. Laws 1253 ..................................................................46

1893 N.C. Sess. Laws 468–69 ...............................................................43

1897 Tex. Gen. Laws 221–22 ................................................................43

## Other Authorities

1 BLACKSTONE COMMENTARIES ...............................................................42

2 ANNALS OF CONGRESS (Joseph Gales ed., 1834) ..........................13, 14

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833) ............................................................................................10

Act of May 5, 1777, ch. 3, in 9 HENING'S STATUTES AT LARGE 281 (1821) .....29, 30

DAVID E. BAILY, THE GENERAL STATUTES OF THE STATE OF NEVADA. IN FORCE. FROM 1861 TO 1885, INCLUSIVE. WITH CITATIONS OF THE DECISIONS OF THE SUPREME COURT RELATING THERETO 1077 (1885) ............................44

JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1851) ................................42

Br. for Nat'l African Am. Gun Ass'n as *Amicus Curiae*, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (May 13, 2019) .........30

THOMAS M. COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS (6th ed. 1890) ...........................................................................................48

THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA (1880) ................................................11, 16

Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 VAND. L. REV. 1135 (1991) ............................38

David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U. L.J. 119 (2018) ...................................... 27, 40, 43, 48

Appellate Case: 23-2248    Page: 7    Date Filed: 08/16/2023 Entry ID: 5306404

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495 (2019) ............................................14, 15

Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/41OFQND ..................................................................................25

*Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick ed., 1938) .....................................................................14

OLIVER H. STRATTAN, CITY CLERK, A COLLECTION OF THE STATE AND MUNICIPAL LAWS, IN FORCE, AND APPLICABLE TO THE CITY OF LOUISVILLE, KY. PREPARED AND DIGESTED, UNDER AN ORDER FROM THE GENERAL COUNCIL OF SAID CITY 175 (1857) ......................................................................39, 40

CHAPEL HISTORY, TATE STUDENT CTR. AT UNIV. OF GA., https://bit.ly/42i4rcA (last accessed Aug. 12, 2023) .......................................................................38

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. OF L. & POLITICS 191 (2006) ...................................................45

Appellate Case: 23-2248    Page: 8    Date Filed: 08/16/2023 Entry ID: 5306404

## STATEMENT OF ISSUES

1. Whether Minnesota's ban on firearm carriage by law-abiding 18-to-20-year-olds violates the Second Amendment to the United States Constitution.

   - U.S. CONST. amend. II
   - *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)
   - *District of Columbia v. Heller*, 554 U.S. 570 (2008)
   - *Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021)
   - *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022), *vacated on reh'g and remanded in light of Bruen*, 47 F.4th 1124 (9th Cir. 2022) (Mem.)

1

## STATEMENT OF THE CASE

Minnesota generally bars ordinary citizens from carrying handguns in public for self-defense unless they first acquire a permit to carry. Minn. Stat. Ann. § 642.714 subd. 1a. And Minnesota does not grant carry licenses to anyone unless they are "at least 21 years old." Minn. Stat. Ann. § 624.714 subd. 2(b)(1)–(5). There is, therefore, a statewide ban on carriage of firearms for law-abiding adult Minnesotans who are otherwise eligible for licenses but fall in the age range between 18 and 21 years old ("the Carry Ban"). Plaintiff Kristin Worth is a 20-year-old Minnesotan who is, but for her age, eligible for a carry license and who would, if it were lawful for her to do so, carry her lawfully possessed handgun in public for self-defense. App. 3; R. Doc. 84, at 3. She is joined as plaintiff by three membership advocacy organizations who count her as a member, as well as by two other individuals whose claims are now moot (because they have turned 21) but who were similarly situated to Worth when this suit was filed. *Id.* at 3–4.

Defendants are the Commissioner of the Minnesota Department of Safety ("the State"), who administers Minnesota's permitting scheme on a statewide basis, and the sheriffs of the three counties where the individual Plaintiffs reside, who are tasked with granting applications for carry licenses under Minnesota law. *Id.* at 4–5.

Plaintiffs filed this suit on June 7, 2021, to vindicate their fundamental, inalienable right to bear arms. R. Doc. 1. After the Supreme Court decided *Bruen* in

Appellate Case: 23-2248    Page: 10    Date Filed: 08/16/2023 Entry ID: 5306404

2022, the parties filed cross-motions for summary judgment on August 4, 2022. *See* R. Docs. 42, 49, and 53. The district court held oral argument on October 5, 2022, and on March 31, 2023, it granted Plaintiffs' motion, holding that the Carry Ban was facially unconstitutional under the Second and Fourteenth Amendments and enjoining its enforcement because 18-to-20-year-olds are part of "the people" protected by the Second Amendment and the State failed to demonstrate that the Carry Ban was part of a historic tradition of firearm regulation that was understood to be consistent with the Second Amendment. App. 49–50; R. Doc. 84, at 49–50. The district court subsequently stayed its injunction pending appeal, App. 67; R. Doc. 98, at 10, and the State timely appealed, R. Doc. 100.

Appellate Case: 23-2248    Page: 11    Date Filed: 08/16/2023 Entry ID: 5306404

## INTRODUCTION AND SUMMARY OF ARGUMENT

Law-abiding 18-to-20-year-old citizens possess full Second Amendment rights, including the right to carry firearms in public for self-defense. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2122 (2022). That necessarily means that the Carry Ban, which bars 18-to-20-year-olds from acquiring licenses and lawfully carrying firearms in public in Minnesota, is unconstitutional under the Second Amendment.

Under *Bruen*, when a law prohibits an activity that falls within the scope of the Second Amendment's plain text, this Court must presume that the law is *unconstitutional*. The only way that such a law can be saved is if the State can affirmatively prove, with reference to historical sources, that the law is similar to historical restrictions that were accepted as constitutional, both in *how* it burdens the right and *why* it burdens it.

The State argues that Plaintiffs' claims fail at either the textual or historical level, but as the district court's well-reasoned opinion demonstrates, there can be no question that 18-to-20-year-olds are members of "the people" whose rights are protected, and the State has failed to come forward with evidence of even *one* relevant restriction from the Founding era. The restrictions it collects from the latter half of the 19th century, in addition to being too late, are distinguishable from the Carry Ban.

Appellate Case: 23-2248    Page: 12    Date Filed: 08/16/2023 Entry ID: 5306404

As to the textual issue, this Court is bound to follow the Supreme Court's binding interpretation of the Second Amendment's plain text in *District of Columbia v. Heller*, 554 U.S. 570 (2008). In that case, the Supreme Court definitively interpreted "the people" to include "all Americans." And though that statement leaves no question as to *who* has a Second Amendment right under the plain text of the Amendment, any lingering doubt is removed by the Second Amendment's "prefatory clause." That clause makes clear that one purpose for which the Second Amendment was included in the Bill of Rights was to protect the existence of the militia—not an organized militia, but the population of all able-bodied men who could be called upon to defend the country in times of need—and that means that, whoever else it might protect, the Amendment must *at least* protect the rights of militia members to "keep and bear" firearms. And it is historical fact that at or just after the Second Amendment's adoption, the federal government and *every state* in the Union included 18-to-20-year-olds in their organized militias, which necessarily means that members of that age group were understood to be part of the unorganized militia as well.

In disputing this, the State reads into the text several limitations are not there. It attempts to limit "the people" to "adults," but the Constitution's text makes no mention of age in this regard. It attempts to equate "the people" with "eligible voters" but that is inconsistent with the Supreme Court's interpretation of the phrase, both

Appellate Case: 23-2248    Page: 13    Date Filed: 08/16/2023 Entry ID: 5306404

in *Heller* and elsewhere. And it attempts to limit "the people" to those who were considered "the people" at the Founding, an argument that both has troubling implications for the rights of many Americans today and closely resembles one that *Heller* dismissed as "borderline frivolous." The district court correctly dismissed these arguments and this Court should do the same.

The State's arguments regarding history fare little better. Although *Bruen* could hardly have been clearer that to support a presumptively unconstitutional law, a state must come forward with evidence showing a well-established historical tradition of similar regulation and that such evidence is most probative if it dates to the Founding, the State has failed to demonstrate a *single* arguably similar historical restriction from before 1856. As another Court of Appeals noted, there is not just an absence of similar restrictions at the Founding, there are laws (the militia laws) that affirmatively *required* 18-to-20-year-olds to own firearms, and no suggestion anywhere that they were restricted from carrying them when not mustering.

