# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

KRISTIN WORTH, et al.,

*Plaintiff-Appellees*,

v.

BOB JACOBSON, in his individual capacity and in his official capacity as Commissioner of the Minnesota Department of Public Safety.

*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of Minnesota
No. 21-cv-1348—Hon. Katherine Menendez.

## NATIONAL RIFLE ASSOCIATION OF AMERICA INC.'S AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFF-APPELLEE AND IN SUPPORT OF AFFIRMANCE

Michael T. Jean
Erin M. Erhardt
National Rifle Association of America –
Institute for Legislative Action
11250 Waples Mill Road
Fairfax, VA, 22030
703-267-1158
MJean@nrahq.org
EErhardt@nrahq.org

*Attorney for Amicus Curiae National Rifle Association of America*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Fed. R. App. P. 26.1(a), Amicus Curiae National Rifle Association of America, Inc., ("NRA") submits the following Corporate Disclosure Statement:

NRA is a nonprofit membership association incorporated in the state of New York. NRA is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

Date: August 23, 2023

*/s/ Michael T. Jean*
Michael T. Jean

*Attorney for Amicus Curiae the National Rifle Association of America*

ii

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

TABLE OF CONTENTS ................................................................................... iii

TABLE OF AUTHORITIES ............................................................................. iv

INTEREST OF AMICUS CURIAE...................................................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................ 2

ARGUMENT....................................................................................................... 4

    I.      YOUNG ADULTS ARE "THE PEOPLE" AND HAVE SECOND AMENDMENT RIGHTS. .................................................................. 4

        A.   Young adults have Second Amendment Rights because they were part of the militia. .................................................................................. 5

        B.   The Constitution's other references to "the people" show that young adults are the people.................................................................... 7

    II.    THERE IS NO HISTORY OR TRADITION OF BANNING YOUNG ADULTS FROM POSSESSING FIREARMS. ................................18

        A.   The statute fails a straightforward application of *Heller* and *Buren.*…….18

        B.   There are no relevant historical analogues banning young adults from keeping and bearing arms. ...........................................................19

CONCLUSION .................................................................................................28

CERTIFICATE OF COMPLIANCE....................................................................30

CERTIFICATE OF SERVICE............................................................................31

Appellate Case: 23-2248    Page: 3    Date Filed: 08/23/2023 Entry ID: 5309268

# TABLE OF AUTHORITIES

**Cases**

*Africa. v. Com. of Pa.*,
    662 F.2d 1025 (3d Cir. 1981) ..........................................................................16

*Alden v. Maine*,
    527 U.S. 706 (1999) ......................................................................................12

*Almeida–Sanchez v. United States*,
    413 U.S. 266 (1973) ......................................................................................17

*Application of Gault*,
    387 U.S. 1 (1967) ......................................................................................5, 8

*Barr v. United States*,
    324 U.S. 83 (1945) ........................................................................................15

*Binderup v. Atty. Gen. U.S. of Am.*,
    836 F.3d 336 (3d Cir. 2016) ...........................................................................7

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) ......................................................................................15

*Carrington v. Rash*,
    380 U.S. 89 (1965) ..........................................................................................9

*D.C. v. Heller*,
    554 U.S. 570 (2008) ................................................................................passim

*Denezpi v. United States*,
    142 S. Ct. 1838 (2022) ..................................................................................13

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ........................................................................................8

*Fla. v. J.L.*,
    529 U.S. 266 (2000) ........................................................................................8

*Healy v. James*,
    408 U.S. 169 (1972) ......................................................................................26

iv

Appellate Case: 23-2248    Page: 4    Date Filed: 08/23/2023 Entry ID: 5309268

*Logan v. United States*,
552 U.S. 23 (2007)......................................................................................12

*McCreary Cnty., Ky. v. Am. C.L. Union of Ky.*,
545 U.S. 844 (2005)....................................................................................16

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)....................................................................................26

*Minor v. Happersett*,
88 U.S. 162 (1874)......................................................................................13

*Morgan v. United States*,
113 U.S. 476 (1885)....................................................................................13

*Morse v. Frederick*,
551 U.S. 393 (2007)....................................................................................25

*Nat'l Rifle Ass'n of Am., Inc. v. Bondi*,
61 F.4th 1317 (11th Cir. 2023) .................................................................... 2

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185 (5th Cir. 2012) ......................................................1, 20

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
719 F.3d 338 (5th Cir. 2013) ....................................................................... 1

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) .........................................................................passim

*Powers v. Ohio*,
499 U.S. 400 (1991)...................................................................................... 9

*Range v. Att'y Gen. United States of Am.*,
69 F.4th 96 (3d Cir. 2023)...............................................................8, 17, 20

*Se. Promotions Ltd. v. Conrad*,
420 U.S. 546 (1975)....................................................................................28

*State v. Campbell*,
756 N.W.2d 263 (Minn. Ct. App. 2008)......................................................23

*State v. Hatch*,
962 N.W.2d 661 (Minn. 2021) ....................................................................19

Appellate Case: 23-2248      Page: 5      Date Filed: 08/23/2023 Entry ID: 5309268

*State v. McFee*,
    721 N.W.2d 607 (Minn. 2006) ........................................................................23

*Texas v. White*,
    74 U.S. 700 (1868) ..........................................................................................13

*Thiel v. Southern Pac. Co.*,
    328 U.S. 217 (1946) ........................................................................................10