For Founding-era support, the State first points to laws targeting groups based on perceived "dangerousness" but these laws (which targeted, for example, African Americans or Native Americans) would all be rightly held unconstitutional today and should play no role in defining the scope of the Second Amendment. What is more, they were all predicated on the reality that the individuals they disarmed were not understood to be part of "the people" at the time (African Americans, Native

6

Americans), had removed themselves from that category (those who would not swear loyalty to the Patriot cause), or were expressly carved out from the then-applicable arms right (Catholics). Second, the State claims that the common law of the era contained restrictions on the firearm rights of 18-to-20-year-olds, but there is zero evidence of any such restriction in any judicial decision, legal commentary, or other similar source. The State merely infers that such restrictions existed, based on the existence of later statutes that imposed purchasing or carrying restrictions on this age group, college rules against gun ownership from the Founding era, and a handful of municipal ordinances that regulated the use of firearms by the young and the old equally. None of these inferences are valid and the Court should end its analysis there.

Even if the State's later laws are considered, the Court should still find that they are inadequate to support the Carry Ban, because very few of them enacted such a severe restriction on the right to carry in public and those few that did were premised on the fact that 18-to-20-year-olds were, at the time, minors, a legal status that does not apply to them today. The State argues that these historical foundations for the Carry Ban, meager as they are, are still more than can be said for other firearms laws that it presumes are valid. But even if that is true, and the State has not proven it is, that does not mean that the State gets a pass on satisfying the *Bruen* standard. *Bruen* made clear that *no restriction* on the Second Amendment right is

valid unless it has adequate historical justification. That the Carry Ban does not is dispositive.

## ARGUMENT

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. This constitutional provision "protect[s] an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. That right presumptively "belongs to all Americans," not "an unspecified subset," *Heller*, 554 U.S. at 580–81, 592, and applies equally against the states through the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion). The Amendment enshrines " 'the right of law-abiding, responsible citizens to use arms' for self-defense. . . . [and] demands our unqualified deference." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). For that reason, the Second Amendment's protections cannot be balanced away in favor of purported state interests. The test that this Court must apply to assess whether the Carry Ban is constitutional is straightforward:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

8

*Id.* at 2129–30. Here, the text of the Amendment encompasses 18-to-20-year-olds, and the State has failed to demonstrate a historical tradition of firearm regulation at all comparable to the Carry Ban, so the district court was correct to grant summary judgment to Plaintiffs.

I. **The District Court Correctly Held that the Second Amendment's Plain Text Covers 18-to-20-Year-Olds' Right to Carry Firearms in Public for Self-Defense.**

### A. 18-to-20-Year-Olds Are Part of "the People."

*Bruen* established once and for all that the Second Amendment right "to keep *and bear* arms" means just what it says—the right to carry (or bear) firearms in public is protected just as much as the right to own (or keep) them. Plaintiffs' challenge is, therefore, within the scope of the Second Amendment, and the burden is on the State to justify the Carry Ban. *See id.* at 2156. The only feature that differentiates this case from *Bruen* is Plaintiffs' age. The district court rejected that distinction, finding that the plain meaning of "the people" referred to in the Second Amendment includes 18-to-20-year-olds. App. 20; R. Doc. 84, at 20. It was right to do so, as several features of the Second Amendment's text make clear that it applies to 18-to-20-year-olds on equal footing with all other adults.

1. The Second Amendment refers to a right of "the people" to keep and bear arms without mentioning age. *See id*. at 14. The " 'normal and ordinary' meaning" of "the people" includes *all* the people. *Bruen*, 142 S. Ct. at 2127. As the

Appellate Case: 23-2248    Page: 17    Date Filed: 08/16/2023 Entry ID: 5306404

Supreme Court made clear in *Heller*, "the Second Amendment right is exercised individually and belongs to *all* Americans." 554 U.S. at 581 (emphasis added); *accord* 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 746, § 1890 (1833) ("The right of the *citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic.") (emphasis added); *Nunn v. State*, 1 Ga. 243, 251 (1846) ("The right of the whole people, old and young, men, women[,] and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree.") (quoted approvingly, *Heller*, 554 U.S. at 612–13 and *Bruen*, 142 S. Ct. at 2147).

Furthermore, construction of the Constitution requires reading individual amendments and clauses "in the context of the Constitution as a whole." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325–26 (2015). The Constitution elsewhere explicitly considers and prescribes limits based on age. *See, e.g.*, U.S. CONST. art. I, § 2, cl. 2 (must be 25 years old to serve in the House of Representatives). This demonstrates that "the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment." *Hirschfeld v. BATFE*, 5 F.4th 407, 421 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021). And in the two other provisions in the Bill of Rights that explicitly describe a right of "the people"

10

generally, the First and the Fourth Amendments, the rights apply *fully* to 18-year-olds and in fact extends to *the whole people*, even those under 18. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) ("Students . . . are 'persons' under our Constitution [who] are possessed of fundamental rights which the State must respect"); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) ("Equally indisputable is the proposition that the Fourteenth Amendment protects the rights of students against [unreasonable searches and seizures] by public school officials[.]"); *see also Hirschfeld*, 5 F.4th at 421. "When the term *the people* is made use of . . . in all the enumerations and guaranties of rights [in the Constitution] the whole people are intended." THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68 (1880). Even where "the people" does not appear, *every other constitutional right* applies *at least* to those 18 and older. *Hirschfeld*, 5 F.4th at 422–23 (noting that the right to jury trial, voting, marriage, and sex apply at least to those 18 years old). As the district court correctly noted, "[a]lthough one can find certain limitations upon the rights of young people secured by both the First and Fourth Amendments, neither has been interpreted to exclude 18-to-20-year-olds from their protections." App. 15; R. Doc. 84, at 15.

    2.    This reading of "the people" is further supported by the inclusion in the Amendment of a "prefatory clause" which reads: "[a] well regulated Militia,

being necessary to the security of a free State . . . ." U.S. CONST. amend. II. As *Heller* explained, this clause "announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 595, 599. As such, although the right is not limited to those who were in the militia or eligible for militia service at the Founding (it is unquestionably broader and includes, for example, women like Plaintiff Worth), "[l]ogic demands that there be a link between the stated purpose and the command," *id.* at 577, meaning that if an individual would have been a member of the "militia," *at least* his rights must be protected by the Amendment.

At the Founding, the "militia" was widely understood to refer to the collection of "all able-bodied men," *id.* at 596, including in the unanimous judgment of the federal government and every state in the union, all men of at least 18 years of age, *Jones v. Bonta*, 34 F.4th 704, 718–19, 738 (App'x 2) (9th Cir. 2022), *vacated on reh'g and remanded in light of Bruen*, 47 F.4th 1124 (9th Cir. 2022) (Mem.) (collecting post-ratification state militia laws). This is apparent from Congress's initial exercise of its power to "provide for organizing, arming, and disciplining, the militia." U.S. CONST. art. I, § 8, cl. 16. Just months after the Second Amendment was ratified, the Second Congress passed The Militia Act of 1792, ch. 33, 1 Stat. 271, § 1, which "commanded that every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." *Jones*, 34 F.4th at 719 (quoting *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990)

12

(alterations omitted)). As a contemporaneous act of Congress, the Militia Act provides extraordinarily powerful evidence that the Second Amendment right applies at a minimum to those 18 and up.

> [M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment.

*Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570 (2008); *see also Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) ("This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given the Constitution's provisions." (cleaned up)).

The legislative history of the Militia Act lends further support. In 1790, Secretary of War Henry Knox submitted a militia plan to Congress providing that "all men of the legal military age should be armed," and that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen." 2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834). Although previously "military age ha[d] generally commenced at sixteen," Secretary Knox instead drew the line at 18 because "the youth of sixteen do not commonly

Appellate Case: 23-2248    Page: 21    Date Filed: 08/16/2023 Entry ID: 5306404

attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field." *Id.* at 2153. Representative Jackson explained "that from eighteen to twenty-one was found to be *the best* age to make soldiers of." *Id.* at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended for beginning militia enrollment. In an enclosure to a 1783 letter to Alexander Hamilton, General Washington—who as President in 1792 signed the Militia Act into law—wrote that "the Citizens of America . . . from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at Short Notice on any very interesting Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick ed., 1938).