*United States* v *Jackson*,
    69 F.4th 495 (8th Cir. 2023) .....................................................................20, 21

*United States v. Maxwell*,
    473 F.3d 868 (8th Cir. 2007) ..........................................................................10

*United States v. Miller*,
    307 U.S. 174 (1939) .......................................................................................... 6

*United States v. Ritchie*,
    58 U.S. 525 (1854) ..........................................................................................14

*United States v. Sitladeen*,
    64 F.4th 978 (8th Cir. 2023) ............................................................................ 4

*United States v. Verdugo–Urquidez,*
    494 U.S. 259 (1990) ......................................................................................... 8

*United States v. Woodall*,
    120 F.3d 880 (8th Cir. 1997) ..........................................................................12

*Wormley v. Wormley*,
    21 U.S. (8 Wheat.) 421 (1823) .......................................................................14

*Worth v. Harrington*,
    No. 21-cv-1348, 2023 WL 2745673 (D. Minn. Mar. 31, 2023) .................19, 27

**Constitutional Provisions**

Minn. Const. art. VII, § 1 ..................................................................................... 9

U.S. Const. amend. XXVI...................................................................................... 9

U.S. Const. art. I, § 2, cl. 1 ..................................................................................11

## Statutes

1 Stat. 271 ................................................................................. 5

18 U.S.C. § 921 ........................................................................12

18 U.S.C. § 922 ........................................................................12

28 U.S.C. § 1865 ......................................................................10

Minn. Stat. § 201.014 ................................................................ 9

Minn. Stat. § 624.714 ........................................................passim

Minn. Stat. § 645.451 ..............................................................22

Minn. Stat. § 645.452 ..............................................................22

## Other Authorities

Akhil Reed Amar, *The Bill of Rights* (1998) ................................5, 6, 11

Albert W. Alschuler & Andrew G. Deiss, *A Brief History of Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867 (1994) ...................................10

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495 (2019) ................................................... 5

Don B. Kates Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (Winter 1986) ..................................................................6, 7, 12

Elizabeth S. Scott, *The Legal Construction of Adolescence*, 29 Hofstra L. Rev. 547 (2000) ...................................................................................9, 22

Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181 (1940) ......................................................................6, 27

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461 (1995) ...................................................................7, 12, 14

Iran Cassim Mohsenin, *Note on Age Structure of College Students*, 23 Hist. of Educ. Q. 491 (1983) ..................................................................24, 25

Jon P. McClanahan, *The 'True' Right to Trial by Jury: The Founders' Formulation and Its Demise*, 111 W. Va. L. Rev. 791 (2009) ................................10

Kelly Sarabyn, *The Twenty-Sixth Amendment: Resolving the Federal Circuit Split over College Students' First Amendment Rights*, 14 Tex. J. C.L. & C.R. 27 (2008) .......................................................................................25, 26

S. Rep. No. 92-26 (1971) ......................................................................26

*The Exclusion of Young Adults from Juries: A Threat to Jury Impartiality*, 66 J. Crim L. & Criminology 150 (June 1975) ...........................................10, 22

The Federalist No. 46 (C. Rossiter ed. 1961) ........................................ 6

*The Meaning(s) of "The People" in the Constitution*, 126 Harv. L. Rev. 1078 (2013) ..............................................................................................11

**Rules**

Fed. R. App. 29 ..................................................................................... 1

Minn. Gen. R. Prac. 808(b)(2) ..............................................................10

Appellate Case: 23-2248     Page: 8     Date Filed: 08/23/2023 Entry ID: 5309268

## INTEREST OF AMICUS CURIAE[1]

The National Rifle Association of America, Inc., ("NRA") is America's oldest civil-rights organization and is widely recognized as America's foremost defender of Second Amendment rights. The NRA was founded in 1871, by Union generals who, based on their experiences in the Civil War, desired to promote marksmanship and expertise with firearms among the citizenry. Today, the NRA has over 4 million members, and its programs reach millions more. The NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement.

The NRA has a significant interest in this case because many of its members are young adults, between the ages of 18 and 20, who wish to exercise their Second Amendment rights, including the right to carry a firearm. The NRA has been litigating this issue for a decade. *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338 (5th Cir. 2013); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185 (5th Cir. 2012), *abrogated by New York State*

---

[1] All parties have consented to the filing of this brief in accordance with Fed. R. App. 29(a)(2). No counsel for a party authored this brief in whole or in part. No party or party's counsel made contributions to fund the preparation or submission of this brief. No person, other than the NRA, its members or its counsel, made contributions to fund the preparation or submission of this brief.

1

*Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The NRA currently has a case challenging a Florida statute prohibiting transfers of firearms to young adults before the Eleventh Circuit, which recently granted en banc review. *Nat'l Rifle Ass'n of Am., Inc. v. Bondi*, 61 F.4th 1317 (11th Cir. 2023), *reh'g en banc granted, opinion vacated*, 72 F4th 1346 (11th Cir. 2023). This case will likely get resolved before and will affect *Bondi*, which has been stayed until the Supreme Court decides *United States v. Rahimi*, No. 22-915. *See* Memorandum to Counsel or Parties, No. 21-12314, Dkt. 88 at *1 (11th Cir. July 21, 2023). The NRA therefore has a great interest in the outcome of this case.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Second Amendment preserved the right of the people to keep and bear arms, including the right to carry a handgun outside the home for self-defense. But Minnesota prohibits anyone under the age of 21, including law-abiding citizens over 18-years-old (young adults) from obtaining a permit to exercise their right to bear arms. This prohibition cannot stand under the Second Amendment.