Shortly after the federal age for militia participation was set at 18, every state set the age at 18 as well. *Jones*, 34 F.4th at 719, 738 (App'x 2). There was thus a consensus in the States that, at age 18, individuals were able to, and hence entitled to, bear arms. Plaintiffs are unaware of even a single state that exempted 18-to-20-year-olds from militia service at the time the Second Amendment was ratified. Indeed, a comprehensive survey of over 250 separate state and colonial provisions enacted from the seventeenth through the end of the eighteenth century found that the minimum "age for militia duty" was never higher than 18 "except for one 19-

Appellate Case: 23-2248    Page: 22    Date Filed: 08/16/2023 Entry ID: 5306404

year period in Virginia [between 1738 and 1757])." David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533 (2019).

To be clear, Plaintiffs do not contend that these militia laws somehow *extended* Second Amendment rights to 18-year-olds. Indeed, *Heller* made clear that the Second Amendment enshrines "an individual right unconnected with militia service." 554 U.S. at 582. Instead, the point is that "the well-regulated Militia" referred to in the Amendment's prefatory clause, which the Constitution understood to be an entity "already in existence" made up of "all able-bodied men," *id*. at 596, is the "pool" from which,

> Congress has plenary power to organize the units that will make up an effective fighting force. That is what Congress did in the first Militia Act, which specified that each and every free able-bodied white male citizen . . . who is or shall be of the age of eighteen years . . . shall severally and respectively be enrolled in the militia.

*Id.* (quoting The Militia Act of 1792) (internal quotation marks omitted). Given that "the federally organized militia may consist of a subset of" the "militia" referenced in the Second Amendment, but nevertheless *must* draw from that larger body, the unanimous inclusion of 18-to-20-years-old in organized militias at or shortly after the passage of the Second Amendment establishes that they *must* have been within the unorganized militia referenced by the Second Amendment. *Id.*; *see also Hirschfeld*, 5 F.4th 407, 429–30 ("Because the individual right is broader than the

15

Second Amendment's civic purpose, those required to serve in the militia and bring arms would most assuredly have been among 'the people' who possessed the right."). As a result, "any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms" is "*inconceivable.*" *Nat'l Rifle Ass'n v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissental) ("*NRA II*").

Finally, it is worth noting as confirmatory evidence that this understanding of the scope of the right, and the importance of the "militia" in the prefatory clause persisted well beyond the time of the Founding. It was still the view in the 19th century following the ratification of the Fourteenth Amendment. As Thomas Cooley wrote in his 1880 treatise, when interpreting the Second Amendment's text,

> [i]t might be supposed from the phraseology of this provision that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by the intent. . . . The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose.

COOLEY, *supra* GENERAL PRINCIPLES at 271. The Court in *Heller* noted: "All other post-Civil War 19th-century sources we have found concurred with Cooley." 554 U.S. at 618. The text of the Amendment cannot be read in any way to exclude 18-to-20-year-olds from its coverage.

### B. The State's Putatively Textual Arguments Are Unavailing.

Appellate Case: 23-2248     Page: 24     Date Filed: 08/16/2023 Entry ID: 5306404

In response to the district court's well-reasoned textual analysis, the State offers a variety of reasons this Court should exclude 18-to-20-year-olds from the Second Amendment's protections. Few of these arguments, however, have anything to do with the Second Amendment's text, and none are persuasive.

1. The State asserts that "*Bruen* does not address the meaning of 'the people' " in the Second Amendment. State Br. at 9–10 (quoting *United States v. Sitladeen*, 64 F.4th 978, 984 (8th Cir. 2023)). That is incorrect—*Bruen* reiterates *Heller*'s holding that the Second Amendment extends to "all Americans." 142 S. Ct. at 2156. *Bruen* therefore did not upset *Heller*'s textual analysis, and *Heller*'s definitive interpretation of "the people" remains binding on this Court. *See Sitladeen*, 64 F.4th at 984. Indeed, it is odd for the State to claim that *Bruen* did not address the question presented here, given that, in the very next paragraph, it tries to read into *Bruen*'s occasional references to the plaintiffs in that case as "adults" an implied instruction to this Court that *only* "adults" are included within "the people." *See* State Br. 10. This is wrong for several reasons. First, as discussed above, the plain text of "the people" does not draw a distinction between adults and minors. Second, *Bruen* also referred to the plaintiffs in that case as, "law-abiding, adult citizens of Rensselaer County, New York"—it is doubtful the Supreme Court intended "citizens of Rensselaer County, New York" as a limitation on the scope of "the people," so it is hard to understand why "adult" should be construed that way.

17

*See Bruen*, 142 S. Ct. at 2125. Third, as the State does not dispute, 18-to-20-year-olds *are* legal adults in Minnesota.

Nevertheless, the State argues that what matters is that "18-to-20-year-olds were not adults when the Second Amendment was ratified" and remained minors until the 1970s, and "*[h]istory and tradition* establish that minors under 21 did not have the right to freely carry guns in public for self-defense." State Br. at 10–11 (emphasis added). The State's own language is a giveaway that this argument is not textual but historical; it is claiming here that being a minor, at earlier periods in American history, came with restrictions on the scope of an individual's rights. That has nothing to do with the text and *Bruen* clearly treated the amendment's history separately, emphasizing that once history is invoked, the law is *presumed unconstitutional* and can only be saved if the State manages to prove the regulation is consistent with historical limitations on the right. *See, e.g.*, 142 S. Ct. at 2127 ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition."). As a result, the historical flaws with this argument are discussed below, in the section of this brief devoted to the second part of the *Bruen* analysis.

To the extent this *could be* cast as a textual argument—that "the people" encompasses only those who were understood to be part of "the people" at the Founding, *see* State Br. at 14—it is a surprising one for the State to make and

18

certainly not one this Court should endorse. After all, "groups like women, Native Americans, and blacks may not have been part of the political community at the time of the founding but are today within the class that we refer to as 'the people.'" *United States v. Carpio-Leon*, 701 F.3d 974, 978 n.1 (4th Cir. 2012). The Supreme Court in *Bruen* noted that Chief Justice Taney, in his infamous opinion in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), rooted the state's authority to prevent free blacks from owning and carrying firearms in the fact that they were not citizens (and therefore not part of "the people"). *See Bruen*, 142 S. Ct. at 2150–51. Indeed, the State affirmatively claims that "[t]he political community at the time of the founding was eligible voters, namely white, male, yeomen farmers." State Br. at 17. It is hard to understand how the State can take the position that the Second Amendment should be cabined to that understanding of "the people" today.

Of course, this difficulty is avoided entirely by treating anyone who is a member of "the political community" *today* as part of "the people." In addition to the fact that we treat other constitutional rights this way (the First and Fourth Amendments both apply to everyone who is part of "the people" *today*), that is the only reading of the Second Amendment that is consistent with *Heller*. After all, *Heller* rejected the argument that "arms" in the Second Amendment meant only arms *that existed at the Founding*, as "bordering on the frivolous." 554 U.S. at 582. The

19

same should be said of the State's argument that "the people" should mean only those *who would have been* the people *at the Founding*.

Furthermore, the State is simply wrong to suggest that, at the Founding or today, minors are not part of "the political community" referenced in *Heller*. The State faults the district court for referring to a "national community" and not the "political community," suggesting that one, but not the other, might include 18-to-20-year-olds. State Br. at 15. But *Heller* treated the phrases as interchangeable. It cited, in making the point that the "all members of the political community" have Second Amendment rights, to an immigration decision that had used the phrase "national community," with no suggestion that it saw the difference as meaningful (or that either "community" was restricted to individuals of a certain age). *See Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). The Supreme Court has used the term "political community" in many contexts to refer to *all citizens* of a community regardless of age or voting rights. *See, e.g.*, *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 593–94 (1989), *abrogated by Town of Greece v. Galloway*, 572 U.S. 565 (2014) ("The Establishment Clause, at the very least, prohibits government from … making adherence to a religion relevant in any way to a person's standing in the political community." (internal quotation marks omitted)). In fact, in the Supreme Court's

Appellate Case: 23-2248     Page: 28     Date Filed: 08/16/2023 Entry ID: 5306404

first ever Second Amendment decision, *United States v. Cruikshank*, 92 U.S. 542 (1875), the Court expressly equated the "political community" with *all citizens*:

> Citizens are the members of the political community to which they belong. They are the people who compose the community, and who, in their associated capacity, have established or submitted themselves to the dominion of a government for the promotion of their general welfare and the protection of their individual as well as their collective rights.