Young adults are "the people" under the Second Amendment. At the founding, they were members of the militia, a group comprised solely of "the people" and is therefore a subset of "the people." They also were, and are, members of the polit-

2

ical or national community at the founding; the Supreme Court has consistently interpreted those terms to mean ordinary citizens. They have also gained political rights over time, which often go hand-in-hand with the right to keep and bear arms. So even if they were not among "the people" at the founding, they absolutely are now, and their Second Amendment rights are protected as a result. That is because Second Amendment is adaptable to human affairs and applies to circumstances beyond those the Founders specifically anticipated, like certain "arms" that did not exist at the founding. Its application to "the people" must be the same.

Because Minnesota has denied young adults their Second Amendment rights, it must identify a relevantly similar, historical tradition of law doing the same; otherwise the prohibition must be stricken. It cannot and has not done so. Founding era prohibitions on distrusted groups are not relevantly similar to Section 624.714's prohibition because young adults were not among the distrusted groups then. Young adults also have political rights and several other legal privileges that show they are trusted members of the community who can make responsible choices. The three college restrictions on firearm possession do not suffice; three restrictions are not enough to establish a tradition. Those college restrictions applied primarily to people under the age of 18 who had very few rights at the time. The other regulations are

3

too late in time. The relevant time frame is 1791. The Second Amendment preserved a preexisting right, just like the First and Fourth Amendments, which also get interpreted according to their original understanding in 1791. And the Supreme Court's jurisprudence clearly indicates a preference for 1791 when it comes to the Second Amendment. The district court was correct that Section 624.714 infringes on young adults' Second Amendment rights. This Court should affirm.

## ARGUMENT

To determine whether a regulation violates the Second Amendment, "a court must begin by asking whether the firearm regulation at issue governs conduct that falls within the plain text of the Second Amendment." *United States v. Sitladeen*, 64 F.4th 978, 985 (8th Cir. 2023) (citing *Bruen*, 142 S. Ct. at 2126). "If the regulation does govern such conduct, the court will uphold it so long as the government can 'identify an American tradition justifying' the regulation." *Id*. (quoting *Bruen*, 142 S. Ct. at 2138). Section 624.714, subds. 1(a) and 2(b)(2), fails this test. It bans young adults, who are "the people," from exercising their Second Amendment right to carry a firearm, and there are no relevantly similar historical justifications for it.

## I. YOUNG ADULTS ARE "THE PEOPLE" AND HAVE SECOND AMENDMENT RIGHTS.

4

**A. Young adults have Second Amendment Rights because they were part of the militia.**

**1.** "The first salient feature of the [Second Amendment's] operative clause is that it codifies a 'right of the people.'" *D.C. v. Heller*, 554 U.S. 570, 579 (2008). The text does not impose any limitations on who the people are. "We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans," *id*. at 581, including young adults above the age of 18— "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone," *Application of Gault*, 387 U.S. 1, 13 (1967).

**2.** The other group referenced in the Second Amendment's text is the militia. "[T]he version of the [Second Amendment] that initially passed in the House, only to be stylistically shortened in the Senate, explicitly defined the militia as 'composed of the body of the people.'" Akhil Reed Amar, *The Bill of Rights* *51–52 (1998) ("Amar") (citation omitted). Indeed, the Supreme Court has said "the 'militia' in colonial America consisted of a subset of 'the people'—those who were male, able bodied, and within a certain age range." *Heller*, 554 U.S. at 580. Officially, that age range was 18 to 45 under the Militia Act of 1792. *Id*. at 596 (quoting Act of May 8, 1792, 1 Stat. 271); *see also* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 533–86 (2019) (collecting

5

state and colonial militia statutes with similar age ranges). Young adults were, therefore, the militia and the people under the law.

Young adults were the militia in practice, too. It was generally understood that "the Militia comprised all males physically capable of acting in concert for the common defense." *United States v. Miller*, 307 U.S. 174, 179 (1939). The militia reflected the local community—the Constitution does not allow the militia to cross international borders, and the militia often refused to leave the state. Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, 189–90, 192 (1940). At the bottom of the ranks, militia members served "alongside their families, friends, neighbors, classmates, and fellow parishioners." Amar at *55; *id.* n*. Indeed, Madison estimated that the "militia amount[ed] to near a half a million citizens," The Federalist No. 46, at 296 (C. Rossiter ed. 1961), a number that could not be obtained without including young adults.

Some scholars, moreover, have argued that the "right to arms was inextricably and multifariously tied to that of the 'virtuous citizen.'" Don B. Kates Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (Winter 1986). The virtuous citizen theory holds that free, republican institutions need virtuous citizens to function. *Id.* "[T]he ultimate expression of civic virtu[e]" was militia service, i.e.,

6

defending the republic. *Id*. Certain individuals, however, were deemed "incapable" of having the virtue to exercise those rights, including "criminals," "children[, and] the mentally unbalanced." *Id*. But because individuals above the age of 18 were members of the militia, they were not "children" under the virtuous citizen theory.[2] They were indeed virtuous citizens who had the right to keep and bear arms.[3]

Because young adults were members of the militia, a subset of "the people," they are unquestionably "the people." The whole is necessarily comprised of its parts: "The right to arms always extended beyond the core membership of the militia, encompassing those (like women, seamen, clergymen, and those beyond the upper age for militia service) who could not be called out for militia duty." Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995).