*Id.* at 549. *Heller* appears to have used the phrase "all Americans" rather than "all citizens" in part because it believed "citizens" was potentially too narrow and those who have "developed sufficient connection with this country to be considered part of [its] community" should be encompassed within the Second Amendment's protections. *See Heller*, 554 U.S. at 580 (quoting *Verdugo-Urquidez*, 494 U.S. at 265).

The district court's use of the phrase "national community" instead of "political community" not only accords with *Heller*, but also with this Court's precedents. The State argues that *Sitladeen* supports its argument in trying to draw a distinction between "political" and "national" communities, but *Sitladeen* itself used both phrases. *See* 64 F.4th at 983–84. *Sitladeen* reaffirmed that, this Circuit's pre-*Bruen* earlier caselaw finding "aliens illegally present in this country" are not part of "the people." *Id.* (quotation omitted). In doing so, it relied upon a Fifth Circuit decision, *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011), which the State *also* cites for support on this point. Specifically, the State claims that *Portillo-*

21

*Munoz* specifically drew a distinction between "the people" protected by the Second Amendment and "the people" covered by the Fourth Amendment, *see* State Br. at 16, but *Portillo-Munoz* did no such thing. Rather, in that case the Fifth Circuit—as in *Sitladeen*, addressing the question of whether an illegal alien was protected by the Second Amendment—held that the alien was not part of "the people" protected by the Second Amendment because the Supreme Court *had* equated the Second and Fourth Amendments and "neither this court nor the Supreme Court has held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally." *Portillo-Munoz*, 643 F.3d at 440. The State quotes the case as stating "We do not find that the use of 'the people' in both the Second and the Fourth Amendment mandates holding that the two amendments cover exactly the same groups of people," State Br. at 16 (quoting *Portillo-Munoz*, 643 F.3d at 440), but the State omits the first half of the quoted sentence which makes clear that it is a secondary, counterfactual argument, based on the situation that could obtain "*if* there were precedent for the proposition that illegal aliens generally are covered by the Fourth Amendment." *Portillo-Munoz*, 643 F.3d at 440. (emphasis added). In any event, if there *were* an argument to be made that those "covered by the Fourth Amendment," *id*., and those covered by the Second Amendment are different, it *must* be based on history and not the text of the Amendment, given that *Heller* equates the text of the two Amendments on this point. 554 U.S. at 580.

Appellate Case: 23-2248    Page: 30    Date Filed: 08/16/2023 Entry ID: 5306404

2.    The State argues that the fact that 18-to-20-year-olds were included in both the national and state militias of the Founding period does not show that they have Second Amendment rights, first pointing out that "*Heller* held that the Second Amendment right is not connected to militia service." State Br. at 18. That is true—but it is not helpful to the State here. As explained above, what *Heller* meant by that was that the Second Amendment right was not *limited* to militia service but rather was "an individual right." 554 U.S. at 605–06. But while the right is not so limited, *Heller* acknowledged that "[l]ogic demands that there be a link between the stated purpose," *i.e.*, the preservation of the militia, "and the command," *i.e.*, that the individual right to keep and bear arms shall not be infringed. *Id.* at 577. Hence, the prefatory clause may be used "to resolve an ambiguity in the operative clause." *Id.* And though Plaintiffs do not suggest there *is* any ambiguity in the phrase "the people," the reference to "the militia"—a body which was universally agreed at the Founding to include 18-to-20-year-olds—underscores the correctness of Plaintiffs' reading of the term. *See* App. 17; R. Doc. 84, at 17 ("The militia laws' significance is that they provide some indication that the existing right to keep and bear arms likely included those who were included in the already existing militia.").

Similarly, the State is wrong to suggest that because "the minimum ages in militia statutes were set as a result of the needs of the militia" they "do not correspond with who had a right to carry guns in the founding era." State Br. at 20.

23

As discussed above, it is true that the minimum ages for service in the state *organized* militia could and did vary, though rarely in a relevant way in the Founding era, and were set based on need and perceived ability, one could not be part of the *organized* militia unless one was *already a member* of the unorganized militia to which the Second Amendment refers. *Heller*, 554 U.S. at 596 ("Although the [unorganized] militia consists of all able-bodied men, the federally organized militia may consist of a subset of them."). In other words, Congress could have excluded 18-year-olds from the organized militia if it had wanted—Article I, Section 8, clause 15 gives it that power—but by including 18-year-olds in the federally organized militia, Congress was demonstrating that they *must also be a part* of the unorganized militia to which the Second Amendment refers.[1]

## II.   The State Has Failed to Demonstrate that the Carry Ban Is Consistent With Historical Restrictions On the Second Amendment Right.

Because the text of the Second Amendment covers carrying firearms in public by 18-to-20-year-olds, the Carry Ban is unconstitutional under *Bruen* unless the State can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. The burden is on the State to prove that the Carry Ban is constitutional, and the only acceptable

---

[1] The State makes other putatively textual arguments (including arguments regarding the importance of these militia statutes), but because those arguments go to alleged historical restrictions on the right, rather than the meaning of the text, Plaintiffs deal with them below.

24

standard against which to judge its constitutionality is the history of firearm regulation in this country. *Id.*; *see also id.* at 2131 ("The Second Amendment . . . 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference." (quoting *Heller*, 554 U.S. at 635)).

When applying this test, the Supreme Court has provided significant guidance to this Court. For instance, it has cautioned that historical regulations cannot justify a modern law unless they are "relevantly similar," meaning that the historical regulations "imposed 'a comparable burden on the right of armed self-defense' and that was 'comparably justified.' " *Sitladeen*, 64 F.4th at 985 (quoting *Bruen*, 142 S. Ct. at 2132–33)). And when analyzing historical analogues, the greatest attention must be paid the practices of the Founding generation: "Because 'constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,' regulations in effect at or near the time of the Second Amendment's ratification carry more weight in the analysis than those that existed long before or after that period." *Id.* (quoting *Bruen*, 142 S. Ct. at 2136) (emphasis in original) (brackets omitted); *see also* Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, Harv. J. L. & Pub. Pol'y Per Curiam (Dec. 7, 2022), https://bit.ly/41OFQND. The State makes the argument that "the

25

public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the states" is "the more appropriate barometer" of the Amendment's meaning, as demonstrated through historical restrictions on the right. State Br. at 47 (quoting *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023)). But this Circuit has already determined in *Sitladeen* that that view is incorrect and *Bondi*, the State's chief support for this argument, was vacated just days after the State filed its brief, *see* 72 F.4th 1346 (11th Cir. 2023) (Mem.). In any event, *Bondi* was wrong even before it was vacated; as the district court correctly noted, "*Bondi* declined to follow rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters." App. 26; R. Doc. 84, at 26.

### A. The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-Olds to Exercise Their Second Amendment Rights on Equal Footing with Older Americans.

Well before the Founding era, the tradition of 18-to-20-year-olds "keeping and bearing arms [was] deep-rooted in English law and custom" and "was brought across the Atlantic by the American colonists." *Jones*, 34 F.4th at 717. As discussed above, in the period immediately following ratification "every state's militia law *obliged*" 18-to-20-year-olds "to acquire and possess firearms." *Id.* at 719 (emphasis added); *see also United States v. Miller*, 307 U.S. 174, 179 (1939) ("[W]hen called

for service these men were expected to appear bearing arms supplied by themselves."); *NRA II*, 714 F.3d at 340–41 (Jones, J., dissental). After exhaustively surveying historical gun regulations related to firearm purchasing by 18-to-20-year-olds, the Fourth Circuit in *Hirschfeld* concluded that it was not until 1856 that *any* state restricted the ability of 18-to-20-year-olds to "possess or purchase weapons." 5 F.4th at 437.