### B. The Constitution's other references to "the people" show that young adults are the people.

---

[2] Minnesota misses this point in its discussion of the virtuous citizen theory. Minnesota Brief at *25–26.

[3] The virtuous-citizen theory has been criticized as being "vague" and "belied by the historical record." *Binderup v. Atty. Gen. U.S. of Am*., 836 F.3d 336, 358 (3d Cir. 2016) (Opinion of Hardiman, J.,). Although it is flawed, Section 624.714 nevertheless fails under it.

7

The Constitution mentions "the people" in six other provisions, and "the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. "The people" "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* (quoting *United States v. Verdugo–Urquidez,* 494 U.S. 259, 265 (1990)) (quotations omitted). That unequivocally includes young adults.

**1.** Nobody denies that young adults have the right to peaceably assemble and petition the government under the First Amendment or be free from unreasonable searches and seizures under the Fourth. Even minors under the age of 18 have those rights. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212 (1975) ("minors are entitled to a significant measure of First Amendment protection"); *Fla. v. J.L.*, 529 U.S. 266, 273 n.* (2000) ("[T]he fact that [a juvenile] was under 21 in no way made the gun tip more reliable than if he had been an adult."). There is no reason to interpret the Second Amendment differently to exclude young adults. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101–02 (3d Cir. 2023) (en banc); *Application of Gault*, 387 U.S. at 13.

**2.** Adult citizens have ties to the community. The biggest indication of that is

8

that they have political rights. They obtain the right to vote upon turning 18. U.S. Const. amend. XXVI; Minn. Const. art. VII, § 1 (allowing 18-year-old citizens the right to vote). "The right to vote has long been the defining marker of legal adulthood and the age of majority has been linked with this important symbol of full-fledged citizenship." Elizabeth S. Scott, *The Legal Construction of Adolescence*, 29 Hofstra L. Rev. 547, 562 (2000). The right to vote, to choose those responsible for governing our daily lives, is at "the core of our constitutional system." *Carrington v. Rash*, 380 U.S. 89, 96 (1965).[4]

Next comes jury service. Writing for the Court in *Powers v. Ohio*, Justice Kennedy proclaimed "with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." 499 U.S. 400, 407 (1991). That has always been the case. The Founding Fathers "believed that juries played an essential role in the success of a

---

[4] Voting residency requirements ensure that the local community's voice will not be overtaken by outsiders who lack sufficient ties to the community. *E.g.*, *Carrington*, 380 U.S. at 93. Minnesota has a 20-day residency requirement to vote. Minn. Stat. § 201.014, subd. 1(3). If ties to the community were a concern for the state, then being a resident for 20 days would quell that concern. The state, however, issues permits to both residents and non-residents. Minn. Stat. § 624.714, subd. 2. So community ties do not seem to be an issue.

9

democracy" by providing an additional check on all three branches of the government. Jon P. McClanahan, *The 'True' Right to Trial by Jury: The Founders' Formulation and Its Demise*, 111 W. Va. L. Rev. 791, 803 (2009). Indeed, "the Founders conceived of the jury as a 'bulwark against the unjust use of governmental power.'" *Id.* at 804.[5]

Young adults this have "duty [and] privilege of citizenship." *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 224 (1946); 28 U.S.C. § 1865(b)(1), Minn Gen. R. Prac. 808(b)(2). That proves that they have sufficient ties to the community; otherwise, they would be struck from the jury de facto based on their age. *United States v. Maxwell*, 473 F.3d 868, 872 (8th Cir. 2007) ("The absence of community attachment is a legitimate, race-neutral reason for striking a juror.") (collecting authorities).

In fact, some scholars have taken a narrower view and argued that Second Amendment rights are political rights, primarily connected with the right to vote.

---

[5] Jury-eligibility requirements traditionally tracked voter-eligibility requirements and were often more onerous. Albert W. Alschuler & Andrew G. Deiss, *A Brief History of Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867, 928 n.52 (1994). Ratification of the Twenty-Sixth Amendment, however, prompted jurisdictions to lower the minimum-age requirement to 18. *The Exclusion of Young Adults from Juries: A Threat to Jury Impartiality*, 66 J. Crim L. & Criminology 150, 150 (June 1975), https://doi.org/10.2307/1142778.

Appellate Case: 23-2248     Page: 18     Date Filed: 08/23/2023 Entry ID: 5309268

Amar at *48 n.* ("There is some fuzziness at the edges, but arms bearing and suffrage were intimately linked two hundred years ago and have remained so.").[6] This is for two main reasons. First, the only other time that the original Constitution uses the phrase "the people" (outside of the Preamble), it refers to voters. U.S. Const. art. I, § 2, cl. 1 (requiring House members to be "chosen … by the People."). Second, groups often obtained the right to vote after bearing arms for their country. In the United States, expanded enfranchisement began when militiamen who fought in the Revolution—but did not meet the property-owning criteria to vote—were trusted and allowed to vote on the federal Constitution. Amar at 48 n* (citation omitted). This trend continued for close to two centuries. The Fifteenth, Nineteenth and Twenty-Sixth Amendments were greatly influenced by blacks' service to the Union in the Civil War, women's service in World War I, and young adults' service in the Vietnam War. *Id.* (citations omitted).