In addition to the "founding-era evidence of militia membership [which] undermines [the district court's] interpretation" of the Amendment, 18-to-20-year-olds were expected to bear arms as part of the *posse comitatus*, which "allowed sheriffs and others to compel citizens to serve in the name of the state to execute arrests, level public nuisances, and keep the peace, upon pain of fine and imprisonment." *Jones*, 34 F.4th at 718, 722 (cleaned up). Similarly, at common law, by age 18 all able-bodied men "were obliged to join in the 'hue and cry' (*hutesium et clamor*) to pursue fleeing criminals." Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, *supra* at 534.

This exposes the flaw in the State's other argument centered on the militia statutes. The State argues that, just because 18-to-20-year-olds were in the militia, "[a] duty to defend one's state and country does not create a right to arms for defense of self." State Br. at 19. But Plaintiffs have not argued that the duty to participate in the militia *created* the right to bear arms. As discussed above, the right precedes the

27

duty and exists *even if* a State chose not to call upon 18-to-20-year-olds to serve. Instead, at the historical step of the analysis, the duty to participate in the militia demonstrates a key background fact—all across the country, 18-to-20-year-olds had to possess firearms in order to participate in the militia. And so while the State argues that the problem it seeks to address is a new one unknown to the Founders—it points out, for example, that handguns became more widely available in the middle of the 19th century, *id*. at 41—the reality is that the State has targeted 18-to-20-year-olds because it views them as immature and dangerous with firearms, but 18-to-20-year-olds at the Founding were *required by law* to be armed and there are no similar restrictions from that period. In such a case, "[t]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. The State disputes this of course, arguing in favor of two different Founding-era precedents for its law: laws targeting "irresponsible or dangerous groups like people aged 18-to-20," State Br. at 22, and "analogous historical precedent . . . in the common law and confirming historical regulations," *id*. at 32. Neither argument has merit.

1. It is irrelevant to this case that there were laws at the Founding targeting certain groups as potentially dangerous if armed because *none of those laws* targeted 18-to-20-year-olds—or any groups understood to have full Second Amendment

rights. Instead, the historical sources on which the State relies were "[s]tatus-based restrictions" that "varied over time, and included, for example, Catholics, Native Americans, slaves, [and] people who would not swear a loyalty oath to the government." *Id*. at 26. While it is true that these laws were generally predicated on a concern about "dangerousness," that does not mean that legislatures today may, consistent with the Second Amendment, disarm groups who are judged (in the State's representative cases, based on the color of their skin or their creed) to be part of a dangerous group. *Bruen* explained that in reviewing historical analogues, courts must assess both "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133. And while the "why"—dangerousness— might be the same today as it was when the State's purported analogues were enacted, the "how" is different. As noted above, these groups were not considered to be part of rights-holding community during the relevant time period—either because of their race, legal status as slaves, or their refusal to sign a loyalty oath— and laws disarming them would not be considered to raise any Second Amendment issue at all. *See, e.g.*, *Dred Scott*, 60 U.S. (19 How.) at 417, 420 (African Americans and Native Americans restricted from citizenship at the Founding); *Bruen*, 142 S. Ct. at 2150 (discussing the same); *Heller*, 554 U.S. at 592–93 (discussing restrictions on rights of Catholics under English law); Act of May 5, 1777, ch. 3, in 9 HENING'S STATUTES AT LARGE 281, 281–82 (1821) (denying those who would not swear

allegiance to the American cause the right to hold office, serve on a jury, or buy lands). Furthermore, *Bruen* warned against putting much weight on wartime measures like the disarmament of Tories, since there is little indication such measures "were designed to align with the Constitution's usual application during times of peace." *Bruen*, 142 S. Ct. at 2152 n.26.

More fundamentally, these laws, which the State embraces, would be unconstitutional today, either under the First Amendment (Catholics, Tories) or the Fourteenth Amendment (Native Americans and African Americans), in addition to the Second Amendment. The Supreme Court has eschewed reliance on such laws in interpreting the Bill of Rights, noting that laws "born of bigotry" that "arose at a time of pervasive hostility" to the targeted group are of "shameful pedigree" and "hardly evince a tradition that should inform our understanding of the [Constitution]." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2259 (2020) (internal quotation marks omitted). And in *Bruen* itself, the Court simply ignored racist laws limiting the right to public carry. *See* Br. for Nat'l African Am. Gun Ass'n as *Amicus Curiae* at 4–10, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (May 13, 2019) (citing racist laws that *Bruen* ignored).

This Court should do the same. Indeed, to permit laws that invidiously discriminated against individuals in the exercise of their fundamental rights to inform our understanding of the scope of those rights is perverse. The State cannot

paper over that fact by claiming that "our sensibilities regarding regulating certain groups have evolved." State Br. at 26. Permitting "[l]egislatures [to] fill in the details 'based on present-day judgments about categories of people whose possession of guns would endanger the public safety,' " is unconscionable in this context. *Id*. at 27 (quoting *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barret, J., dissenting). It is helpful to contrast the laws the State cites as analogues—which make broad class-based determinations of "dangerousness" and would uniformly fail constitutional muster today—with the laws that limited the arms rights of people at the Founding and have been considered as possible analogues by the Supreme Court. The unifying feature of such laws is that unlike the State's proposed class-based analogues and the Carry Ban, these laws operated *individually* on people who had been *specifically* shown to be dangerous. *See, e.g.*, *Bruen*, 142 S. Ct. at 2148 (discussing surety statutes). Of course, the State does not even bother to cite such laws, since it is obvious that they burden the right for a different reason (because of an *individualized* determination of dangerousness) and in a different manner (the requirement of finding a surety) than the Carry Ban does, and so cannot support the Carry Ban under *Bruen*.

What the State's proffered historical laws actually teach is that this Court should not accept the State's suggestion that a legislative judgment of "dangerousness" is adequate to satisfy the *Bruen* inquiry. If the Second Amendment

31

includes a carve out for "dangerous people" *and* history grants legislatures carte blanche to decide who is dangerous based on "sensibilities" of legislators that "evolve[]" over time, then the Second Amendment means nothing at all. *See, e.g.*, *Heller*, 554 U.S. at 614 ("Blacks were routinely disarmed by Southern States after the Civil War."). Such a holding would eviscerate the core protection of the Amendment and leave legislatures with *more power* to define the content of the right than they had before *Bruen* emphatically held that, while "deference to legislative interest balancing is understandable . . . it is not deference that the Constitution demands here." 142 S. Ct. at 2131. Indeed, *Bruen* specifically cautioned against courts "engag[ing] in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 2133 n.7. There can be no doubt that the State, which devotes several pages of its brief to the exact sort of evidence that used to come in as part of the means-end analysis, *see* State Br. at 27–28 (invoking "social science"), in suggesting this expansive power for itself, is inviting this Court to defy the Supreme Court's clear instructions.

To the extent that these categorical bans targeting groups *other than* 18-to-20-year-olds should factor into this Court's analysis at all, they support Plaintiffs, because though there were many laws that restricted access to (or the right to carry) firearms on a class-wide basis, the State has not cited *one* from this period that targeted 18-to-20-year-olds. As Judge Jones explained:

> Originalism is not without its difficulties in translation to the modern world. For example, deciding whether the use of a thermal heat imaging device violates the original public meaning of the Fourth Amendment is a hard question. In this case, however, the answer to the historical question is easy. . . . The members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar.

*NRA II*, 714 F.3d at 342 (Jones, J., dissental). If this Court indulged the State in abstracting from these historical laws to a general principle of "dangerousness," it would "endors[e an] outlier[] that our ancestors would never have accepted." *Bruen*, 142 S. Ct. at 2133 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)). *Bruen*'s analysis was much more tailored than that, and so must be the analysis here.

2. The State also turns to the common law to support its claim that 18-to-20-year-olds' Second Amendment rights were restricted at the Founding. *See* State Br. at 33. As an initial matter, Plaintiffs do not dispute that the State can rely upon the common law to understand the scope of the Second Amendment—indeed, the Supreme Court looked to the common law in both *Heller* and *Bruen* to understand the historical and legal background of the Second Amendment. *See, e.g.*, *Bruen* 142 S. Ct. at 2145–46 (discussing *State v. Huntly*, 25 N.C. 418 (1843) (per curiam)). However, Plaintiffs *do* dispute that the common law can help the State in this case because, despite all the space devoted to it in its briefing, the State has not come forward with *any* evidence that the common law of the Founding era contained restrictions on the rights of 18-to-20-year-olds to carry firearms in public.