This is consistent with the virtuous citizen theory discussed above. Although

---

[6] One scholar that Minnesota relies on, Minnesota Brief at *17, suggests that only "'eligible voters'" are the people under *Heller. The Meaning(s) of "The People" in the Constitution*, 126 Harv. L. Rev. 1078, 1079 (2013). The NRA does not suggest that *Heller sub silentio* altered First and Fourth Amendment jurisprudence so that only voters have First and Fourth Amendment rights as this article suggests. The NRA only argues that voters are unequivocally included amongst the people in the First, Second, and Fourth Amendments.

11

defending the republic was the "hallmark" of civic virtue, Kates, 49 Law & Contemp. Probs. at 146, it is by no means the only way republican institutions depended on virtuous citizens. "[T]he republican conception … rests on the understanding of its citizens precisely that the government is not above them, but of them." *Alden v. Maine*, 527 U.S. 706, 802 (1999) (Souter, J., dissenting). Again, the right to vote is the most obvious because there cannot be a government of the people unless the people vote. Unvirtuous citizens, therefore, "were excluded from the right to arms precisely as (and for the same reasons) they were excluded from the franchise." Reynolds, 62 Tenn. L. Rev. at 480.[7]

The fact that young adults have these political rights shows that they have sufficient ties to the community under *Heller*. That also means they are "the people" under the Second Amendment.

**3.** But wait, Minnesota says, "'constitutional rights are enshrined with the

---

[7] Congress and the courts have continually linked political rights to the right to bear arms. Felons and individuals with misdemeanor domestic-violence convictions are deprived of their right to bear arms until they have gotten their "civil rights restored." 18 U.S.C. §§ 921(a)(20), (33), 922(g)(1), (9). The Supreme Court held "that the civil rights relevant under the … provision are the rights to vote, hold office, and serve on a jury." *Logan v. United States*, 552 U.S. 23, 28 (2007); *see also United States v. Woodall*, 120 F.3d 880, 881–82 (8th Cir. 1997) (noting that these are the "'core civil rights'") (citation omitted).

Appellate Case: 23-2248    Page: 20    Date Filed: 08/23/2023 Entry ID: 5309268

scope they were understood to have *when the people adopted them*,' it is clear that minors 18-to-20-years old were not part of the political community during the founding or reconstruction eras." Minnesota Brief at *14 (emphasis in original) (citations and footnotes omitted). That conclusion is wrong on at least two accounts.

*First*, it misunderstands the political community, a term that the Supreme Court has consistently used in reference to either a particular government body or the people subject to a particular government body. *Texas v. White*, 74 U.S. 700, 720 (1868), *overruled by Morgan v. United States*, 113 U.S. 476 (1885) (noting that a "state" is a "political community" under the Constitution, but sometimes "state" refers to "a people or political community, as distinguished from a government"); *Denezpi v. United States*, 142 S. Ct. 1838, 1845 (2022) ("[B]efore Europeans arrived on this continent, tribes 'were self-governing sovereign political communities' with 'the inherent power to prescribe laws for their members and to punish infractions of those laws.'") (citation omitted). A political community is "an association of persons for the promotion of their general welfare." *Minor v. Happersett*, 88 U.S. 162, 165–66 (1874). A member of the political community is synonymous with a "'subject,' 'inhabitant,' and 'citizen.'" *Id*. at 166. The national community is a political community, and both terms refer to "the people."

13

Young adults were citizens, subjects, and inhabitants of states, subject to the laws therein. The Supreme Court has been clear that even women and minors were "citizens," either by native birth or naturalization, during the founding era. *Wormley v. Wormley*, 21 U.S. (8 Wheat.) 421, 451 (1823); *United States v. Ritchie*, 58 U.S. 525, 526 (1854). Young adults, moreover, promoted the general welfare of the state. The most obvious example of that is their militia service. Scholars have pointed out that colonial and founding era militia duty is similar to jury duty, Reynolds, 62 Tenn. L. Rev. at 486, a right and obligation of citizenship. Young adults executed their duty to promote the general welfare of the community. They were members of the political community at the founding.

*Second*, it is ultimately of no matter if young adults were not members of the political community at the founding because they absolutely are now. Remember that "the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs.'" *Bruen*, 142 S. Ct. at 2132 (citation omitted). The Constitution's "meaning is fixed according to the understandings of those who ratified it" but "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* (citation omitted).

14

The Supreme Court has twice explained that although the term "arms" has a "historically fixed meaning,"—"'arms' does not apply 'only [to] those arms in existence in the 18th century.'" *Id.* (quoting *Heller*, 554 U.S. at 582) (alteration in original). "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.* (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016) (*per curiam*) (holding that stun guns are protected arms even though they did not exist at the founding or reconstruction)); *Barr v. United States*, 324 U.S. 83, 90 (1945) ("[I]f Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators.").

So too, then, must be the case with "the people." Its meaning is fixed according to its historical understanding, but it is not limited only to the individuals who comprised "the people" at the founding. To hold otherwise would subject one noun in the Second Amendment's operative clause (people) to a different standard of interpretation than the other (arms), and there is nothing in the Second Amendment's text suggesting that the two nouns should be interpreted differently. *See Bruen*, 142 S. Ct. at 2134 ("Nothing in the Second Amendment's text draws a home/public

15

distinction with respect to the right to keep and bear arms."). Indeed, the Court would not entertain an argument that newly discovered indigenous populations should not receive equal protection of the law under the Fourteenth Amendment or be denied the right to vote (if they obtained citizenship) in accordance with the Fifteenth Amendment because their race was unknown in 1868 or 1870. That argument would be beyond "bordering on the frivolous." *Heller*, 554 U.S. at 582.