33

The State argues that " 'American law followed the common law until a wave of statutory restrictions in the 1800s' codified the common law and limited minors' rights to guns." State Br. at 35 (quoting *Dobbs v. Jackson Whole Women's Health Org.*, 142 S. Ct. 2228, 2248 (2022)). But in *Dobbs*, the Supreme Court did not say that statutory restrictions from the 1800s were *always* consonant with the common law, but that the *specific laws* creating criminal liability for abortions were codifications of earlier common law restrictions. *Dobbs*, 142 S. Ct. at 2248. To prove that, the Supreme Court engaged in a detailed analysis of common law restrictions on abortions at the Founding. *Id.* at 2249–52. The State cannot merely *assert* that the statutory restrictions that came long after the Founding period codified the common law that existed at the Founding, it must *prove* it by reference to actual evidence of what the common law said at the Founding. It has failed to do so.

Instead, it points to the Militia Act of 1792 and other militia acts that required 18-to-20-year-olds to acquire firearms as negative evidence of the content of the common law, suggesting that the statutes exist *because* otherwise 18-to-20-year-olds were forbidden from owning firearms. State Br. at 36. But that does not make sense; the militia statutes existed to organize the militia, and their requirement that individuals acquire firearms applied to *all* enrolled militia members, not just 18-to-20-year-olds. *See NRA II*, 714 F.3d at 340 n.8 (collecting statutes) (Jones, J., dissental). It is odd to infer that such a law was intended to overturn some common

34

law prohibition. Furthermore, if the militia laws, which were all enacted in a very short period of time following ratification of the Second Amendment *did* overturn a common law prohibition on possession of firearms, then that proves that such a common law prohibition is inconsistent with the Second Amendment. *See Bruen*, 142 S. Ct. at 2136 ("English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution. . . . It is better not to go too far back into antiquity . . . unless evidence shows that medieval law *survived to become our Founders' law*.") (cleaned up) (emphasis added).

The State elsewhere relies on the fact that 18-to-20-year-olds were minors at the founding, with limitations on their abilities to "participate in the Nation's hallmark civic duties in the way today's 18-to-20-year-olds can." State Br. at 12. But generic appeals to the age of majority or to "infancy" are no more effective than unsubstantiated claims about "the common law." Without evidence that minors were not permitted, because they were minors, to carry firearms, the status is simply irrelevant. "Majority or minority is a status that lacks content without reference to the right at issue." *Hirschfeld*, 5 F.4th at 435 (cleaned up); *see also Jones*, 34 F.4th at 722. In other words, even if Plaintiffs are a member of an age cohort that was considered, at the time of the Founding, to have their rights limited in some ways,

without evidence that the right to own and use firearms was one such restricted right, the State has failed to carry its burden under *Bruen*.

One amicus argues that restrictions on the purchasing power of minors at the Founding—they could not "purchase anything upon credit except necessaries"— constituted an effective prohibition on minors purchasing firearms because "[w]hile the exact scope of those 'necessaries' was slightly flexible and debatable, Amicus has never encountered a situation where a firearm was considered a necessary." *See* Brewer Amicus Br. at 18, 20. First, as the amicus admits, such restrictions were based on the fact that minors could, upon attaining the age of majority, repudiate his debts, so that it would be highly risky for any merchant to agree to sell expensive items to minors on credit. That means the restrictions should be disregarded because they were not motivated by the same "why" as the Carry Ban (after all, Plaintiffs are adults today, and if they buy a firearm on credit, they are fully liable for that debt). And second, such a limitation did not at all restrict the ability of a minor to pay up front to acquire firearms and made no limitations, once they were purchased, on how such firearms might be used; the "how" of the historical analogue is also different from the "how" of the Carry Ban.

The State points to the significant authority that parents had over their children, including their 18-to-20-year-old children, at this period, relying chiefly on Justice Thomas's dissent in *Brown v. Entertainment Merchants Association*, 564

36

U.S. 786 (2011). State Br. at 11–12. In *Brown*, the court declared unconstitutional a California law restricting the sale of certain video games to minors, and Justice Thomas, who would have upheld the law, argued it was valid in light of the authority parents had at the Founding to restrict their minor children's access to information and entertainment. He explained: "[t]his conception of parental authority was reflected in laws at that time," and he cited laws detailing the sort of parental authority relevant to that case (authority to regulate information and entertainment consumption of one's children). *Brown*, 564 U.S. at 824 (Thomas, J., dissenting). However, to state the obvious, Justice Thomas's dissent did not command a majority of the Court, which refused to rely on historic powers of parents over their children to inform the scope of authority that the *state* should have today. *See id.* at 802–04 (maj. op.). This Court should follow suit and reject the State's attempt to convert parental authority at the Founding into State authority today.

Even if this Court accepts Justice Thomas's view of things from *Brown*, that would not advance the State's argument here. Justice Thomas looked to the scope of parental authority to define the meaning of the First Amendment because the California law at issue would have essentially imposed parental authority as the decisive factor in whether minors had access to certain video games; a minor who wanted a restricted game could have had their parents buy it for them. *Id.* at 789. But the power of parents over their children with respect to firearms is irrelevant here,

because Minnesota parents cannot exempt their 18-year-old sons and daughters from the Carry Ban even if they want to.

For the same reason, the State's references to "founding era college regulations" do not reflect "the common law and the public understanding that people under 21 lacked the right to freely carry firearms in public." State Br. at 36. These school rules, as the State admits, were rooted in "the guardianship authority of their college *in loco parentis*." *Id.* Such authority is unsurprising, given the very young age of many of the students at the schools, *see* Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 VAND. L. REV. 1135, 1136 n.5 (1991) ("In 1826 two-thirds of Yale College's freshman class was 16 years of age and younger."), and it represents nothing more than the fact that *parents* could restrict their children in all sorts of ways. In this capacity, schools could require other things of their students that, if commanded by the government, would certainly violate their constitutional rights. *See, e.g.*, CHAPEL HISTORY, TATE STUDENT CTR. AT UNIV. OF GA., https://bit.ly/42i4rcA (last accessed Aug. 12, 2023) (explaining that the chapel, UGA's second, had hosted mandatory daily religious services since 1832). In other words, these rules targeted students not because of their age, but because they were under the authority of the schools. As the district court correctly noted "they would not have prevented a person under the age of 21 who was not a student at one of the schools from possessing or carrying a

38

firearm, and they undoubtedly applied with equal force to students older than 21." App. 30; R. Doc. 84, at 30. Furthermore, it is puzzling that the State concludes that these regulations "confirm the common law" understanding of the rights of 18-to-20-year-olds to carry firearms. State Br. at 36. If such an understanding existed, such regulations would hardly seem necessary—instead, these rules tend to show that the State's unsupported assertions about the common law are baseless.

Finally, the State argues that Founding-era "municipal ordinances also reflect an American tradition of regulating guns in the hands of minors to improve public safety." *Id*. at 38. The State cites two such ordinances from this period, an 1803 New York ordinance and an 1817 Columbia, South Carolina ordinance. *Id*. Both punished anyone *of any age* for firing a gun in town; they treated minors differently only in that in New York a minor's guardian would be responsible for paying the fine and in Columbia a minor's firearm could be seized if the fine was not paid. App. 32–33; R. Doc. 84, at 32–33. These laws are fundamentally unlike the Carry Ban because "they place restrictions on the discharge of firearms, but do not ban carrying them outright" and "governed conduct regardless of age." *Id.*

The State also cites an 1857 Louisville, Kentucky ordinance restricting sale of gunpowder to minors without a parent's permission. State Br. at 38. But that law, dating from just a few years before the Civil War, is well outside the Founding period and, in any event, it applied only to minors under 15 and notably *did not* bar the sale

39

of firearms. OLIVER H. STRATTAN, CITY CLERK, A COLLECTION OF THE STATE AND MUNICIPAL LAWS, IN FORCE, AND APPLICABLE TO THE CITY OF LOUISVILLE, KY. 175, 176 (1857); *see also Fraser v. BATFE*, No. 3:22-cv-410, 2023 WL 3355339, at *20 n.41 (E.D. Va. May 10, 2023).