Yet that is what Minnesota argues: "The political community at the time of the founding was eligible voters, namely white, male, yeomen farmers. The political community 'as it then existed' was 'free, Christian, white men.'" Minnesota Brief at *17 (citations omitted). That argument is wrong under the Second Amendment. It is also wrong under the First and Fourth Amendments, both of which use "the people," and both of which apply to beyond white, Christian men. *Africa. v. Com. of Pa.*, 662 F.2d 1025, 1032 n.12 (3d Cir. 1981) (new religions are protected) (citation omitted); *McCreary Cnty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844, 884 (2005) (O'Connor, J., concurring) (same).

With that argument, Minnesota is trying to have its cake and eat it, too. It argues that "the people" is fixed to its historical meaning, but the classes of people who can be deprived of their rights change based on the whim of the present-day

16

legislative branch: "Legislatures may fill in the details [of who is categorically un-protected by the Second Amendment] 'based on present-day judgments about categories of people whose possession of guns would endanger the public safety.'" Minnesota Brief at *27. (citation omitted).[8] The Supreme Court and the Third Circuit have already rejected this type of argument. *Range*, 69 F.4th at 105 ("[H]istorical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there.") (quoting *Bruen*, 142 S. Ct. at 2134); *Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."). This Court should reject it, too.

*     *     *

Young adults are "the people" under the Second Amendment. Wherever the outer boundaries of "the people" may ultimately be, it is unquestionable that members of the founding-era militia and citizens who hold political rights fall safely within. Young adults therefore have the right to carry a firearm, the same right at

---

[8] Of course the state cannot suspend an individual's rights by merely calling them dangerous. *Cf. Almeida–Sanchez v. United States,* 413 U.S. 266, 273 (1973) ("The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards").

17

issue in *Bruen*.

## II. There is no history or tradition of banning young adults from possessing firearms.

The burden now falls on Minnesota to identify a historical tradition banning young adults from carrying firearms. *Bruen*, 142 S. Ct. at 2135. It cannot do so under the straightforward application of *Heller* and *Bruen*, which is the end of the matter. But even if reasoning by analogy to historical restrictions were appropriate, § 624.714 still cannot pass muster.

### A. The statute fails a straightforward application of *Heller* and *Buren*.

The state cannot justify § 624.714 under *Bruen*. Here, "that inquiry [is] fairly straightforward." *Bruen*, 142 S. Ct. at 2131. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*.

Section 624.714 addresses a general societal problem. "[T]he purpose of the permit-to-carry statute is 'to prevent the possession of firearms in places where they are most likely to cause harm in the wrong hands, i.e., in public places where their discharge may injure or kill intended or unintended victims.'" *State v. Hatch*, 962

18

N.W.2d 661, 664 (Minn. 2021), *cert. denied sub nom.* 142 S. Ct. 768 (2022) (citation omitted); *see also* Minnesota Brief at *28 ("Minnesota made a determination that this age group posed a risk to public safety."). That is the same general societal problem that existed since the founding and was at issue in *Heller* and *Bruen*. *Bruen*, 142 S. Ct. at 2131. And the district court correctly noted that "[o]ther courts looking for historical restrictions from the founding era on the rights of 18-to-20-year-olds to keep and bear arms have similarly come up empty." *Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *15 (D. Minn. Mar. 31, 2023) (citations omitted). The district court was right. Minnesota cannot meet its burden under this straightforward application of *Heller* and *Bruen*.

### B. There are no relevant historical analogues banning young adults from keeping and bearing arms.

Failing to meet its burden under the straightforward application of *Heller* and *Buren* should be the end for Minnesota. But it attempts to argue that the ban is relevantly similar to historical analogues. To succeed, Minnesota must show that the ban "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. It must show this through analogical reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in

19

original). Because the ban addresses a general historical problem that existed since the founding, the historical analogue must be "distinctly similar" to the modern regulation. *Id.* at 2131. The analogue's similarity is measured by "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Minnesota cannot meet that burden.

**1.** Minnesota tries to shoehorn its ban in with other categorical bans, such as bans on "on the possession of firearms by felons and the mentally ill," *Heller*, 554 U.S. at 626, and other "certain groups of people," *United States* v *Jackson*, 69 F.4th 495, 502 (8th Cir. 2023). Those comparisons miss the mark.

It is true that "founding-era governments disarmed groups they *distrusted* like Loyalists, Native Americans, Quakers, Catholics, and Blacks." *Range*, 69 F.4th at 105 (emphasis added). The Fifth Circuit likewise described these founding era restrictions as bans against the "'untrustworthy,'" "'suspect groups,'" or groups "'deemed likely to disrupt society.'" *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 200 (5th Cir. 2012) (citations omitted). And this Court recently noted that those bans were addressing a purported threat "'to an orderly society and compliance with its legal norms,'" which is why *Buren* repeatedly said "that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms." *Jackson*, 69 F.4th

20

at 503 (citations omitted).