### B. The State's Reconstruction Era Analogues Are Too Little, Too Late to Justify the Carry Ban.

The State cites twenty laws from the mid-to-late-19th century (excluding the Louisville ordinance discussed above), which it claims provides support for the Ban.[2] The district court, which "carefully reviewed the text of each of the 19th century laws" cited as possible analogues correctly held that "[e]ven aside from the fact that they were enacted decades after the founding, for various reasons, none of these regulations is 'relevantly similar' to the age requirement in Minnesota's permit-to-carry law." App. 37; R. Doc. 84, at 37.

The State has just three proposed analogues that predate the Civil War or the ratification of the Fourteenth Amendment in 1868: from Alabama, Tennessee, and Kentucky. *See* 1856 Ala. Laws 17; 1856 Tenn. Pub. Acts 92; 1859 Ky. Acts 245 §

---

[2] Each of the laws the State relies upon before this Court is drawn from the Fifth Circuit's pre-*Bruen* decision in *Nat'l Rifle Ass'n v. BATFE*, 700 F.3d 185, 202 (5th Cir. 2012) ("*NRA I*"). As Plaintiffs will explain, these statutes are not adequate analogues and can all be distinguished. For a lengthy analysis of the problems with the Fifth Circuit's reliance on these analogues and other historical evidence in that decision, *see* David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U. L.J. 119, 132–45 (2018).

Appellate Case: 23-2248     Page: 48     Date Filed: 08/16/2023 Entry ID: 5306404

23. The Kentucky law is discussed below, but the Alabama and Tennessee laws should be understood as exceptions that prove the rule that has been uniformly demonstrated from the Founding—18-to-20-year-olds were considered to have full Second Amendment rights and restrictions on the exercise of those rights are evidenced *nowhere* until over 60 years after the Second Amendment was ratified. *See Bruen*, 142 S. Ct. at 2137. In this case, leading up to 1856 "there is not just a vacuum at the founding era: instead, the founding-era evidence of militia membership undermines" the importance of these antebellum outliers. *Jones*, 34 F.4th at 722. Furthermore, "[i]t would . . . be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." *Hirschfeld*, 5 F.4th at 440; *see also McDonald*, 561 U.S. at 770–78; *Jones*, 34 F.4th at 722 (noting the "deeply offensive nature of many of" "the Reconstruction-era laws" restricting the Second Amendment rights of 18-to-20-year-olds).

The rest of these laws come from the period between 1875–1897, which, as discussed above, is too late to inform the meaning of the Second Amendment, especially in a case like this one where there is *no* indication of similar restrictions from the Founding. The State tries to explain the lateness of these analogues by suggesting that the states were "respond[ing] to the application of the Second Amendment to them by passing laws regulating guns in the hands of minors under

41

21." State Br. at 40. But this explanation makes no sense in the context of the State's argument. Why would the states need to legislate to restrict minors once the Second Amendment applied against them through the Fourteenth Amendment, if minors are not protected by the Second Amendment anyway? And if minors *are* protected, why would the states wait until such laws would be unconstitutional to pass them?

In any event, in addition to being too late, none of these laws are analogues for the Carry Ban. *Bruen* requires asking *both* "how and why" past laws infringed on the Second Amendment right, and historical laws can only serve as useful analogues if their modern comparator is "comparably justified." *Bruen*, 142 S. Ct. at 2132–33. To the extent these laws restricted the rights of 18-to-20-year-olds, they did so when 18-to-20-year-olds were minors under the legal protection of their parents or guardians. *See, e.g.*, 1 BLACKSTONE COMMENTARIES *441. That is no longer the case. Today, 18-to-20-year-olds in Minnesota are legal adults. And Plaintiffs are not aware of any law from any potentially relevant time frame that singled out the firearm rights of legal *adults* for special restrictions based on their being younger than other legal adults. *See, e.g.*, JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1851) (explaining that upon reaching the age of majority, "every man is in the full enjoyment of his civil and political rights"). Because they are based on a legal status that has no application here, these statutes can all be rejected because both the "how" and the "why" are different than Minnesota's law.

Appellate Case: 23-2248    Page: 50    Date Filed: 08/16/2023 Entry ID: 5306404

Even apart from this issue, these laws can be distinguished. Seven of the cited laws restricted sales to minors but permitted some method for them to acquire firearms anyway (either because they permitted gifts or allowed sales with permission from a parent or employer). *See* 1859 Ky. Acts 245, § 23;[3] 1878 Miss. Laws 175–76; 16 Del. Laws 716 (1881); 1881 Ill. Laws 73; MO. REV. STAT § 1274 (1879); 1893 N.C. Sess. Laws 468–69; 1897 Tex. Gen. Laws 221–22. The State argues that these exceptions merely demonstrate that the laws "codified the founding era common law." State Br. at 43. As discussed above, that inference does not follow, and the State has come forward with no evidence of such a common law restriction. And even if the State's logical leap from these laws to the common law were valid, so much the better for Plaintiffs, because that would mean that both the codified restrictions and their common law antecedent differ from the Carry Ban in the way they burden the right. Unlike in Minnesota, if an 18-year-old in Mississippi in 1878 were able to acquire a handgun through a gift, no law precluded him from carrying the firearm in public. In fact, the specific Mississippi law the State cites confirms

---

[3] The State cites 1873 Ky. Acts 359 in its brief, but quotes from 1859 Ky. Acts 245, § 23 in its appendix. The Fifth Circuit in *NRA I* cited the 1873 statute, but that statute "has nothing to do with arms," Kopel & Greenlee, *History and Tradition in Modern Circuit Cases, supra* at 138 & n.100. It is entirely possible that this law, which the State substitutes for that one, would have been law applied against sales or gifts to "any minor, or slave, or free negro." As discussed above, laws like this one were given no weight in *Bruen*. They should be entirely excluded from the analysis of the Second Amendment right.

43

this, noting in its third part that fathers could be punished for permitting "any minor son under the age of sixteen years" (but not those who were 18-to-20-years old) "to carry concealed" (but not openly). 1878 Miss. Laws 175–76, § 3. The clear implication of such a restriction is that those over sixteen *could*, if they owned a firearm, carry it openly (or concealed). It is not, as such, "relevantly similar," to the Carry Ban. *Bruen*, 142 S. Ct. at 2132.

One law the State claims "ma[de] it unlawful for 'anyone under the age of twenty-one (21) years' " to carry a handgun "or other dangerous or deadly weapon," State Br. at 44 (quoting Nev. Rev. Stat. § 4844 (1885)), does no such thing—the State omits language (both in its brief and its statutory excerpts in the appendix)—that makes clear that the law, which is entitled "An act to prohibit the carrying of concealed weapons by minors" applies only those minors who wore a weapon "concealed upon his person." DAVID E. BAILY, THE GENERAL STATUTES OF THE STATE OF NEVADA. IN FORCE. FROM 1861 TO 1885, INCLUSIVE. WITH CITATIONS OF THE DECISIONS OF THE SUPREME COURT RELATING THERETO 1077 (1885).[4] Open carriage, illegal for Plaintiffs under the Carry Ban, was permitted under this statute.

The State emphasizes that the Carry Ban permits open carriage "at home, on [an 18-to-20-year-old's] premises and land, and in the fields and waters of the state

---

[4] The State has provided only brief excerpts in its addendum. Plaintiffs have provided the full text of each of these laws in an addendum accompanying this brief. *See* Aple Add. 1–54.

for hunting or target practice," as a way of making it seem less restrictive than these historical laws. State Br. at 45; Minn. Stat. § 624.714, subd. 9. Notably absent from this litany is the general ability to carry a loaded, operable firearm for self-protection in public. That is a critical right that the Second Amendment protects, which is denied here, and was not denied under these proposed analogues. *See Bruen*, 142 S. Ct. at 2122. So, these exceptions—to the extent that being permitted to carry "at home" can even be called an exception, *see Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012) ("The right to 'bear' as distinct from the right to 'keep' arms is unlikely to refer to the home. To speak of 'bearing' arms within one's home would at all times have been an awkward usage.")—to the State's general rule are immaterial.