Minnesota reads these prohibitions "far too broadly." *Bruen*, 142 S. Ct. at 2134. Young adults are not a distrusted or suspect group likely to disrupt society. They would not have been entrusted with any political rights if they were. They would also be forbidden from serving in the armed forces, which requires swearing an oath of allegiance to Constitution. Simply put, young adults do not pose a risk of societal revolution like the other disarmed groups were thought to have posed.

**2.** Minnesota similarly tries to argue that there is a tradition of regulating a group based upon a determination that they pose a risk to public safety, are irresponsible, or are dangerous. Minnesota Brief at *24. It claims that young adults "were 'infants' in the eyes of the law, lacking in judgment and existing under strict parental authority." *Id.* at *6. It also argues that young adults' "rational thinking is overridden by more 'impulsive, emotional, or irrational behavior.'" *Id.* at *21 n.8, *28 ("impulsivity"). Again, these arguments miss the mark.

*First*, there was no historical determination that the age of majority was 21 because of mental maturity. "The common law age of majority was twenty-one, apparently because, in the Middle Ages, most men were presumed capable of carrying armor at this age." Elizabeth S. Scott, *The Legal Construction of Adolescence*, 29

21

Hofstra L. Rev. 547, 558 (2000); *The Exclusion of Young Adults from Juries: A Threat to Jury Impartiality*, 66 J. Crim. L. & Criminology 150, 158 n.69 (1975) (The "change in the minimum age for knighthood, [was not due] to any recognition of increased maturity or competency, but to the increased weight of armor and need for extra training in combat skills and chivalry. This age was then carried over into the common law.") (citation omitted). Twenty-one was a historical relic from the Middle Ages. Its justification was gone by the founding. Minnesota Brief at *21 (noting that minors had "the physical strength" to muster for the militia).

*Second*, the state cannot seriously argue that young adults lack proper judgment or the ability to exercise rational decision making considering the other rights that it has given them. The obvious ones, again, are the political rights. And that argument, if accepted, calls into question every conviction rendered by a jury with a young adult on it. Minnesota also gives young adults several other important legal responsibilities. *E.g.,* Minn. Stat. §§ 645.451–645.452 (18 is the age of majority). They can sue and be sued—as Ms. Worth is doing here. They have the authority to manage their own affairs through a number of legal instruments: They can sign a will or a legally binding contract; they can create a power of attorney or serve as an attorney-in-fact—a fiduciary relationship. *State v. Campbell*, 756 N.W.2d 263, 271

22

(Minn. Ct. App. 2008). They leave the juvenile justice system, which has a greater focus on rehabilitation, and enter adult justice system, which has a greater focus on punishment. *State v. McFee*, 721 N.W.2d 607, 612 (Minn. 2006) (citation omitted). The state would not permit any of that, if it truly thought young adults were incapable of making rational decisions.[9]

**3.** Minnesota next turns to three university codes of conduct that prohibited possessing firearms on campus. These arguments are, again, off target.

*First*, *Bruen* was clear when it said that "we doubt that *three* colonial regulations could suffice to show a tradition" of regulation. 142 S. Ct. at 2142 (emphasis in original). Three college regulations are simply not enough. But even worse, there were 23 colleges in the country in 1800, as opposed to 13 colonies.[10] *Bruen* also emphasized that "the bare existence of … localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition." 142 S. Ct. at

---

[9] And if an individual young adult actually does pose a threat to themselves or the public, then the state could make that finding and deny the permit, just like it does for adults over the age of 21. Minn. Stat. § 624.714, subd. 6(3).

[10] *The History of Higher Education in the United States*, WorldWideLearn, https://www.worldwidelearn.com/articles/history-higher-education/ (last visited Aug. 17, 2023).

Appellate Case: 23-2248     Page: 31     Date Filed: 08/23/2023 Entry ID: 5309268

2154. There were only around 1,000 students subject to the three university regulations.[11] This argument is a nonstarter. The math simply does not work.

*Second*, the college bans were not relevantly similar because college students were significantly younger during the founding era. The average age of matriculation at schools in the years leading up to the American Revolution was just 15. Iran Cassim Mohsenin, *Note on Age Structure of College Students*, 23 Hist. of Educ. Q. 491, 492 (1983). Indeed, at the beginning of the eighteenth century, it was not uncommon to admit students as young as 10 or 11 years old. *Id.* at 492–493. Consequently, students graduated at much younger ages; for instance, the average age of graduates of the University of Pennsylvania in 1812 was 17. *Id.* at 493.

Thus, the student body in early America was not comprised of young adults who enjoyed the full rights of citizenship. Rather, those students were both legally and socially considered children below the age of majority. *See* Kelly Sarabyn, *The*

---

[11] Erika Lindemann, *True and Candid Compositions: The Lives and Writings of Antebellum Students at the University of North Carolina* ch. 3, available at https://docsouth.unc.edu/true/chapter/chp03-01/chp03-01.html (last visited Aug. 17, 2023) (151 students at UNC in 1839, the year after it enacted its arms prohibition); Larry B. Dendy, *Through the Arch: An Illustrated Guide to the University of Georgia Campus* 4 (2013) (UGA had 100 students in 1859); Judith Schiff, *A Brief History of Yale*, Yale Library, https://guides.library.yale.edu/yalehistory (last visited Aug. 17, 2023) (Yale had 755 students in 1870).