Of the remaining laws, five come from states with no Second Amendment analogue at the time they were enacted, *see* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. OF L. & POLITICS 191, 193–204 (2006); 1884 Iowa Acts 86; 1882 Md. Laws 656; 1890 La. Acts 39; 1882 W. Va. Acts 421– 22; 1883 Wis. Sess. Laws 290. One comes from Kansas, 1883 Kan. Sess. Laws 159, which had a Second Amendment analogue but was singled out by *Bruen* as an example of a state that, around this time, "operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*," *see Bruen*, 142 S. Ct. at 2155. *Bruen* was also dismissive of overly restrictive firearm laws in the

45

Western Territories, which "were rarely subject to judicial scrutiny" and deserving of "little weight," *id.* at 2121, and the State's Wyoming law qualifies. *See* 1890 Wyo. Sess. Laws 1253.

That leaves three laws—27 Stat. 116–17 (1892) (District of Columbia), 1876 Ga. Laws 112, and 1875 Ind. Acts 59. Three laws, at this late date, are insufficient to prove the Carry Ban's constitutionality and, in any event, two of these laws (like many of the other laws dismissed for other reasons above), on their face apply to "minors." *See* 27 Stat. 116–17 (1892) (District of Columbia); 1876 Ga. Laws 112. 18-to-20-year-olds in Minnesota today are, as we have stressed, *not minors*. And of course, even Indiana's law, though it mentions ages instead, *also* applied only to minors.

To buttress its reliance on these disanalogous laws, the State stresses that "there is a marked absence of cases from the 1700s or 1800s which find age restrictions to be unconstitutional, and only one challenge." State Br. at 49. As to cases from the 1700s, the lack of cases raising the issue is easily explained by the lack of any laws restricting 18-to-20-year-olds at the time. From the later period, the State cites four cases that "reviewed convictions under historical age restrictions," *id*. at 49–50, but these do not demonstrate the constitutionality of the statutes involved. *Tankersly v. Commonwealth*, 9 S.W. 702, 703 (Ky. 1888), dismissed the appeal for want of jurisdiction in just three sentences. *Coleman v. State*, 32 Ala. 581

46

(Ala. 1858), and *State v. Allen*, 94 Ind. 441 (1884), are a little longer than *Tankersly*, but they too did not grapple with the constitutionality of the law at issue. The only case that the State cites in this regard that *did* analyze the constitutionality of the law at issue is *State v. Callicutt*, 69 Tenn. 714 (Tenn. 1878), but that case only "addressed concealed carry of dangerous weapons, not the right to keep and bear arms more generally." *Jones*, 34 F.4th at 720. The only legal reasoning in *Callicutt* on the scope of the right to bear arms is a pair of citations to *Aymette v. State*, 21 Tenn. 154 (Tenn. 1840) and *Page v. State*, 50 Tenn. 198 (Tenn. 1871). *Heller* singled out *Aymette* as demonstrating an "odd reading of the right" which was "not the one [the Court] adopt[ed]," and simultaneously permitted citizens "to carry arms openly, unconnected with any service in a formal militia, but . . . use them only for the military purpose of banding together to oppose tyranny." 554 U.S. at 613. *Page* asserted that the legislature could restrict carrying a revolver because it was not "an arm for war purposes." 50 Tenn. at 198. Again, *Heller* made clear that the Amendment is not limited to protecting arms for war purposes but "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. *Callicutt* is not good law and has nothing informative to say about the appropriate scope of the Second Amendment right.

The State tries to get double mileage out of *Callicutt* by citing to an 1868 treatise that cited to it for the proposition that "the State may prohibit the sale of

47

arms to Minors." *NRA I*, 700 F.3d at 203; State Br. at 39, 49. But this quote is from

the section of Cooley's treatise that discussed the police power of the state, and he

does not address there the Second Amendment or the right to bear arms. Cooley was

not weighing in on the legitimacy of the *Callicutt* decision, rather he was "simply

identifying [it] as a case related to his discussion, which is how he utilized footnotes

to cite thousands of cases throughout the treatise." Kopel & Greenlee, *supra History

and Tradition in Modern Circuit Cases* at 143. Cooley notably did, elsewhere,

address the scope of the right to bear arms, but he specifically declined to analyze

the legitimacy of any restrictions on it:

> [H]ow far it may be in the power of the legislature to regulate the right
> [to keep and bear arms] we shall not undertake to say. Happily there
> neither has been, nor, we may hope, is likely to be, much occasion for
> an examination of that question by the courts.

THOMAS M. COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS 427 (6th ed.

1890).

Nor is it appropriate for this Court to infer, from a lack of challenges to state

laws limiting the firearm rights of minors, that such laws were viewed as comporting

with the Second Amendment. *See* State Br. at 50. But the historical record on this

point hardly tilts decisively in the State's favor—after all, there is just one case that

examined the constitutionality of these laws at all, and as discussed above, it rested

on grounds that were specifically rejected by the Supreme Court in *Heller*. It is not

48

clear from the record, in fact, that these laws were often enforced, an issue that could just as easily explain the lack of challenges to them. *See Bruen*, 142 S. Ct. at 2149.

## C. The Carry Ban Is Not A "Presumptively Lawful" "Longstanding Prohibition."

In *Heller*, the Supreme Court noted that it did "not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" but cautioned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places . . ." *Heller*, 554 U.S. at 626–27. The State seizes on this language and claims that its laws are "significantly more 'longstanding' " than those that were included in *Heller*'s list. State Br. at 52. Even if that were true, it would not matter. After *Bruen* clarified the analysis that must be applied to *every* Second Amendment challenge, *Heller*'s discussion of "longstanding" laws must be read as purely descriptive and without doctrinal significance. There is no exception to *Bruen* for laws older than the federal ban on felon possession of firearms (one metric the State chooses, which it dates to 1938). After all, the New York law at issue in *Bruen* was *itself* older than that law. *See* 142 S. Ct. at 2122 (dating New York's *Sullivan* law to 1911). Under *Bruen*, there is only one presumption, and it runs against the State.

## III. The State Has Waived Its Arguments Regarding Sovereign Immunity and *Ex parte Young*.

49

The State claims, in a footnote to its "Statement of Issues" preceding its brief, that "although not briefed substantively" it is not waiving "the issue of sovereign immunity and maintains the district court erred in determining that the *Ex parte Young* exception applies." State Br. at 2 n.1. A footnote, not even included in the body of the brief, which acknowledges that the State is not making any substantive argument on an issue, is insufficient to preserve it for this Court's review. *See, e.g.*, *Glasgow v. Nebraska*, 819 F.3d 436, 440 n.4 (8th Cir. 2016) (holding appellant forfeited right to challenge a decision because, although she alleged the decision "was error in her Statement of the Issues . . . her appellate brief contains no other reference to the issue"). In any event, even if not waived, the district court's opinion explains well why the State's arguments regarding *Ex parte Young* must be rejected. App. 44–47; R. Doc. 84, at 44–47.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

50

Dated: August 15, 2023

Respectfully submitted,

Blair W. Nelson

BLAIR W. NELSON LTD

205 Seventh Street NW, Ste. 3

Bemidji, MN 56601

Tel: 218-444-4531

bwnelson@paulbunyan.net

/s/ David H. Thompson

David H. Thompson (No. 17-0143)

Peter A. Patterson (No. 17-0144)

William V. Bergstrom (No. 23-0238)

COOPER & KIRK, PLLC

1523 New Hampshire Avenue, N.W.

Washington, D.C. 20036

(202) 220-9600

(202) 220-9601 (fax)

dthompson@cooperkirk.com

ppatterson@cooperkirk.com

wbergstrom@cooperkirk.com

*Attorneys for Plaintiffs-Appellees*

51

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 12,801 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionately spaced typeface using the 2016 version of Microsoft Word in 14-point Times New Roman font.

As required by Eighth Cir. R. 28A(h), this brief and the addendum have been scanned for viruses and are virus-free.

Date: August 15, 2023

/s/ David H. Thompson
David H. Thompson

Appellate Case: 23-2248    Page: 60    Date Filed: 08/16/2023 Entry ID: 5306404

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ David H. Thompson
David H. Thompson

Appellate Case: 23-2248    Page: 61    Date Filed: 08/16/2023 Entry ID: 5306404