24

*Twenty-Sixth Amendment: Resolving the Federal Circuit Split over College Students' First Amendment Rights*, 14 Tex. J. C.L. & C.R. 27, 51 (2008); *see also Nat'l Rifle Ass'n of Am*, 700 F.3d at 201. "The extreme youth of students was ample justification, in the eyes of early college administrators, to enforce strict discipline and regulate every aspect of student life." Mohsenin, 23 Hist. of Educ. Q. at 493.

In fact, early American schools at all levels followed the doctrine of *in loco parentis*, under which a parent "delegate[d] part of his parental authority, during his life, to the tutor or schoolmaster of his child" including the power "of restraint and correction." *Morse v. Frederick*, 551 U.S. 393, 413 (2007) (Thomas, J., concurring) (citation omitted); *see also* Sarabyn, 14 Tex. J. C.L. & C.R. at 70–71 ("The in loco parentis model arose, historically, precisely because the university's much younger students were viewed as children in need of guidance.").

However, *in loco parentis*, at least at the college level, was abrogated with the ratification of the Twenty-Sixth Amendment in 1971. The Senate that recommended enactment of the Twenty-Sixth Amendment "emphasized that the young adults who would be enfranchised under the new amendment were 'mentally and emotionally capable of full participation in our democratic form of government….' The common law age of majority was dismissed as a matter of historical accident." Scott, 29

25

Hofstra L. Rev. at 563 (quoting Senate Comm. On the Judiciary, Lowering the Voting Age to 18, S. Rep. No. 92-26, at 7 (1971) ); *see also id*. at 559; Sarabyn, 14 Tex. J. C.L. & C.R. at 65 (The Twenty-Sixth Amendment "would permanently end the legitimacy of the paternalistic legal relationship between students and the university.").

Just one year after ratification of the Twenty-Sixth Amendment, the Supreme Court held that "the principles of the Bill of Rights" apply to young adults in college. *Healy v. James*, 408 U.S. 169, 194 (1972); *see also id*. at 197 (Douglas, J., concurring). Young adult citizens now enjoy the rights protected by the First Amendment, just as older citizens of the community do. And because the right to bear arms is "not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees,'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)), young adult citizens are similarly entitled to the enjoyment of the rights protected by the Second Amendment.

**4.** Lastly, the other historical restrictions on which the state relies are inapposite. Local ordinances are insufficient to form a historical tradition. *Bruen*, 142 S. Ct. at 2154, 2156. The others are too late in time. *Bruen* categorized two 1870s Texas Supreme Court cases as "late-19th-century." *Id*. at 2153; *see also id.* at 2137 ("'mid-

26

to late 19th-century courts come too late to provide insight into the meaning of the Constitution in 1787'") (cleaned up). It also categorized territorial laws from 1868–1890 as "late-19th-century." *Id*. at 2154. And it unequivocally stated that reliance on these laws had "several serious flaws even beyond their temporal distance from the founding." *Id*. That combined with the Court's acknowledgment that it has generally held that the Bill of Rights' meaning "is pegged to the public understanding … in 1791" seems to have, at least implicitly, resolved the debate about whether 1791 or 1868 is the relevant time for interpreting the Second Amendment. *Id*. at 2137–2138 (citing First, Fourth, and Sixth Amendment precedent holding that 1791 was the relevant time).

Moreover, the Militia Act of 1792 remained untouched by Congress until the Dick Act, which essentially established the National Guard, was passed at the behest of the Teddy Roosevelt administration in 1903. Wiener, 54 Harv. L. Rev. at 193–95. Thus, young adults were "the people" long before and long after the Fourteenth Amendment was ratified.

The district court was right when it concluded that there are "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people.'" *Worth*, 2023 WL 2745673, at *11. This Court, too, should find

27

that 1791 is the relevant timeframe, especially because the Second Amendment, like the First and Fourth, "codified a *pre-existing* right," *Heller*, 554 U.S. at 592; *Bruen*, 142 S. Ct. at 2137–38.

*     *     *

At the end of the day, Minnesota has not met is burden. Young adults are "the people," and there is no historical tradition of similar laws restricting their abilities to carry a firearm. They cannot be denied a permit to carry based on their age alone. As the Supreme Court said almost 50 years ago: "[A] free society prefers to punish the few who abuse [their] rights … after they break the law than to throttle them and all others beforehand." *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975). Section 624.714 does not comply with that edict. It cannot stand.

## CONCLUSION

For the foregoing reasons, the district court's decision should be affirmed.

Date: August 23, 2023   Respectfully submitted:

*/s/ Michael T. Jean*
Michael T. Jean
Erin M. Erhardt
National Rifle Association of America – Institute for Legislative Action
11250 Waples Mill Road
Fairfax, VA, 22030

28

703-267-1158
MJean@nrahq.org
EErhardt@nrahq.org

*Attorney for Amicus Curiae the National Rifle Association of America*

29

# CERTIFICATE OF COMPLIANCE

As required by Federal Rule of Appellate Procedure 32(g), I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 29(a)(5) because it contains 6,450 words, excluding the portions of the brief that are exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

This brief also complies with Circuit Rule 28A(h)(2) because it has been scanned for viruses and is virus free.

Date: August 23, 2023

*/s/ Michael T. Jean*
Michael T. Jean

*Attorney for Amicus Curiae the National Rifle Association of America*

30

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: August 23, 2023

*/s/ Michael T. Jean*
Michael T. Jean

*Attorney for Amicus Curiae the National Rifle Association of America*

31